ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# IN UNITED STATES DISTRICT COURT
*for the*
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

2011 APR -8  PM 2: 35

DEPUTY CLERK

| | |
|---|---|
| R. Lance FLORES, and<br>Vicki CLARKSON,<br><br>    *Plaintiffs,*<br><br>     v.<br><br>Scott Anthony KOSTER,<br>Kerim S. EMRE,<br>Thomas P. HARLAN,<br>Mark Alan GELAZELA a.k.a. Mark Zella,<br>William Chandler REYNOLDS,<br>Steven E. WOODS,<br>Richard HALL,<br>Winston Jerome COOK,<br>ALICORN CAPITAL MANAGEMENT LLC,<br>IDLYC HOLDINGS TRUST LLC (USA),<br>IDLYC HOLDINGS TRUST (New Zealand),<br>BMW MAJESTIC LLC,<br>COOK BUSINESS SERVICES LLC,<br>BEREA INC, and<br>John/Jane DOE(s) 1-8,<br>    *Defendants,*<br>and<br>IBALANCE LLC,<br>GODSPEEDS ENDEAVORS LLC,<br>GODSPEEDS, INITIATIVE LLC,<br>GODSPEEDS, ENTERTAINMENT,<br>SPIN ENTERTAINMENT,<br>Vladimir PIERRE-LOUISE,<br>Christine WONG-SANG, and<br>TULIN EMRE a.k.a. Tulin Tulay Reid, Solely<br>for the Purpose of Equitable Relief,<br>    *Nominal Defendants.* | **CIVIL ACTION**<br><br>**3-11CV-726-M**<br><br>№<br><br><br><br>**PLAINTIFFS'<br>ORIGINAL<br>COMPLAINT** |

## PLAINTIFFS' ORIGINAL COMPLAINT

## PLAINTIFFS' ORIGINAL COMPLAINT

## CONTENTS

§ I   PARTIES ................................................................. 2

1.1 PLAINTIFFS .................................................... 2
    1.1.1   Plaintiff, Rudolph Lance Flores ............................... 2
    1.1.2   Plaintiff, Vicki Clarkson ..................................... 2

1.2 DEFENDANTS ................................................... 2
    1.2.1   Presently, Defendants Steven E. Woods, Mark A. Gelazela, BMW
MAJESTIC LLC, IDLYC HOLDINGS TRUST LLC, AND IDLYC
HOLDINGS TRUST and Nominal Defendant IBALANCE LLC are named as
defendants or relief defendants in a complaint filed in the United States
District Court for the Central District of California, Los Angeles Division, on
February 24, 2011, Case No. SACV11-00314, by the United States Securities
and Exchange Commission in what appears, at this time, to be an unrelated
case of similar nature ......................................... 2
    1.2.2   Scott Anthony Koster individually and d/b/a Interlink Global
Messaging ..................................................... 2
    1.2.3   Kerim S. Emre ............................................... 3
    1.2.4   Thomas P. Harlan ............................................ 4
    1.2.5   Mark Alan Gelazela ........................................... 4
    1.2.6   William Chandler Reynolds .................................... 6
    1.2.7   Steven E. Woods a.k.a. Steve Woods .......................... 6
    1.2.8   Richard Hall ................................................. 7
    1.2.9   Winston Jerome Cook ......................................... 7
    1.2.10  Alicorn Capital Management, LLC .............................. 8
    1.2.11  Idlyc Holdings Trust LLC (IDLYC-USA) ...................... 8
    1.2.12  Idlyc Holdings Trust (N Z) ................................... 8
    1.2.13  BMW Majestic LLC, ......................................... 9
    1.2.14  Berea Inc. ................................................... 9
    1.2.15  Cook Business Services LLC ................................... 9
    1.2.16  John/Jane Doe(s) ............................................. 9

1.3 NOMINAL DEFENDANTS ...................................... 10
    1.3.1   Vladimir Pierre-Louise ...................................... 10

1.3.2   Christine Wong-Sang; President ............................ 10
1.3.3   Godspeeds Entertainment ................................. 10
1.3.4   Godspeeds Initiative LLC ................................. 10
1.3.5   Godspeeds Endeavors LLC ................................ 10
1.3.6   IBalance LLC ............................................ 11
1.3.7   SPIN Entertainment a.k.a. ............................... 11
1.3.8   Tulin EMRE a.k.a. Tulin Tulay Reid ...................... 11
1.3.9   Defendants' Conveyance, and Misappropriation ............... 11

§ II   JURISDICTION– VENUE ............................................ 12

2.1 DIVERSITY .................................................... 12

2.2 PERSONAL JURISDICTION .................................... 12

2.3 VENUE ....................................................... 14

§ III   BACKGROUND & SUMMARY OF THE FACTS AND ALLEGATIONS .... 15

3.1 THE INTERNET AGE GANGSTER ............................. 15

3.2 THE INSURMOUNTABLE CIVIL PROSECUTION OF THE
MODERN MOB AND THEIR SUCCESS ............................... 17

3.3 THE FIRST FRAUD SCHEME ................................. 18

3.4 THE SECOND FRAUD SCHEME ............................. 21
    3.4.1   The Syndicate's international private placement program ....... 22

§ IV   STATEMENT OF FACTS AND ALLEGATIONS ......................... 33

4.1 FIRST SOLICITATION ......................................... 33

4.2 12/2/2009 - EMRE SOLICITS AND OFFERS FINANCIAL
SOLUTIONS. ....................................................... 34

4.3 12/10/2009 - 1ST FRAUD SCHEME (Alicorn/Idlyc/BMW Majestic) .... 36
    4.3.1   The Solicitation & Alicorn Introduction – Koster/Idlyc Offer ..... 36

4.4 8/30/2010 - KOSTER DESCRIBES THE BREADTH OF HIS
COMMERCIAL ENTERPRISE ......................................... 38
    4.4.1   Koster Describes His Enterprise ............................ 38
    4.4.2   Koster's Public Acclamation and Promotion ................... 39

4.5 12/11/2009 - PROFIT-SHARING AGREEMENT ................... 40

4.6  12/14/2009 - FIRST REQUEST FOR DISCLOSURE ............... 41

4.7  12/15/2009 - SYNDICATE'S COMPULSION TO SOLICIT FUNDS ... 42

4.8  FALLACY & DECEPTIVE TRADE PRACTICE – 1ST Fraud Scheme –
The Alicorn/Idlyc/BMW Syndicate ....................................... 44
    4.8.1  Modus Operandi ........................................... 44
        4.8.1.1  Fraudulent Inducement .............................. 45
        4.8.1.2  A Catalyst for the Fraud ........................... 46

4.9  12/14/2009 — 12/30/2009 KOSTER INITIATES A PATTERN OF
CAMOUFLAGED ARTIFICES ....................................... 46
    4.9.1  The First Straw Man ...................................... 46
    4.9.2  Second Straw Man ........................................ 47

4.10  1/7/2010 - PAYOUT AND DEPOSIT SCHEDULE ................. 48

4.11  1/13/2010 - EMRE TAKES A 16.7% CUT OF FLORES' PSP
EARNINGS ....................................................... 48

4.12  1/13/2010 - FRAUD BEGINS WITH DELAYS, DECEIT, AND MORE
ARTIFICES ...................................................... 48
    4.12.1  1/13/2010 - DEFENDANT'S LONG SILENCE ................ 48
    4.12.2  1/13/2010 — 1/25 2010 - LEGAL NOTICE: LEGAL RIGHT TO
RELY ON INTEGRITY AND HONESTY ........................... 49

4.13  1/26/2010 - THE THIRD MAN OF STRAW ....................... 51
    4.13.1  1/26/2010 - FIRST SELF-JUSTIFICATION FOR THE DELAY.
.......................................................... 51
    4.13.2  2/3/2010 - NOTICE TO DEFENDANTS OF ACCUMULATING
DAMAGES ...................................................... 51
    4.13.5  DEFENDANTS CREATE A FACADE TO ELUDE PROOF ... 55
    4.13.6  ESTABLISHING PSEUDO-LEGITIMATE RESOURCES .... 55

4.14  2/4/2010 - DEFENDANTS' FALSE PROOF OF PERFORMANCE.
.................................................................. 57
    4.14.1  Notice of Delivery of Promised Proof of Performance .......... 57

4.15  2/4/2010 - KOSTER DELIVERS THE THIRD STRAW MAN ....... 57

4.16  3/5/2010 - DEFENDANTS ARE INFORMED OF THE MOUNTING
DAMAGES ...................................................... 59

4.17  DEFENDANTS' BEGIN LONG CAMPAIGN OF DELAY AND

DECEIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    4.17.2 DEFENDANTS CONTINUALLY ARE INFORMED OF
DETERIORATING CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

4.18 3/15/2010 — 3/16/2010 - KOSTER & ATTORNEY CLAIM WITNESS
TO PERFORMANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    4.18.1 The April 2nd Scheduled Payout & Default . . . . . . . . . . . . . . . . . . . . 61
    4.18.2 Defendants Exhibit Conscious Indifference to Silence, Concealment
& Non-disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

4.19 EXTRINSIC FRAUD ATOP DETRIMENTAL RELIANCE . . . . . . . . 63

4.20 3/26/2010 - KOSTER DECLARES 100% CONFIRMATION ARRIVAL
OF FUNDS IN U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

4.21 3/26/2010 - DEATH KNELL TOLLS FOR PSP PARTNER . . . . . . . . 64

4.22 SYNDICATE/KOSTER BLAME HSBC FOR DELAYS . . . . . . . . . . . 65

4.23 3/26/2010 - KOSTER MAKES 2ND CONFIRMATION AND ADDS
ANOTHER HEDGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

4.24 3/26/2010 - CANCELLATION EDICT FOR VOICING LEGAL ACTION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

4.25 3/30/2010 — 4/14/2010 - 91ST DAY IN DEFAULT - 116TH
TRANSACTION DAY – DISCLOSURE REQUEST – TERMINATED
PARTNER SPEAKS OUT ABOUT IDLYC . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    4.25.3 Koster's Reinforce Previous Threat of Retaliation . . . . . . . . . . . . . 70
    4.25.5 188TH DAY NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    4.25.6 Koster acknowledges film project damages – suggests move to
commodities trade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

4.26 4/22/2010 - KOSTER REPORTS SEC INVESTIGATOR SAYS
IDLYC CHECKS OUT – FUNDING IS IMMINENT . . . . . . . . . . . . . . . . . 73

4.27 4/24/2010 - FLORES INFORMS IDLYC PRINCIPALS & KOSTER
OF THEIR INTRINSIC FIDUCIARY DUTY . . . . . . . . . . . . . . . . . . . . . . . 76

4.28 6/24/2010 - LEGAL NOTICE GIVEN - LEGAL DEFINITION -
DEFINING AND GOVERNING FIDUCIARY DUTY ARISE OUT OF THE
LAW OF EQUITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

4.29 EMRE'S REQUEST FOR IRS W9 FORM. PAYMENT SCHEDULE
UPDATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**4.30  May 5TH - *COME TO JESUS TIME FOR MARK & CHANDLER*** ............................................................. 78
  4.30.1  Non-disclosure .......................................... 79
  4.30.2  Acquiescence ........................................... 79

**4.31  KOSTER OFFERS GOLD BUY/SELL VALUE EQUIVALENCY SUBSTITUTION FOR IDLYC PERFORMANCE IN DEFAULT** .......... 80

**4.32  4/29/2010 - PLAINTIFFS' APRIL 29TH DEMAND FOR PERFORMANCE & PRODUCTION OF DOCUMENTS** ................... 81
  **4.32.1  FLORES APRIL 29TH DEMAND FOR PAYOUT PERFORMANCE** ................................................ 81

**4.33  6/13/2010 - FLORES' JUNE 13TH DEMAND FOR PERFORMANCE & PRODUCTION OF DOCUMENTS** ...................................... 82
  4.33.2  Flores clearly sets forth the deficiencies in the Defendants' actions, and breach of their fiduciary duties ................................ 82
  4.33.3  Defendants, having the opportunity, never respond ............. 82
  4.33.4  Non-disclosure ......................................... 82

**4.34  6/29/2010 - CLARKSON'S CALL FOR VERIFICATION OF KOSTER'S PURPORTED DEMAND LETTER TO IDLYC** .................... 84
  **4.34.1  CLARKSON'S 1ST REQUEST FOR A COPY OF KOSTER'S PURPORTED IDLYC DEMAND LETTER** ........................... 84
  **4.34.2  6/30/2010 - CLARKSON'S 2ND CALL FOR A COPY OF KOSTER'S PURPORTED IDLYC DEMAND LETTER** ........................... 84
  **4.34.3  6/30/2010 - CLARKSON'S 3ND REQUEST FOR A COPY OF KOSTER'S PURPORTED IDLYC DEMAND LETTER** ................. 85
  **4.34.4  KOSTER FAILS TO PRODUCE DOCUMENTS CONCEALING THE INTERNAL ACTIVITIES OF THE SYNDICATE** ................ 85
  4.34.5  Knowledge of Fiduciary Duty ................................ 85
  4.34.7  Defendants Fully Informed of Governing Laws ................ 86
  4.34.8  Non-disclosure & Silence .................................. 86

**4.35  6/30/2010 - KOSTER BMW MAJESTIC PLAUSIBLE DENIABILITY - USING THEIR OWN STRAW MAN** .................................... 87

**4.36  7/5/2010 – KOSTER WITHHOLDS EVIDENCE FROM FEDERAL SEC INVESTIGATOR.** ............................................... 88

**4.37  7/8/2010 - LEGAL NOTICE TO KOSTER & HARLAN - FLORES URGES KOSTER NOT TO WITHHOLD EVIDENCE FROM SEC** ......... 91

**4.38  7/8/2010 - RESPONSE TO OBSTRUCTION OF JUSTICE - ADMITS**

TO WITHHOLDING EVIDENCE FROM FEDERAL INVESTIGATION. . . . 92

4.39  7/9/2010 – 2ND LEGAL NOTICE TO KOSTER OF FEDERAL CRIMES & OBSTRUCTION OF JUSTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

4.40  7/29/ 2010 - ACKNOWLEDGMENT OF DAMAGES AND HARM BY SILENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
    4.40.2  Flores July 29TH Msg., 222ND Day of Transaction - Notice of Damages & Non-Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

4.41  7/29-8/16/2010 – 2ND FRAUD SCHEME – GENESIS (Berea/Hall Gold Buy/Sell) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
    4.41.1  Conditions & Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
    4.41.2  Plaintiffs Plan for Use of Gold Buy/Sell Funds for Critical Short-Term Damage Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
    4.41.4  Contract Executed under Coercion and Duress . . . . . . . . . . . . . . . 98

4.42  8/18/2010 - FLORES' SIGNATURE WITHDRAWAL . . . . . . . . . . . . . 99

4.43  8/24/2010 - KOSTER ESTABLISHES EARLIEST OPPORTUNITY TO SIGN THE 1ST WIND-UP AGREEMENT - EVIDENCE OF AUGUST 16TH DOCUMENT FORGERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

4.44  8/25/2019 - NINE MONTH DEFAULT/FAILURE TO PERFORM NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

4.45  9/1/2010 10:43 AM - SCHEDULE FOR TELEPHONE CONFERENCE CALL W/GOLD TRADE COMPANY PRINCIPAL RICHARD HALL . . . . . . 102

4.46  9/1/2010 12:01 AM - 2ND FRAUD SCHEME - DURING CONFERENCE KOSTER INITIATES AN EXTORTION KICKBACK PLOT . . . . . . . . . . . . . . 103
    4.46.1  9/1/2010 12:01 AM - Richard Hall/Gold Buy/Sell Telephone Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
    4.46.2  9/4/2010 8:24 AM Flores Raises Issues with Koster Concerning the Eugene Fletcher's Control of the Payout Stream Raised During the Teleconference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

4.47  9/6/2010 11:10 AM – 2ND FRAUD SCHEME - THE SHAKEDOWN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
    4.47.1  Koster Reveals the Shakedown and the Eventual Take it or Loose Everything Deal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

4.47.2  9/9/2010 - Childs Defines Procedures for the Richard Hall Gold Buy/sell Instrument Transactions – Koster to Fund Escrow Account . . . . . . . . . . . . . . . . . . . 107

**4.48 9/6/2010 - 2ND FRAUD SCHEME - JOHN CHILDS EMERGES AN ACTOR IN THE SHAKEDOWN** ....................................... 108
  **4.48.1 John Childs Acknowledges Emre Had No Entitlement to Fee -- But Would Aid in the Kickback for Emre** ................................. 108
  **4.48.3 9/7/2010 6:20 AM - John Childs Continues Extortion Sham Asserting Claim to a Nonexistent Emre Agreement He Had Already Acknowledge Didn't Exist** .............................................................. 109
  **4.48.4 9/7/2010 10:17 AM - Koster Continues Extortion Sham[14] Referring to a Nonexistent Agreement** ........................................ 109
  **4.48.5 9/7/2010 11:05 AM, John Childs Advances a New Extortion and Strikes out to Kill the Richard Hall/berea Gold Transaction** .............. 111
  **4.48.6 9/22/2010 9:54 PM CST - Flores Gives Notice to Koster and Emre That Emre Has No Wavier** ........................................... 111

**4.49 10/11/2010 - KOSTER ANNOUNCES READY TO EXECUTE GOLD TRANSACTION - IDENTIFIES THE THREE PARTNERS** ............. 112

**4.50 10/19/2010 5:45 PM, - 2ND FRAUD SCHEME - THE RANSOM NOTE** .................................................................. 113
  **4.50.2 10/19/2010 6:11 PM CST - Flores Responds to the Extortion Demand** ......................................................... 114

**4.51 10/20/2010 6:49 PM CST - FLORES GIVES NOTICE OF BREACH OF FIDUCIARY RESPONSIBILITY, INTERSTATE FRAUD, AND EXTORTION** .................................................................. 115

**4.52 10/21/2010 3:00 PM – CHILDS IDENTIFIES EMRE AS AUTHOR OF EXTORTION DOCUMENT AND IN THE FRAUDULENT REPRESENTATION OF CLARKSON AND IMPLICATES EMRE IN THE EXTORTION** ...................................................... 116

**4.53 10/21/2919 - KOSTER WANTS A STOP OF LEGAL NOTICES "FOR EVERYONE TO SEE"** .............................................. 117

**4.54 10/25/2010 - PLAINTIFFS DEMAND STATUS TERMS AND TIME-LINE OF GOLD TRANSACTION** .................................... 118

**4.55 PLAINTIFFS MAKE IMPASSIONED DEMAND FOR PERFORMANCE ON THE GOLD BUY/SELL SETTLEMENT** .......... 119

**4.56 11/2/2010 - CLARKSON'S NOVEMBER 2ND MSG. – DEMAND FOR VERIFIABLE DOCUMENTATION OF GOLD TRANSACTION** .......... 119

**4.57 10/28/2010 - WINSTON J. COOK IS LOCATED AND QUARRIED ABOUT IDLYC AND GOLD TRANSACTION** ........................... 120

**4.58 11/10/2010 - NOVEMBER 10TH/11TH FLORES/CLARKSON DIALOGUE - INITIATION OF LITIGATION** (copied to Scott A. Koster) . . . 121

**4.59 11/11/2010 1:23 PM - KOSTER RESPONSE TO NOVEMBER 11TH CLARKSON/FLORES INITIATION OF LITIGATION** . . . . . . . . . . . . . . . . . . 122

**4.60 KOSTER IMPLICATES RICHARD HALL, and TWO PARTNERS IN CONVERSION, THEFT, AND CONSPIRACY OF PLAINTIFFS' ONE-THIRD (⅓) INTEREST IN THE GOLD TRANSACTION** . . . . . . . . . . . . . . . 123
      4.60.1 Koster Threatens and Acts to Attempts and Intentionally Tortuously Interferes with the Gold Transaction Agreement . . . . . . . . . . . . . . . . . . . . . . . . 123

**4.61 11/11/2010 1:23 PM - KOSTER DECLARES HE CAN PROVE AND DEFEND EVERYTHING IN A COURT OF LAW – LITIGATE OR GO AWAY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
      **4.61.2 FEDERAL COURT DARE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
      4.61.5 Koster Cannot Now Present Evidence and Seek a Defense . . . . . 127

**4.62 11/11/2010 - FLORES CALLS OUT KOSTER AND CONFRONTS "EVERYTHING CAN BE PROVEN AND DEFENDED IN A COURT OF LAW" CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**4.63 11/12/2010 – KOSTER'S PATHOLOGICAL LYING AND *PSEUDOLOGIA FANTASTICA*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
      4.63.2.1 The Big Lie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

**4.64 I ALWAYS TELL THE TRUTH STATEMENT AN INDICATION OF *PSEUDOLOGIA FANTASTICA.*** . . . . . . . . . . . . . . . 131

**4.65 11/15/2010 - GARY GRAB'S LETTER - NOTICE OF INTENT TO JOIN & PARTICIPATE IN SUIT AND DEMAND FOR PRODUCTION FROM KOSTER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

      4.65.1 Flores' Tuesday, November 16TH Message Inquiring On Koster's Legal Counsel and Clarifying Legal Status of He and Clarkson . . . . . . . . 134
      4.65.2 Emre Is Given Opportunity to Provide Proof of the Gold Buy/sell Legitimacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

**4.66 11/16/2010 4:26 PM - KOSTER RESPONSE TO PLAINTIFFS ATTORNEYS' DEMAND FOR PRODUCTION OF DOCUMENTS** . . . . . . . . 135
      4.66.2 11/16/2010 4:26 PM - Documents Produced Show Breaches of Fiduciary Duties, Bad Faith, and Fraud by Koster, Hall and Cook . . . . . . . . 136

**4.67 11/17/2010 1:13 AM - DISCOVERY OF AUGUST 16TH & OCTOBER 18TH**

**DOCUMENT FORGERIES IN SECOND DOCUMENT SET DELIVERY**
...................................................... 138
    4.67.2 The August 16TH document forgery is fully described at ¶ , pg. , although the August 16TH document forgery was not discovered until Koster delivered all three of the above documents over the wires by Internet e-mail to Flores on November 17, 2010 at 1:13 AM.
        4.67.3 The October 18TH Document Forgery ...................... 139

**4.68 11/22/2010 - INTERNAL FINDINGS OF PLAINTIFFS' ATTORNEYS** ................................................................ 140

**4.69 12/1/2010 - DELIVERY OF TEXAS DECEPTIVE TRADE PRACTICES ACT NOTICE & EVIDENTIARY FINDINGS** .............. 141

**4.70 1/21/2011 - THOMAS HARLAN EXTOLLS HIS PROFESSIONAL EXPERIENCE AND ACKNOWLEDGES RECEIPT AND REVIEW OF TEXAS DTPA NOTICE** .......................................... 142
    4.70.5 EXPIRATION OF TIME TO RESOLVE TEXAS DTPA ...... 144

**4.71 OPEN-ENDED CONTINUITY INVOLVING DISTINCT THREAT OF LONG-TERM ILLEGAL AND ABUSIVE ACTIVITY** ................ 145

**§ V CAUSES OF ACTION** ................................................ 146

**5.1 1ST CAUSE OF ACTION – FRAUD IN THE INDUCEMENT AGAINST:** Scott Anthony Koster, Kerim S. Emre, Thomas P. Harlan, John Childs, Mark Alan Gelazela, William Chandler Reynolds, Steven E. Woods, ALICORN CAPITAL MANAGEMENT LLC, IDLYC HOLDINGS TRUST LLC (USA), IDLYC HOLDINGS TRUST (NEW ZEALAND), BMW MAJESTIC LLC AND/OR THEIR AGENTS. John/Jane Doe(s) (the "Syndicate Defendants") ......................................... 146

**5.2 2ND CAUSE OF ACTION – COMMON LAW FRAUD**
    AGAINST: All Defendants ..................................... 147

**5.3 3RD CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION AND DECEIT**
    AGAINST: All Defendants ..................................... 148

**5.4 4TH CAUSE OF ACTION – FRAUD BY NON-DISCLOSURE**
    AGAINST: All Defendants ..................................... 149

**5.5 5TH CAUSE OF ACTION – AIDING AND ABETTING FRAUD**
    AGAINST: All Defendants ..................................... 150

x

5.6  6TH CAUSE OF ACTION – BREACH OF CONTRACT
   AGAINST: Scott Anthony Koster, Thomas P.  Harlan, Kerim S.
   Emre, and Alicorn Capital Management LLC . . . . . . . . . . . . . . . . . . . . . . . 151

5.7  7TH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY . . . . . . 152
Defendants owed the Plaintiffs the following fiduciary duties . . . . . . . . . . . . . . . 152
      5.7.4   Defendants have breached their fiduciary duties owed to the
Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

5.8  8TH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY &
   BREACH OF CONFIDENTIAL OR SPECIAL RELATIONSHIP
   AGAINST:   Scott Anthony Koster, Richard Hall, Winston Jerome Cook,
            Kerim S.  Emre, John Childs, Thomas P. Harlan, ALICORN
            CAPITAL MANAGEMENT LLC, BEREA LLC, and COOK
            BUSINESS SERVICES LLC.  (the "Gold Transaction
            Defendants") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

5.9  9TH CAUSE OF ACTION – CONVERSION
   AGAINST:   All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

5.10  10TH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH
EXISTING CONTRACTS
   AGAINST:   Scott Anthony Koster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

5.11  11TH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH
PROSPECTIVE CONTRACT
   AGAINST:   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

5.12  12TH CAUSE OF ACTION – VIOLATIONS OF THE DECEPTIVE
TRADE PRACTICES ACT
   AGAINST:   Scott Anthony Koster, Kerim S. Emre. . . . . . . . . . . . . . . . . . . 162

5.13  13 TH CAUSE OF ACTION – PROMISSORY ESTOPPEL
   AGAINST:   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

5.14  14TH CAUSE OF ACTION – PROMISSORY ESTOPPEL
   AGAINST:   Scott Anthony Koster, Richard Hall, Winston Jerome Cook,
            Kerim S.  Emre, John Childs, Thomas P. Harlan, ALICORN
            CAPITAL MANAGEMENT LLC, BEREA LLC, and COOK
            BUSINESS SERVICES LLC.  (the "Gold Transaction
            Defendants") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

5.15  15TH CAUSE OF ACTION – INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS

AGAINST:   All Defendants ......................................... 168

5.16  16TH CAUSE OF ACTION – CIVIL CONSPIRACY
AGAINST:   All Defendants ......................................... 170

5.17  17TH CAUSE OF ACTION – SECURITIES FRAUD: CONTROLLING
PERSONS LIABILITY  (15 U.S.C. §78t(a))
AGAINST:   All Syndicate Defendants ................................ 171

5.18  18TH CAUSE OF ACTION - UNJUST ENRICHMENT /
CONSTRUCTIVE TRUST
AGAINST: All Defendants ......................................... 173

§ VI  OTHER PLEADINGS ................................................ 175

6.1  AGENCY & AUTHORITY ...................................... 175

6.2  RATIFICATION ............................................. 176

6.3  PIERCING THE CORPORATE VEIL/ALTER EGO .............. 177

6.4  PLAINTIFFS PLEAD DELAYED DISCOVERY & INTENTIONAL
INTERFERENCE ................................................. 177

6.5  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR:
RACKETEERING (INVOLVING, *inter alia*, WIRE FRAUD, EXTORTION,
FORGERY, OBSTRUCTION OF JUSTICE AND MONEY LAUNDERING)
.............................................................. 178

6.6  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR: FRAUD AND
FRAUDULENT CONCEALMENT OF THIS FRAUD ................... 181

6.7  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR: FRAUDULENT
CONCEALMENT OF FACTS UNDER DEFENDANTS' CONTROL ...... 181

6.8  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR:  BREACH OF
FIDUCIARY DUTY, INCLUDING THE DUTY TO DISCLOSE ......... 182

6.9  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR: JOHN/JANE
DOE(S) CONCERT OF ACTION ................................... 182

6.10  PLAINTIFFS PLEAD DELAYED DISCOVERY FOR: INCLUSION
OF NOMINAL DEFENDANTS UNJUST ENRICHMENT ............... 184

6.11  PLAINTIFFS PLEAD: VIOLATION OF SECTION 10(b) OF THE

EXCHANGE ACT AND RULE 10-5 ................................... 184

  6.12  PLAINTIFFS PLEAD: <u>VIOLATIONS OF SECTION 17(a) OF THE
SECURITIES ACT</u> ................................................ 185

  6.13  PLAINTIFFS PLEAD: <u>VIOLATIONS OF SECTION 5(a) AND 5(c) OF
THE SECURITIES ACT</u> ........................................... 187

  6.14  PLAINTIFFS PLEAD: <u>VIOLATIONS OF SECTION 1 5(a)(1) OF THE
EXCHANGE ACT</u> ................................................. 188

  6.15  CLAIM AGAINST THE NOMINAL DEFENDANTS AS
CUSTODIANS OF INVESTOR FUNDS AND UNJUST ENRICHMENT .. 189

  6.16  PLAINTIFFS PLEAD: ESTOPPEL BY SILENCE ............. 190

  6.17  PLAINTIFFS PLEAD ESTOPPEL BY ACQUIESCENCE ....... 191

  6.18  PLAINTIFFS PLEAD PRECLUSION FROM CLAIMING A BAR BY
LIMITATIONS .................................................... 192

  7.1  COMPENSATORY DAMAGES ................................ 193

  7.2  EXEMPLARY DAMAGES. ................................... 193
     7.2.1   DTPA RELIEF & DAMAGES ........................... 194

  7.3  PRE-/POST- JUDGMENT INTEREST & ATTORNEYS' FEES .... 195

§ VIII  REQUEST FOR ORDER PROHIBITING DESTRUCTION
OR SPOLIATION OF EVIDENCE ........................................ 196

§ IX  PRAYER ....................................................... 197

R. Lance Flores
Lead Attorney
3314 Pleasant Drive
Dallas, Texas 75227 USA
Tel. (Dallas): +1 (214) 272-0349
Tel. (Fax): +1 (210) 519-6528

Attorney for the Plaintiff

Vicki Clarkson

2416 - 36 Street SW
 Calgary, AB T3E 2Z5
Tel. (Calgary): +1 (403) 244-9980
Tel.  (Fax:) +1 (403) 246-3331

Attorney for the Plaintiff

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Plaintiffs R. Lance Flores and Vicki Clarkson to file their Original Complaint against Defendants Scott Anthony Koster individually and d/b/a Interlink Global Messaging, Kerim S. Emre, Thomas P. Harlan, Mark Alan Gelazela a.k.a. Mark Zella and d/b/a SPIN Entertainment, William Chandler Reynolds, Steven E. Woods a.k.a. Steve Woods, Richard Hall, Winston Jerome Cook, Alicorn Capital Management LLC, Idlyc Holdings Trust LLC (USA), Idlyc Holdings Trust (New Zealand), BMW Majestic LLC, Berea Inc, Cook Business Services LLC, John/Jane Doe(s) 1-8,  (collectively the "Defendants"), and against Nominal Defendants Vladimir Pierre-Louise, Christine Wong-Sang, Godspeeds Entertainment, Godspeeds Initiative LLC, Godspeeds Endeavors LLC, IBalance LLC, SPIN Entertainment a.k.a. Mark Alan Gelazela a.k.a. Mark Zella, Tulin EMRE a.k.a. Tulin Tulay Reid.  In support thereof Plaintiffs allege the following:

1

## § I   PARTIES

### 1.1  PLAINTIFFS

1.1.1   Plaintiff, Rudolph Lance Flores ("Flores"), d/b/a Mockingbird Films International ("MFI"), is an individual, a Texas resident, U.S. citizen, with his principal place of business operation and activity in the City of Dallas, Dallas County, Texas, USA.

1.1.2   Plaintiff, Vicki Clarkson ("Clarkson"), d/b/a Clarkson's Classics, is an individual, an Alberta resident, Canadian citizen, with her principal place of business operation and activity in the City of Calgary, Alberta, Canada.

### 1.2  DEFENDANTS

1.2.1   Presently, Defendants Steven E. Woods, Mark A. Gelazela, BMW MAJESTIC LLC, IDLYC HOLDINGS TRUST LLC, AND IDLYC HOLDINGS TRUST and Nominal Defendant IBALANCE LLC are named as defendants or relief defendants in a complaint filed in the United States District Court for the Central District of California, Los Angeles Division, on February 24, 2011, Case No. SACV11-00314, by the United States Securities and Exchange Commission in what appears, at this time, to be an unrelated case of similar nature.

1.2.2   Scott Anthony Koster individually and d/b/a Interlink Global Messaging ("Koster" or "Scott Koster" or "Scott A. Koster"), is the sole managing member of Alicorn Capital Management, LLC. Koster is a resident of Mille Lacs County, Minnesota, whose business address is 14391 80TH Street, Milaca, Minnesota 56353,

business phone numbers (763) 389-2018, (612) 916-7007, and Fax# (925) 407-8440.

Koster along with Gelazela and Woods subscribed investors for a bank guarantee

scheme through Alicorn Capital Management LLC, Idlyc Holdings Trust LLC, and

BMW Majestic LLC, with the cooperation, aid and abetment of, *inter alios*, Reynolds,

Harlan and Emre, created a private placement platform and bank guarantee funding

program. At times material to this Complaint, Koster was the Senior Partner with

exclusive control of a profit-sharing partnership ("PSP") and *defacto* Investment

Advisor, and/or associated with an Investment Advisor, within the meaning and

contemplation of the securities laws of the United States, and through the course of

Koster's acts, he is *trustee ex maleficio* arising from his wrongdoings and misdeeds.

Koster proximately caused damages and injuries thereby to the Plaintiffs as alleged

herein.

    1.2.3   Kerim S. Emre ("Emre"), at times material to this Complaint was account

manager, agent and intermediary for Koster and Alicorn Capital Management LLC.

Emre's last known address is 206 Baltimore Ave., Huntington Beach, CA 92648,

business telephone numbers are 714-408-8777, 714-408-4695, Fax # 951-231-9804.

Emre was the primary agent and contact to Koster's/Alicorn's Profit-Sharing

Partnership. Emre, as well, performed as account manager, *defacto* Investment

Advisor, and/or associated with Investment Advisor Koster, within the meaning and

contemplation of the securities laws of the United States, and through the course of

Emre's fraudulent acts he is *trustee ex maleficio* arising from his wrongdoings and

misdeeds. Emre, proximately caused damages and injuries thereby to the Plaintiffs as

alleged herein.

1.2.4   Thomas P. Harlan ("Harlan"),  at times material to this Complaint, Harlan was Koster's legal council who advised Koster throughout the racketeering enterprise scheme and worked hand-in-hand creating the written instruments used in the fraud process. Harlan is an attorney licensed to practice law by the State Bar of Minnesota and is one of the founding shareholders of Madigan, Dahl & Harlan, P.A. (herein after the "Firm"). He may be served at his last known address at Madigan, Dahl & Harlan, P.A., Campbell Mithun Tower, 222 South Ninth Street South, Suite 3150, Minneapolis, Minnesota 55402, Tel: 612-604-2589 (direct); 612-604-2000 (main), 612-604-2599 (fax), harlan@mdh-law.com.

As well, at all times material to this Complaint, Harlan was one of the primary actors in Koster's Alicorn's Profit-Sharing Partnership. Harlan performed as legal advisor in the events related to the ALICORN-IDLYC-BMW MAJESTIC Syndicate investment transaction and the ALICORN-BEREA/HALL Gold Buy/Sell transaction. Thus, Harlan was the Investment Legal Advisor associated with Koster, within the meaning and contemplation of the Minnesota Rules of Professional Conduct and the securities laws of the United States. Through the course of Harlan's fraudulent acts he is *trustee ex maleficio* arising from his wrongdoings and misdeeds. Harlan, proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.5   Mark Alan Gelazela ("Gelazela") a.k.a. Mark Zella a.k.a SPIN Entertainment.  Gelazela's last known address is 26 Marlwood Lane, Palm Beach Gardens, FL 33418, but appears to be an actor-producer-screenwriter and resident of Marina del Rey, California Ph. 310-770-2115, and at times material to this Complaint Gelazela was:

1.2.5.1   Managing Member and the Registered Agent of Idlyc Holdings Trust LLC, USA (IDLYC) 01/07/2010, FL – FEI/EIN # 271651047, located at 3677 Jasmine Ave., #10, Los Angeles CA  90034, USA;

1.2.5.2   Founder/Agent/Producer-Actor-Screenwriter of Godspeeds Entertainment, 8577 SW 137 Ave., Miami, FL 33183 USA, (310) 770-2115, (310) 722-9351 Fax: 310-921-3800;

1.2.5.3   Registered Agent and a Managing Member of Godspeeds Initiative LLC, 26 Marlwood Lane, Palm Beach Gardens, FL 33418, (310) 770-2115;

1.2.5.4   Registered Agent and a Managing Member of Godspeeds Endeavors LLC located at  26 Marlwood Lane, Palm Beach Gardens, FL 33418, (310) 770-2115.  Godspeeds Endeavors LLC is co-managed by Idlyc Holdings Trust of New Zealand, 9 Melody Lane, Ruakura Road, Hamilton, New Zealand;

1.2.5.5   Managing Member of IBalance LLC, located at  26 Marlwood Lane, Palm Beach Gardens, FL 33418;

1.2.5.6   Principal of SPIN Entertainment (SPIN) located at 3677 Jasmine Ave., #10, Los Angeles CA  90034, USA, (310) 770-2115.

At times material to this Complaint, Gelazela along Woods subscribed investors for a bank guarantee scheme through Idlyc Holdings Trust LLC (USA), Alicorn Capital Management LLC and BMW Majestic LLC. By Gelazela's fraudulent acts he is *trustee ex maleficio* arising from his wrongdoings and misdeeds, and proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.6    William Chandler Reynolds ("Reynolds") at times material to this Complaint, Reynolds was a Managing Member of Idlyc Holdings Trust LLC, USA (IDLYC); 01/07/2010, FL; FEI/EIN # 271651047, 3677 Jasmine Ave, # 10., Los Angeles CA 90034, USA whose last known address is 26 Marlwood Lane, Palm Beach Gardens, FL 334185. At times material to this Complaint Reynolds was the registered agent of IBalance LLC, located at 26 Marlwood Lane, Palm Beach Gardens, FL 33418. At times material to this Complaint Reynolds' was and continues as *trustee ex maleficio* arising from his wrongdoings and misdeeds. Reynolds, proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.7    Steven E. Woods a.k.a. Steve Woods, ("Woods") is a resident of Branson, Missouri and the owner and principal of BMW Majestic LLC. Woods is not registered as, or associated with, a broker-dealer. Woods, last known business address is 300 Terrace Rd, Branson Missouri 65616. Woods may be served through his registered agent, Gary Allman, for BMW Majestic LLC located at Ste. 100, 101 State Drive, Hollister, MO 65672, (417) 334-8101, Fax (417)334-8165, garyallman@bransonlawyers.com. At times material to this Complaint Woods owned and controlled BMW Majestic LLC ("BMW") and subscribed investors for a bank guarantee scheme through BMW with the cooperation and aid of, *inter alios*, Gelazela, Reynolds, Koster and Emre who forma a purported private placement platform and bank guarantee funding program. By Woods fraudulent acts he is *trustee ex maleficio* arising from his wrongdoings and misdeeds. Woods, proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.8    Richard Hall at times material to this Complaint was the CEO of Berea

Inc., #500, 3330 Cumberland Blvd., Atlanta, GA 30339 and may be served through the

Corporation's Agent, Hendrickx Toussaint , #500, 3330 Cumberland Blvd., Alanta, GA

30339 - Tel: (770) 933-6269). At times material to this Complaint, Hall and other

corporate officers of Berea Inc. supervised the Alicorn PSP Gold Buy/Sell transaction

and subscribed investors in the profit sharing of the gold purchases and its sale,

financed by the investors for use of their bank guarantee, and initiated the removal of

the Plaintiffs one-third (⅓) interest in that transaction according to Koster. By Hall's

collaborative fraudulent acts, he is *trustee ex maleficio* arising from his wrongdoings

and misdeeds. Hall, proximately caused damages and injuries thereby to the Plaintiffs

as alleged herein.

1.2.9    Winston Jerome Cook at times material to this Complaint was the CEO of

Cook Business Services LLC, 5710 Melanie Trail, Atlanta, GA, 30349-2853 – Tel. (770)

969-2217. At times material to this Complaint, Cook of Cook Business Services LLC

managed or supervised the Alicorn PSP Gold Buy/Sell transaction investors in the

profit sharing of the gold purchases and its sale, financed by the investors through the

debt funds owed to the Plaintiffs from non-performances and damages of the

ALICORN/IDLYC/BMW tranaction for use of their bank guarantee, and initiated the

removal of the Plaintiffs one-third (⅓) interest in that transaction according to Koster.

By Cook's collaborative fraudulent acts, he is *trustee ex maleficio* arising from his

wrongdoings and misdeeds.  Cook, proximately caused damages and injuries thereby

to the Plaintiffs as alleged herein.

1.2.10  Alicorn Capital Management, LLC ("Alicorn"), Scott A. Koster CEO, no Agent listed, is a Minnesota limited liability company and the management company for the subject financial transaction by and between, *inter alia,* the Idlyc Holdings Trust LLC. Alicorn has its principal place of business located at 14391 80TH Street, Milaca, Minnesota 56353, business phone numbers 763-389-2018, 612- 916-7007 and Fax # 763-389-2018. Alicorn, *inter alios,* proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.11  Idlyc Holdings Trust LLC (IDLYC-USA), a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, is partially owned and controlled by Gelazela. It is not registered with the Securities and Exchange Commission in any capacity and it has not registered any offering of securities under the Securities Act nor any class of securities under the Exchange Act. Gelazela created this entity in the United States so that he could open a domestic bank account under the "IDLYC" name. IDLYC-USA, *inter alios,* proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.12  Idlyc Holdings Trust (N Z) is a New Zealand foreign trust for which Gelazela is the settlor and a trustee. It is not registered with the United States Securities and Exchange Commission in any capacity and it has not registered any offering of securities under the Securities Act nor any class of securities under the Exchange Act. IDLYC Holdings Trust, *inter alios,* proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

1.2.13  BMW Majestic LLC, ("BMW") is a Missouri limited liability company with its principal place of business in Branson, Missouri, is owned and controlled by Woods. BMW Majestic LLC is registered as a Missouri restaurant and entertainment company, and is not registered with the Securities and Exchange Commission in any capacity and it has not registered any offering of securities under the Securities Act nor any class of securities under the Exchange Act. Woods signed up investors for the bank guarantee scheme through BMW.

1.2.14  Berea Inc., #500, 3330 Cumberland Blvd., Atlanta, GA 30339 and may be served through the Corporation's Agent, Hendrickx Toussaint , #500, 3330 Cumberland Blvd., Atlanta, GA 30339 - Tel: (770) 933-6269).

1.2.15  Cook Business Services LLC; ("CBS") service may be had to company's registered agent Winston Jerome Cook at 5710 Melanie Trail, Atlanta, GA, 30349-2853 – Tel. (770)  969-2217).

1.2.16  John/Jane Doe(s), co-conspirators whose numbers are precisely not yet known. Plaintiffs are not aware of nor can verify the true names and/or complete capacities, and/or addresses of Does in the events related to the Complaint.  Plaintiffs therefore sue said aggregated and enumerated Doe Defendants by such fictitious names because of Defendants' torts, including but not limited to, non-disclosure, fraudulent omission, negligent and intentional misrepresentations, and concealment of material information which the Defendants had a duty to provide. Plaintiffs will seek leave of this court to amend this complaint to include the true names and/or capacities and/or service addresses of the defendants sued herein as Does, inclusive, when the same have been ascertained. Plaintiffs are informed and believe, and thereby allege,

that each of the defendants that are designated herein as a "Defendant Doe(s)" acted in concert with each and every other defendant, intended to, and did, participate in and cause the events, acts, practices and courses of conduct alleged herein, or, alternatively, acted as the principal or agent of the other defendants or in the course and scope of said employment or agency, and by and through the course of their fraudulent acts, they are *trustee ex maleficio*, thus share obligation, *obligatio ex maleficio*, arising from their wrongdoings and misdeeds, they proximately caused damages and injuries thereby to the Plaintiffs as alleged herein.

## 1.3 NOMINAL DEFENDANTS

1.3.1   Vladimir Pierre-Louise; CFO/Secretary, Berea Inc., #500, 3330 Cumberland Blvd., Atlanta, GA 30339; Agent: Hendrickx Toussaint - Tel: (770) 933-6269).

1.3.2   Christine Wong-Sang; President, Berea Inc., #500, 3330 Cumberland Blvd., Atlanta, GA 30339; Agent: Hendrickx Toussaint - Tel: (770) 933-6269).

1.3.3   Godspeeds Entertainment, 8577 SW 137 Ave., Miami, FL 33183 USA, (310) 770-2115, (310) 722-9351 Fax: 310-921-3800.

1.3.4   Godspeeds Initiative LLC, 26 Marlwood Lane, Palm Beach Gardens, FL 33418, (310) 770-2115.

1.3.5   Godspeeds Endeavors LLC located at 26 Marlwood Lane, Palm Beach Gardens, FL 33418, (310) 770-2115.  Godspeeds Endeavors LLC is co-managed by Idlyc Holdings Trust of New Zealand, 9 Melody Lane, Ruakura Road, Hamilton, New Zealand.

1.3.6    IBalance LLC, located at  26 Marlwood Lane, Palm Beach Gardens, FL

33418.

1.3.7    SPIN Entertainment a.k.a. Mark Alan Gelazela a.k.a. Mark Zella  located

at 3677 Jasmine Ave., #10, Los Angeles CA  90034, USA, (310) 770-2115.

1.3.8    Tulin EMRE a.k.a. Tulin Tulay Reid; 206 Baltimore Ave., Huntington

Beach, CA 92648, business telephone numbers are 714-408-8777, 714-408-4695, Fax #

951-231-9804.

1.3.9    Defendants' Conveyance, and Misappropriation. Since December 18, 2009,

the Defendants transferred some of their illicit proceeds to others in the course of

their frauds.

## § II   JURISDICTION– VENUE & CONDITIONS PRECEDENT

All conditions precedent to the Plaintiffs' suit have been performed or have occurred.

2.1 DIVERSITY.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 since there is complete diversity, as well as supplemental jurisdiction over certain pendant common law claims pursuant to 28 U.S.C. §1367.  The elements of diversity jurisdiction are satisfied as the parties in this case are citizens of different states. Plaintiff Flores is domiciliary of Texas while Plaintiff Clarkson is a Canadian citizen of Alberta, who desires to prosecute this action in the same venue, while Defendants are domiciliary of different States. Accordingly, the parties to this action are completely diverse. With regard to the amount-in-controversy requirement, Plaintiffs' amount-in-controversy requirement is determinable to a "legal certainty" by prima face evidence presented to the Court that Plaintiffs meet the threshold amount.[1] Accepting the amount pled as true, Plaintiffs' jurisdictional allegations satisfy the requirements of 28 U.S.C. § 1332.

2.2 PERSONAL JURISDICTION. Pursuant to Texas Long-Arm Statute the Court sitting in diversity, may exercise personal jurisdiction over the nonresident Defendants since the long-arm statute of Texas, the forum state, confers personal jurisdiction over the Defendants.  The exercise of such jurisdiction by The State of Texas is consistent with

---

[1]   *See St. Paul Reinsurance Co.*, 134 F.3d at 1253.

due process.  The Due Process Clause permits the Court to exercise personal jurisdiction over the nonresident Defendants because the Defendants have purposefully and willfully availed themselves of the benefits and protections of the State of Texas by establishing "minimum contacts" with the State through selective and continuous and substantial communications to Flores in Dallas County.  Thusly, the exercise of jurisdiction by this Court over Defendants does not offend "traditional notions of fair play and substantial justice."[2]

The issue of personal jurisdiction is *prima facie* evident there is no need for evidentiary hearing as the court must accept as true all uncontroverted allegations in the complaint, and any factual conflicts must be resolved in favor of the Plaintiffs.[3]

The Defendants' nonresident contacts[4] were so extensive over in the period material to this case, that the Defendants should have had reasonably expected, and, in fact, did expect,[5] to be hauled into a federal court in Texas.[6]

---

[2] "...the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." *Latshaw,* 167 F.3d at 211 (quoting *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945).

[3] *Bullion v. Gillespie,* 895 F.2d 213,217

[4] *See Busch v. Buchman, Buchman & O'Brien, Law Firm,* 1 1 F.3d 1255, 1258 (5th Cir. 1994) (citing cases); *also, Quilling v. Stark,* № 3-05–4-CV-1976-L, 2006WL 1683442 at*2 N.D. Tex. Jun. 19,2006).

[5] *e.g.,* Failing to affirmatively respond or to resolve Texas Deceptive Trade Practices Act notice (¶ 4.70.4, pg. 144); by actions essentially daring Plaintiffs to challenge Defendants through litigation, in order to force their fiduciary duty to disclose, *&c.,* (¶ 4.61, pg. 125); and, refusing to negotiate settlement until Plaintiffs provided a case number from a complaint. Thomas P. Harlan: "I will await to see the complaint regarding the issues that you are alleging and the damages that you seek." *et seq.* Exhibit 121. Koster was already informed that Plaintiff had intended to file in the U.S. Dist. Ct. Northern District of Texas, Dallas Division, thus, by their acknowledgment and silence they acquiesced to this Court's jurisdiction.

[6] *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567; see *Haisten,* 784 F.2d at 1397.

2.3  VENUE. The venue is proper in that the vast majority of the events giving rise to the claims iterated herein occurred in Dallas County, Texas. The balance of the business relationship has been established in Calgary, Alberta, Canada to which the Canadian plaintiff asserts her venue preference to be the U.S. District Court, Northern District of Texas, Dallas Division located in Dallas County, Texas.

## § III   BACKGROUND & SUMMARY OF THE FACTS AND ALLEGATIONS

This suit involves two separate frauds, theft of money activities, imparting racketeering acts of, inter alia, coercion, extortion, forgery, obstruction of justice, and wire fraud, ensuing out of two separate financial investment transactions involving an international transactional funding process in the order of Twenty-five Billion Dollars ($25,000,000,000 USD) with just over twenty (20) principals.

3.1  THE INTERNET AGE GANGSTER. The Internet has given rise to a modern form of organized crime that has made significant departures from the conventional gang. The evolution is comparative to differences between the Russian Mafia and the Italian Mafia styles of criminal employment. The modern Internet form is even more global reaching and its behavior is more akin to the Russian Mafia which is more dynamic and amorphous than is the well-established Italian Mafia which adheres to an astringent hierarchical organization. This difference makes the Internet-based gangster more effective and illusive to track without the use of sophisticated digital and network forensic tools.

This modern criminal gestalt takes full advantage of the ephemeral nature of the Internet and the commercial and social dependency of the World Wide Web. These criminal organizations readily integrate whatever international criminal resources necessary to emerge only for a duration necessary to accomplish an individual criminal pursuit, then move on. Internet criminal enterprises necessarily make use of legitimate commercial entities and their financial resources for operating in an emulsified legitimate/quasi-legitimate/criminal mixture and focus on sophisticated complex

white-collar crimes almost exclusively. They frequently involve activities like insurance fraud, credit card fraud, stocks and investment securities using the same tools as its criminal parentage such as fraud, extortion, forgery, money laundering, wire fraud, obstruction of justice, or otherwise, the elements of racketeering much more effectively.

Such structures can emerge, evolve and vanish, then reappear to suit the opportunity. They involve the equivalent of a loosely tied *Capo* or *Wise Guy* supporting membership in the structure. The one exception, is the necessary role of the *Consigliere* equivalent. This player is one of the few location bound entities the organization may require. This position is most often filled by individual lawyers or small partnerships, though on occasion, small firms with partners having a strong mutual trust between the firm's attorney and their clients. The Internet lawyer exerts less influence than the older world *Consigliere* in the administration of the business of the organization. Nonetheless, the modern gangster attorney plays a vitally important role in the legal Petri dish of modern organized crime. Internet crime control is illusive at best, and there is little doubt that Internet law primarily addresses privacy[7] concerns. This provides a safe haven for the Internet criminal. The modern fraud criminal's ability to load or discharge from one safe berth to another berth has confounded almost every federal Circuit Appellate Court, save the Ninth Circuit, which has managed to find a very small procedural fissure in the statutory polder of the Decency Act. The modern *Consigliere* is well aware of this, and given difficulty inherent in prosecuting fraud in either the civil or criminal significance, the attorney maneuvers his client through the quagmire by influencing his client's strategic

---

[7] The Communications Decency Act (the "Decency Act")

planning and creating slippery legal instruments that best effects the clients' deceptive

trade practice and operational tactics.  Additional necessary roles provided to the criminal

enterprise, are the protections provided to relationship by attorney/client privilege, public

perception, standing, and visibility in the community. They often serve as the liaison

between the ringleader and influential figures or legitimate individuals and entities.


3.2  THE INSURMOUNTABLE CIVIL PROSECUTION OF THE MODERN MOB

AND THEIR SUCCESS.  Internet gangsters and even lone Internet criminals are aware

of the difficulty of mounting a successful suit against them.  Likewise, they have even less

fear of state or federal authorities assisting their victims.  They know well that

complainants will rarely get past the intake officer of any agency.  The indifference to

individual citizen complaints to officials in federal agencies, assures the modern criminal

their crimes will pay off.  A recent example, is, after the many red flags that might have

tipped officials off to Bernie Madoff's fraud, and eight SEC investigations[8] over sixteen

years, Madoff was not caught; it took essentially, a national financial catastrophe before

Madoff was caught and prosecuted.

Essentially, without overwhelming proof of the fraud particulars, it is difficult to get

past Rule 9(b), which the crime group's attorney will surly attack with vigor, knowing full

well that no one will freely hand over evidence.  All this makes criminal investigation

difficult, and civil action nearly insurmountable because of the very nature of the fraud

artifice, and the higher pleading standard required for fraud. This particular civil

---

[8]  *Madoff Chasers Dug for Years, to No Avail*
*Regulators Probed at Least 8 Times Over 16 Years; Congress Starts Review of SEC Today,*
http://online.wsj.com/article/SB123111743915052731.html

planning and creating slippery legal instruments that best effects the clients' deceptive trade practice and operational tactics.  Additional necessary roles provided to the criminal enterprise, are the protections provided to relationship by attorney/client privilege, public perception, standing, and visibility in the community. They often serve as the liaison between the ringleader and influential figures or legitimate individuals and entities.

### 3.2  THE INSURMOUNTABLE CIVIL PROSECUTION OF THE MODERN MOB AND THEIR SUCCESS.  Internet gangsters and even lone Internet criminals are aware of the difficulty of mounting a successful suit against them.  Likewise, they have even less fear of state or federal authorities assisting their victims.  They know well that complainants will rarely get past the intake officer of any agency.  The indifference to individual citizen complaints to officials in federal agencies, assures the modern criminal their crimes will pay off.  A recent example, is, after the many red flags that might have tipped officials off to Bernie Madoff's fraud, and eight SEC investigations[8] over sixteen years, Madoff was not caught; it took essentially, a national financial catastrophe before the Madoff was caught and prosecuted.

Essentially, without overwhelming proof of the fraud particulars, it is difficult to get past Rule 9(b), which the crime group's attorney will surly attack with vigor, knowing full well that no one will freely hand over evidence.  All this makes criminal investigation difficult, and civil action nearly insurmountable because of the very nature of the fraud artifice, and the higher pleading standard required for fraud. This particular civil

---

[8]  *Madoff Chasers Dug for Years, to No Avail*
*Regulators Probed at Least 8 Times Over 16 Years; Congress Starts Review of SEC Today,*
http://online.wsj.com/article/SB123111743915052731.html

procedure and agency indifference, is exploited by the illusive crime organization when these complex and sophisticated networks are involved in litigation.

3.3  THE FIRST FRAUD SCHEME.  The first fraud scheme is an international investment private placement program built around a large complex structure of recently created, established, and inactive entities.  The scheme included the cooperation of other entities used for funneling monies into the Defendants' operation and for the distribution and laundering of funds[16] out of the organization. The enterprise is operated as a single *association-in-fact* international syndicate[9] (the "Syndicate"); much of the operation related in the instant cause beginning just prior to December18, 2009 (see figures below). The Syndicate uses some legitimate financial machinery and instruments to lever large funds from "prime" banks. The organization then conceals the funds, never paying out the investors. The network construct of the Syndicate is quite complex like most white-collar organized crime engaged in racketeering. It is a dynamic part of the operation continually adding pipelines for the movement and distribution of funds. The following diagram is by no means complete because of the Plaintiffs' delayed discovery, but establishes the depth and complexity of the Alicorn/Idlyc/BMW Majestic Syndicate. Prior to the collaboration of the Gelazela-Reynolds-IDLYC and Woods-BMW Majestic enterprises with the Koster-ALICORN group, both Reynolds and Gelazela had created a number of companies and networks of their own. Koster eventually collaborated with IDLYC and BMW to form the

---

[9]  See FN 23; Alicorn/Idlyc/BMW as RICO Association-in-Fact Enteprise

Syndicate with his attorney handling much of the Syndicate's and Koster's "issues".  See illustrations below.

The Minnesota-based Koster developed numerous mechanisms to conceal the vast majority of his operation with the aid and collusion of Kerim S. Emre, Thomas P. Harlan, and John Childs. The facts below will establish the operational nature of this unified collective (the "Collective") that has evolved its own *persona* which comports to accord with, and facilitate, the attainment of their business objectives and forms the organization's culture. The Collective exhibits an aggregate *collective narcissism*[10] which reflects what appears to be an elemental *malignant narcissism*[11] expressed by individual members. One of the shared characteristics among the Collective's members, is their frustratingly pleonastic employment of a *doublespeak* vernacular they have developed, and use relentlessly. Koster, Emre, and Childs use their evasive language as a prevarication, to create intentional misunderstanding, or as a vague response to avoid Plaintiffs' questions. They also use this technique in replies or reports in messages that they wish to  infer different meanings than that which was intended by the Plaintiffs. The second trait shared among Koster, Emre, Harlan, and Childs is their Collective identification that seems bound by a common emotional investment in the unrealistic belief of invincibility and their self-absorbed social importance. Koster's reactive behavior of heightened arrogance is often expressed in verbal or messaging exchanges with the Plaintiffs' concerning their demands for proof and production. It is often a predictor of his

---

[10]  Golec de Zavala, A., Cichocka, A., Eidelson, R., Jayawickreme, N. (2009). "Collective Narcissism and Its Social Consequences". Journal of Personality and Social Psychology 97 (6): 1074–96. doi:10.1037/a0016904. PMID 19968420.

[11]  Fromm, Erich, The Heart of Man, 1964; *see also*,

evoked hostility. All of the Collective's members seem to react with enmity in response to criticism of the group. The Plaintiffs' continual demands for adherence to fiduciary duty appears to challenge the Collective's integrity and a threat to the group's positive image to which they react aggressively. Upon disinterested observation and examination of the pleadings, and the evidence incorporated from the exhibits, the observer will readily identify and assimilate these attributes as the unvarying and habitual method of the Collective's operating procedure.

Koster aided by the Firm's lawyer, Thomas Harlan, created various instruments that would lead most of the Collective's clients to believe they had no recourse if ALICORN failed to perform, even if the program was riddled with fraud and entrenched corruption. Koster used Childs as his primary resource for the purchase of financial instruments, and Childs advanced himself as an independent contractor. Nonetheless, Childs would engage Koster's clients as an ALICORN agent, often working closely with Koster's clients as would an account manager.

Emre on the other hand, was presented by Koster as a broker who managed the client account. Emre solicited, advised and managed the account. Moreover, Emre's primary function was as the *Front Man* that ran interference for Koster. Emre maintained a canopy of anonymity for Koster, and aided in the concealment of the company's activities. Though Koster always referred to Emre in the context of Emre's relationship with the Plaintiffs as a broker, Emre seemed to resent being "the broker". As the Syndicate's transactions became more involved, and Emre completely managed the Plaintiffs' account, and other functions for the Syndicate, the more Emre seemed to assume, or to be given, the more important role of an *Underboss* in the Syndicate. It was initially

impossible to contact Koster directly. Koster exclusively used conference calls with Emre

which he represented the phone number to be the company's main number. Later it

would be uncovered, that it had been Emre's cell phone in which he used three-way-

calling to simulate an office phone network.  It wasn't until Clarkson discovered and

informed Flores (Exhibit 50) about Koster's cell phone number appearing in an

advertisement (Exhibit 51) unrelated to Koster financial business.


3.4  THE SECOND FRAUD SCHEME.  The second fraud consists of a

ALICORN/HALL/BEREA/CBS Gold Buy/Sell program (the

"ALICORN/HALL/BEREA/CBS Enterprise"), which was purportedly substituted for

the performance failure of the first program. It was actually used to dissuade, delay or

otherwise disrupt Plaintiffs investigation and eventual litigation. The second motive for

the delay was to allow time for the moving of assets, and to give members of the Syndicate

time for covering up and purging of physical and other circumstantial evidence.

The substitute schema would evolve into another unlawful taking of the Plaintiffs'

revenues generated from the Richard Hall/Berea Gold Buy/Sell transaction. Both of the

schemes were contrived, and both, nothing less than *mala in sese*.

Moreover, the second artifice was created as a tool to delay, dissuade or otherwise

prevent the discovery of the larger international scheme that came under intense scrutiny

by the Plaintiffs. Koster and Emre were aware of the Plaintiffs' intense investigation of

their syndicate operations, and they continued a pattern to impede those investigations.

Koster came into conflict with Flores after Koster stated he was questioned by SEC

authorities and later withheld information concerning wire and telephone communications

with Woods and Gelazela. Flores, admonished Koster on several occasions about Koster's intentional obstruction of justice and pressed Koster to cease aiding and abetting the other members of their Syndicate operation and their commissions of crimes. Flores, stated to Koster, that Koster had first hand information and other evidence, which he withheld from the Plaintiffs as well. Flores expressed that he would inform the SEC if Koster would provide to him the evidence. However, Flores stated he couldn't approach the SEC or Justice Department with only heresy. By all accounts, Koster, Harlan, Childs and Emre were aware of the criminal objectives of the Syndicate. Shortly thereafter, it became apparent to the Plaintiffs that Koster, Harlan, Emre, and Alicorn were inextricably intertwined with the activities of Woods, Reynolds, Gelazela, Idlyc and BMW Majestic.

3.4.1   The Syndicate's international private placement program incorporated financial transactional funding[12] in the order of Twenty-five Billion Dollars U.S. ($25,000,000,000 USD) with twenty (20) principals according to Koster. The said transactional funding platform and related financial instruments were created within an association-in-fact business enterprise in which Defendants Woods, Gelazela, Reynolds, Koster, Harlan, and Emre presented security for investment funds based on a stated written bank guarantee on a Deutsche Bank SBLC instrument and monetization of that SBLC through HSBC Hong Kong.

---

[12] Transactional funding "… Essentially, this is a type of service where investors … are given the opportunity to use a type of loan called the bridge loan, that allows you to undertake the simultaneous closings safely and with the backing of money provided by the loan. … With transactional funding and the bridge loan under it, you are already conducting valid closings that give you the opportunity to make money out of opportunities in the form of simultaneous closings." Source: Duncan Wierman - Author:

3.4.2    The Defendants promised returns on the investment trades which were alleged to have been scheduled trades with subscribed associated buyers. The SBLC instrument was reportedly transmitted to and receive by HSBC Hong Kong and returns paid to a New Zealand company and reported to have been paid to certain U.S. principals. The balance which was due to the Plaintiffs and others, was not paid and was alleged to have remained in Hong Kong or transmitted elsewhere to avoid paying investors and thereby effecting a laundering scheme of the Defendants ill-gotten funds. The Alicorn profit-sharing partnership consisted of about four partners, of which Flores one, and Clarkson his partner. The Syndicate used Koster's Alicorn Capital Management LLC company as a funneling tool overseen by Koster to move funds into the IDLYC/BMW investment platform. The following Gelazela and Reynolds corporate networks diagrams, and the schematic of the Syndicate and ALICORN/HALL/BEREA/CBS Enterprise, illustrate the architecture and process of the two fraud schemes, becoming eventually concurrent in their operation. The Defendants used a complex network of their companies and other indirect network resources to accomplish their theft of money, frauds and alleged criminal activities.

3.4.3    The Syndicate schematic, and the ALICORN/HALL/BEREA/CBS Enterprise below, is deduced from digital and Internet forensic investigation, documentary, and other evidence of which some accuracy is dependent on representations made by the Defendants.



**Figure 1** William Chandler Reynolds Corporate Network

Source: CorporationWiki.com



**Figure 2** Gelazela – Reynolds Corporate Network Interface

The ALICORN/IDLYC/BMW MAJESTIC Syndicate
&
the ALICORN/HALL/BEREA/CBS Enterprise



* Madigan, Dahl & Harlan, P.A.

Figure 3 Criminal Networks Map

3.4.4   Flores' purpose for position as a partner was to extend negotiated commercial primary funding from a well-established international developer, source of his primary funding, for a slate of motion pictures consisting of five producers, having responsibility to five production crews, related talent and other resources.  Among the groups affected by the Defendants fraud is the Nez Perce Nation and the Affiliated Tribes of the Northwest.  The groups' have made great efforts, and commitments toward the production of the film <u>Blanket of the Sun,</u> a project of one of the producers. Their efforts and commitments included three thousand participants from the Tribes and the Nation, use of their sacred lands, period wardrobe and effects, all in the dedication to this people's intention to a long forestalled preservation of their culture.

Additionally, the use of funds from the primary funding included initial purchase of facilities in San Antonio, Texas in which the local government had gone to extensive efforts to accommodate the development of the production facilities and related production needs. Flores had alternative sources to secure the funding from the international developer, however, the Defendants assured Flores they would deliver their payout in sufficient time for Flores to secure his primary funding, as their financial product was secured by a written guarantee from a large international bank. Koster and Emre were well aware and had full understanding of the liabilities and rigorous requirements for scheduled payments.

3.4.5   Scott Anthony Koster, Mark Alan Gelazela, William Chandler Reynolds, Thomas P. Harlan, Kerim S. Emre, and Steven E. Woods, *inter alios,* established the international Alicorn-Idlyc-BMW Majestic Syndicate, then, after receiving partnership funds, expropriated all control over the funds, and secreted or otherwise

censored documents and information as well as the dissemination of the information

legally due the Plaintiffs. Defendants through an enterprise of their creation, engaged

in the international scheme extending from the United States across the Pacific to,

among other places, Hong Kong, People's Republic of China (PRC); Manila, Republic

of the Philippines; Australia; Canada; and New Zealand to eventually defraud the

Plaintiffs and others through false or fraudulent pretenses, representations, and

promises.

Koster, by his own accounts, funneled the monies of the profit-sharing partnership

into the large financial transaction, through Idlyc Holding Trust LLC into the control

of Gelazela, Reynolds, Woods and BMW Majestic LLC. A self-styled boss in the

financial industry, Koster saw himself having equal footing with Gelazela, Reynolds

and Woods, and joined the Syndicate conspiracy and intentionally, willfully, and by

design, established his place in the enterprise whose aggregate and components were

mere tools or business conduits of one-another.

3.4.6   Kerim S. Emre by his own account "negotiates direct buys from major

motion picture and television studios" in his position as "VP of Marketing".[13] Gelazela

also  goes by his Hollywood alias "Mark Zella", and purports to be a resident of

Marina del Rey, California actor, producer, and screenwriter. Both Emre and

Gelazela appear to be intimately engaged with the film and television industries and

would be aware of the damages and harm Defendants would, and eventually did, inflict

upon the Plaintiffs. Emre, worked directly with Koster promoting their financial

---

[13]  Exhibit 16

products and managing the Plaintiffs' account. Koster, Gelazela, Reynolds, Woods,

Harlan, and Emre through their Syndicate hatched a labyrinth of fraudulent plans to

form a private placement platform and bank guarantee funding program. The

program extensively used the telephone voice wires and the Internet to execute and

further the scheme to defraud the Plaintiffs.

3.4.7   Flores was contacted by Kerim Emre who represented a company,

inferring the due diligence effort from another and separate project of which Flores

was familiar. Emre offered his "private placement instruments" that would enable

short term payments needed to increase the size of the security instrument to Flores'

funding provider, Prosperity International LLC. The enlargement of the loan was

needed for the increased cash flow requirements for a completed motion picture film's

prints and advertising.

3.4.8   In the instant case, the Syndicate operated much like the highly publicized

Bernie Madoff who kept investors happy by sending statements showing good, steady

returns to a few people and sending bogus reports out, which prosecutors said were

fiction. Similarly, Koster made assurances, promises, and commitments of the security

and status of the partnership's financial instrument in an even larger scheme.

Defendants promulgated the solicitation and promotion of their financial products,

advancing the same business model and operational attributes of themselves[14] directly

influencing and impinging upon the social fabric and the public good through their

---

[14] "We [Alicorn Capital Management LLC] can provide a proven track record in all of these fields, *with full disclosure and transparency.*" (*emphasis added*) *See,* Exhibit 19

fraudulent inducement. (*e.g.*, Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20, Exhibit 21)

3.4.9   Within weeks after the transaction start of December 18, 2009, Koster began a pattern of omissions, and misrepresentations refusing to provide proof of his status reports and denying access to any verifiable documents that would demonstrate the legitimacy of his claims. When a demand became heated, Koster manufactured a Straw Man to distract and delay the delivery of proof to the Plaintiffs. Koster in the end, refused to consider providing verification, saying that doing so would consume his time and he considered such to be "babysitting" as he had other important business commitments requiring his full attention.

3.4.10   Plaintiffs relentlessly gave Koster and the Defendants legal notice of civil and criminal law, including Koster's duties as a fiduciary, and the liabilities from the damages that resulted by his flagrant disregard for regulations, statutes, and obligations. Defendants were given legal warnings based on clearly asserted facts or legal principle over a period in excess of fifteen months to which Koster responded only by silence. Legal warning provided well-supported citations of law and precedent so that Koster, Harlan, and their associates in the Syndicate would be fully informed and have complete cognisance and understanding of their actions. Koster, Harlan and Emre, in behalf of themselves and their associates in the Syndicate, remained arrogant and unresponsive, refusing to alter their otherwise unlawful or illegal behavior.

3.4.11   After months of continuous inquiries and demands for verifiable documentation of the transactions concerning the ALICORN/IDLYC/BMW

transaction, Koster, Childs and Emre only replied with phone calls and e-mail intimating that the funds would be delivered, maintaining their position not to produce any verifiable documents or information. These tactics would persist for both the IDLYC/BMW transaction, which Koster eventually, some how, dissociated, and the substituted Richard Hall/Berea Gold Buy/Sell transaction until a recent demand for production of documents, as fully set forth in the recital of the facts below.

3.4.12  Koster was continually informed of the substantial damages being accrued as a result of failures to perform and the continued delay of those performances resulting in lost revenues and losses related to missing critical marketing windows. As well, Koster had full knowledge of the potential loss to Flores of his original $100MM funding instrument for which Flores, relying on Emre's and Koster's assurances and statements of the bank guarantees, released his collateral for the primary funding instrument which was lost at the end of February of 2010. Again, when the PSP defaulted the second time, Flores lost a second funding source of $165MM in March because of the Defendants performance default. Though Flores castigated the Defendants concerning the harm they were inflicting upon communities, crews, casts production people and other communities by their unconscionable conduct, Defendants remained unmoved and unconcerned by the damages and harm their actions had inflicted. To this, Defendants responded that these people would come crawling back later, intentionally affronting Flores' personal and professional responsibility concerns and sensibilities from which the collective damages, and further ensuing harm and malice of the Defendants, brought about this litigation.



3.4.13  On or about June 14, 2010, Koster purported to have exchanged the Alicorn PSP performance liability for the partnership's placement into Richard Hall's "Gold Buy/Sell" transaction which "would be levered up" to reach the promised IDLYC returns. Then on or about August 4, 2010 Mr. Emre stated that the first payment from Flores' Gold Buy/Sell participation would occur on August 10, 2010.

3.4.14  It wasn't until September 1, 2010 at or about 12:23 PM CST, that the intermediary agent or facilitator of the Gold Buy/Sell transaction, Richard Hall, was introduced on a conference call with Koster, affirming the participation of Flores in the substituted Gold Buy/Sell transaction. However, the September 1st meeting was already twenty-two days past the stated transaction date and no buy/sell agreement had been delivered. Promises were made by Emre and Koster counseled by Harlan, that the transaction would be resolved to the Plaintiffs' satisfaction. Nonetheless, Defendants' continued their breaches of their fiduciary duties of care and loyalty.

3.4.15  Even after all that had transpired, Koster, aided by Harlan, attempted to sneak through a measure to take Plaintiffs out of the direct returns of the Gold Buy/Sell transaction which Defendants promised and Plaintiffs agreed upon. Defendants stealthily replaced the initial understanding and agreement with only a loan payoff for an Intermediary who would take the profits instead. In response, Flores and Gary Grab, attorney at law, representing Clarkson, jointly demanded production of the Gold Buy/Sell transaction partnership agreement, a copy of the SBLC instrument, and the Gold Buy/Sell contract. Koster insisted the documents were being generated by Richard Hall and would be delivered shortly thereafter. Though copies of several documents were delivered to Flores, no copies of the

requested financial instruments with the information requested by Flores and Grab were delivered. It is factually apparent, given the evidence at hand, that the acts of the Defendants, relating to the Gold Buy/Sell transaction (the "Gold Transaction"), were made with malice aforethought and the willful intent of constructive fraud, by and through Defendants' breach of fiduciary duty, their fraud in the factum, fraud in the inducement, fraud in law, and actual fraud.

3.4.16  Further factual exploration of these events, unveil Defendants' deceptive intent and outcome that were intentional, willful and contrived and executed by interstate wires over the telephone and Internet and is proof of intended detrimental reliance being among the *sine qua non* requirements of satisfying the proximate cause of Defendants fraud.

3.4.17  Plaintiffs have made every effort to resolve this issue to no avail and have no alternative but to bring this Complaint before the Court for resolution of the issues presented herein.

WHEREFORE, pursuant to the requisite specificity set forth by FED. R. CIV. P. 9(b) the Plaintiffs further plead:

## § IV   STATEMENT OF FACTS AND ALLEGATIONS

Plaintiffs incorporate by reference from the records, Plaintiffs' Exhibits Volumes 1, 2,

3, 4, 5, 6, and 7, the Certified Domestic Business Records contained there within,

pursuant to, and in accordance with Fed. R. Evid. 803(6),  FRE 801(d)(2), and FRE 803(6)

asserting that, regarding the aforesaid Certified Domestic Business Records, there is

substantive foundation for heresy exception, in that the source of information or method

or circumstances of preparations are trustworthy.[15] The facts having their existence in all

of the exhibits are hereby re-averred and re-alleged, for all purposes, and incorporated

herein with the same force and effect as if set forth verbatim herein.


### 4.1  FIRST SOLICITATION

4.1.1   Shortly before December 2, 2009, FLORES was contacted in Dallas on his

telephone by Mr. Kerim Emre. Emre stated he had become aware that Flores' was

searching for an additional letter-of-credit ("LOC") or standby-letter-of-credit

("SBLC") to purchase. Flores informed Emre he required the financial instrument be

---

[15]   The standard for authenticating computer records is the same as for authenticating other records. The degree of authentication does not vary simply because a record happens to be (or has been at one point) in electronic form. See *United States v. DeGeorgia*, 420 F.2d 889, 893 n.11 (9th Cir. 1969); *United States v. Vela*, 673 F.2d 86, 90 (5th Cir. 1982). But see *United States v. Scholle*, 553 F.2d 1109, 1125 (8th Cir. 1977) (stating in dicta that "the complex nature of computer storage calls for a more comprehensive foundation"). For example, witnesses who testify to the authenticity of computer records need not have special qualifications. The witness does not need to have programmed the computer himself, or even need to understand the maintenance and technical operation of the computer. *See, UnitedStates v. Moore*, 923 F.2d 910, 915 (1st Cir. 1991) (citing cases). Instead, the witness simply must have first-hand knowledge of the relevant facts to which he or she testifies. *See generally, United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (FBI agent who was present when the defendant's computer was seized can authenticate seized files) *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985) (telephone company billing supervisor can authenticate phone company records); *Moore*, 923 F.2d at 915 (head of bank's consumer loan department can authenticate computerized loan data). Evidence that a computer program is sufficiently trustworthy so that its results qualify as business records according to Fed. R. Evid. 803(6) also establishes the authenticity of the record. *Compare, United States v. Saputski*, 496 F.2d 140, 142 (9th Cir. 1974).

able to supplement an increase of a loan for a motion picture production slate in order to accommodate the cash flow for a completed film requiring prints and advertisement.[16] During the telephone conversation Emre assured Flores that he and his business partners, including Scott Koster, could solve Flores' immediate needs with a high quality private placement program, allowing Flores to enlarge his loan instrument and affording the immediate cash flow requirements for the new film slate addition and insure the March-release of the completed film.

4.1.2   Flores explained to the Defendants the critical nature of changing the funding mechanism by incorporating their proposed instruments.[*3] Flores further elucidated upon this need to maintain his obligations and responsibilities to the producers, crews, talent, involved in his slate of films as well as other commitments to humanitarian documentaries and production commitments to the City of San Antonio, Texas. Flores stated the Defendants would have to assure him that their financial product would not interfere with his ability to maintain the funding commitments of senior funding resources, more specifically, Prosperity International.

## 4.2   12/2/2009 - EMRE SOLICITS AND OFFERS FINANCIAL SOLUTIONS.

4.2.1   On December, 2, 2009 4:16 PM CST,[17] Kerim Emre proposed and offered, by wire over the Internet, a Forty-million dollar ($40,000,000) SBLC financial instrument whose lower costs would provide an economic advantage over Flores

---

[16]   Increase to accommodate P&A high cash flow needs of the film ("Randall") that was scheduled for theatrical release in March of 2010.

[17]   Unless otherwise noted all time references indicated are North America Central Standard Time or show offset adjustment to GMT standard time for North American Central Standard Time (CST).

having to spending equity and using his factored Michigan Tax Rebate, saving

$1,128,600 in factoring fees. (Exhibit 3)

4.2.2   On December 3, 2009 9:23 AM, Kerim Emre notified Flores, by wire over

the Internet, that he would have the SBLC paperwork "shortly" and was also trying to

get the escrow paperwork at the same time. Emre provided instruction, advice and

stated his belief that the instrument would satisfy FLORES' requirements for his

negotiated senior financing from Michael F. Burgess' (Managing Member) of

Prosperity International LLC. Later on 12/3/2009 at 12:45 PM, 3:16 PM, 4:05 PM and

other times by telephone Kerim Emre inquired on information and metrics needed to

satisfy the amount of the letter-of-credit to satisfy the Prosperity financing

specifications."[3] (Exhibit 4)

4.2.3   On December 8, 2009 at 11:48 AM, 2:00 PM, and 3:34 PM, Kerim Emre, by

wire over the Internet, completed the transaction documents, managed the execution

of the purchase for Flores of an irrevocable and assignable Bank Guarantee ("BG")

for fifty-five million dollars ($55,000,000.00) from a Top World Bank. Emre stated the

BG would be delivered through a separate agreement from the source of the collateral

providing the BG under the basic terms as follows:

James Long, 2848 Grey Moss Pass, Duluth, GA 30097, Tel. (770)
715-0909
• Amount: $55,000,000.00 (USD) Term: 12 months (renewable12
month periods).
• BG Supplier: Deutsche Bank AG London.
• Method of Delivery: SWIFT MT760.
• Call Option Fee: $38,000 (USD) 20,000 EURO of the Call Option
fee applied to the Bank Service Fee at Payment.
• Cost: 10.25% (Due to [the] supplier within 72 hours of closing)
Includes Issuance Fee • Client to Supply: Irrevocable Corporate
Pay Order Timing to close within 72 hours of confirmation on
delivery of issuance-fee to escrow.

4.2.4   On 12/9/2009 at 3:33 PM, Kerim Emre provided the escrow service

information that would be used for the bank guarantee payment transfers to

Prosperity International LLC ("Prosperity") and related fees. Later at 6:07 PM,

Emre sent wire instructions that a bank guarantee ("BG") would be executed as soon

as Prosperity International is ready to fund. Kerim requested bank coordinates where

the BG was to be delivered to Prosperity's Account and how the Bank Irrevocable

Commercial Payment Order or MT103.23 would issue.

4.3   12/10/2009 - 1ST FRAUD SCHEME (Alicorn/Idlyc/BMW Majestic)

4.3.1   The Solicitation & Alicorn Introduction – Koster/Idlyc Offer. On

December 10, 2009 Kerim Emre called Flores by telephone from a domestic phone

number (951) 719-4819 to solicit and present an additional opportunity in which his

business partner would provide the P&A cash flow for his Canadian picture at Voice

Pictures, Inc.[18] ("Voice Pictures") film "Randall".

---

[18]   Voice Pictures Inc., Goose Pictures Canada Inc. B8, Suite 111, 2526 Battleford Ave. SW.
Calgary, AB T3E 7J4; Wendy Hill-Tout (Principal)

4.3.2    From Friday, December 10, 2010 through December 14th, Kerim Emre and his business partner Scott A. Koster at Alicorn Capital Management LLC initiated conference calls by wire from phone number indicated on caller ID as (951) 719-4819 to discuss their program:

4.3.2.1  Emre and Koster promoted IDLYC as a well established private placement fund institution whose principal, Mark A. Gelazela, had close personal relations and strong business ties with Scott Koster and Alicorn. IDLYC purportedly used a "proprietary strategy pre-negotiated and secure " involving an active, controlled and complex investment structure whereby PSP's monies would be secured by a letter of credit or standby letter of credit issued by Deutsche Bank and monetize by HSBC Hong Kong in a written guarantee by the Platform in order to protect the PSP's funds, stabilize returns and protect against dramatic trading market fluctuations.

4.3.2.2  Defendants again advanced the IDLYC principals as highly experienced in international banking having established business relationships with top banks including HSBC Holdings PLC, Deutsche Bank and Credit Suisse Group. Defendants represented that IDLYC purchased bank guarantees and other financial instruments, including Mid Term Notes (MTN's) from the banks in very large blocks on behalf of a large collection of investor/lenders for substantial discounts. It was stated by Koster that the platform's program was guaranteed in writing by Deutsche Bank. Emre and others, as well, would in turn, take a substantial portion of the weekly proceeds from the beneficiary Flores, in addition to Emre's broker fee. The consensus by the Defendants was that the IDLYC

payment would pay for the SBLC and Flores could release his equity from the Michigan. Flores could then use another instrument to increase the loan size, since the Deutche Bank letter of credit was purchased and the HSBC Hong Kong funds were in place. The <u>PSP payout funds arrival should occur on January 4, 2010 and be distributed by the escrow attorney on or about January 12, 2010</u>, depending on the wire transfers to and from the escrow account paymaster.

4.3.2.3  Defendants articulated they would place the Plaintiffs' money in the PSP and Flores, would in turn, own a proportional interest in the IDLYC PPP platform which was guaranteed in writing by a secured financial instrument. Flores asked Koster to provide the due diligence report to him, and Koster pledged that "his friend Mark", Mark Gelazela,[19] had a successful financial trading company which Koster had substantial knowledge, experience and had previously obtained successful results with Mark Gelazela's transactions for other clients.


## 4.4  8/30/2010 - KOSTER DESCRIBES THE BREADTH OF HIS COMMERCIAL ENTERPRISE

4.4.1  Koster Describes His Enterprise.  On August 30, 2010 8:43 PM, (Exhibit 72) Scott Koster wrote to Flores explaining the size and breadth of his business.:

> "Lance, I just wanted to take a second, and explain what all else I do throughout the day … Ive never really talked to you about what I do, outside of you being involved with me on the IDLYC transaction.

---

[19]  Idlyc Holdings Trust LLC (IDLYC); 01/07/2010, FL; FEI/EIN # 271651047
Mailing Address: 3677 Jasmine Ave., Los Angeles CA 90034
a. Mark A. Gelazela, Title MGRM (Registered Agent), 3677 Jasmine Ave., Los Angeles CA 90034 USA
b William Chandler Reynolds, Title MGRM, 26 Marlwood Lane, Palm Beach Gardens, FL 33418 USA
Idlyc Holdings Trust, Head Office, Melody Lane 9, Ruakura Road, 3216 Hamilton, New Zealand

"Right now, John [Childs] and I have several pending, and delivered financial instruments to Richard [Hall] and his group [see FN[20]]. In addition to dealing with those clients, we have lending files to follow up on, instrument files not going to the Buy/Sell, two separate BG purchase transactions, and we are starting a new company [Interlink Global Messaging], to issue SWIFT messages for HedgeFunds, small banks, brokerages, and individuals who do not otherwise have the relationships with their own bank to get items delivered. Its like depository of sorts. In addition to those, we are working with several banks in the Phillipines [sic] to start getting them to issue instruments directly, rather than having an investor own the money.

"I know that does not seem like a lot, but pair that with other life tasks and commitments, the day dissapears [*sic*] very quickly. Nobody works for themselves to be swamped all the time, but it seems that each day I become a slave to my job. Please understand that I am just sitting back and chilling with any of this. I know this has not come up from you lately, but each time I feel horrible, because you have not had a chance to see anything outside of this one nightmare of a transaction. I did not get to where I am today from failed transactions, and I hope that I get to show that to you soon.

"So with all of that being said, I did not get ahold [*sic*] of Richard this evening. He did commit to getting the call knocked out, but we just cannot match schedule's to do this.

Scott"

4.4.2   Koster's Public Acclamation and Promotion. Essentially the profile and

public financial offerings of Koster's Alicorn Capital Management LLC is

comprehensively described on the company's Internet web site, to wit:

---

[20]   Vladimir Pierre-Louise; CFO/Secretary, Berea Inc., and Christine Wong-Sang; President, Berea Inc.



**Figure 4 Alicorn Capital Management - Services (Vol. 6 Exhibit "**

### 4.5  12/11/2009 - PROFIT-SHARING AGREEMENT

4.5.1      On 12/11/2009 10:22 AM, Kerim Emre, by wire over the Internet, delivered

"the JV agreement for the trade program." (Exhibit 5) In essence, the metrics of the

PSP was summarized the PSP Agreement Overview:

> "Alicorn Capital Management has a direct working relationship with a PPP
> that has a surplus of holdings in the amount of 110,000,000,000.00USD (One
> Hundred and Ten Billion Dollars) in Bank Guarantee (BG's) with the
> following Financial Institutions; HSBC Hong Kong, Standard Chartered
> Hong Kong, Deutsche Bank Hong Kong. Our company has been provided
> with the opportunity to obtain these instruments at a discounted fee, to be
> taken directly back into the Platforms own programs. The profit for this
> program, based on these instruments, is 15% weekly or better, <u>guaranteed
> in writing by the platform</u>. This is a limited entry offer. The following buy in
> points will allow you the a [sic] return of the corresponding amount based
> off of the issuance of a <u>100MUSD Bank Guarantee</u>." (*emphasis added*)

4.5.2   On December 11, 2009 5:40 PM, Kerim Emre sent the following message by wire over the Internet summarizing the payout terms, PSP payout summary, his fees and attached the Alicorn Profit-Sharing Agreement and Fee Protection Agreement.

> Emre: "Hi Lance, Just to be safe, I am sending you the PDF as a doc file.  I also included the FPA for the trade.  You will be getting approximately 1.8M/week, of which 16.7% will be the brokers' fees, which will leave you, in your pocket, 1.5M based on the 1.8M being paid out." (Exhibit 6)

4.6   12/14/2009 - FIRST REQUEST FOR DISCLOSURE. Throughout the period from about 12/14/2009 through 12/30/2009 Flores made numerous telephone calls to Emre at his phone number 951-719-4819 or 951-224-6844 requesting full verification of associated contracts including information of the partners in the PSP. Flores further requested that he be copied on the banking and financial transactions related to the PSP transactions, the IDLYC and partnerships' revenues. In that period, Flores executed a non-disclosure agreement (NDA) in order that he could maintain due diligence on the integrity of Alicorn and IDLYC transactions. Emre insured Flores that full disclosure and transparency[12] would be afforded to Flores upon execution of the NCND (Non-Circumvention Non-Disclosure Agreement) and as each contract was completed. Shortly thereafter the mutual non-disclosure was executed.

4.6.1   On 12/14/2009 11:27 AM, Kerim Emre, by wire over the Internet, sent wiring instructions for the trade partnership (Exhibit 7) to:
Scott Koster
TCF Bank
19270 Freeport Street, Elk River MN 55330
763-441-1560

Routing Number: ████0001 [21]
Account Number: ████7813

   4.6.2   On 12/14/2009 3:43 PM, Kerim Emre, by wire over the Internet, sent wire instructions for Flores to John T Childs. At 1:02 PM, Kerim Emre delivered a non-circumvention non-disclosure agreement to Flores, in order to receive full disclosure of the partnership's structure, finances, transactions and the operations of the PSP.[12]


## 4.7   12/15/2009 - SYNDICATE'S COMPULSION TO SOLICIT FUNDS FOR PSP

   4.7.1   On 12/15/2009 2:51 AM, Kerim Emre sent a message by wire over the Internet to check on funds. At 10:18 AM, Kerim Emre instructed: "… please make sure that the wire goes directly into to [*sic*] Scott's account rather than into John's account. This should speed things up and get us in by the deadline."

   4.7.2   On 12/16/2009 1:26 PM, Kerim Emre, by wire over the Internet, stating that he was "[g]etting calls from Scott's [Koster] people[22] to find out where we are with sending the wire …"

   Later, at 1:49 PM, Kerim Emre wrote: "… they are nagging me at this point about the transfer …"

   At 2:42 PM, Kerim Emre wrote: "As you can see I am getting some grief on this at this moment. Where are we at? It shouldn't take this long to get the wire conformation from them? Did they just not send it? 'I don't think he understands.

---

[21]   Redacted pursuant to Fed. R. Civ. P. 5.2 "… a party or nonparty making the filing may include only: … (4) the last four digits of the financial-account number."
[22]   *See also* John Doe(s) defendants, ¶ 1.2.16, pg. 9, *supra*.

This needed to be done first thing this morning.  It is now 2:34 CST.'" [Sender's name not cited by Emre; presumably, Koster]

And later at 4:07 PM, Flores responded to Emre with the information and identification of the first "funds resource for the SBLC ..."

At 6:32 PM, Kerim Emre acknowledge Flores' message; then at 9:48 PM, Kerim Emre wrote: "... Just wanted to let you know the 80k didn't hit Scott's account today. Hopefully you can get me the receipt still and it hits his account tomorrow."

4.7.3   On 12/17/2009 9:42 AM, Kerim Emre, by wire over the Internet, established a number to send wiring information to the Syndicate: "... (925) 407-8440 is the fax number we need to use. [Interlink Global Messaging]"  At 3:13 PM, Kerim Emre inquired again about the deposit of funds for the Alicorn PSP; at 4:05 PM, Kerim Emre wrote again that the funds hadn't arrived and "they moved ahead without us."

4.7.4   On Fri, Dec 18, 2009 at 9:31 AM, Flores, by wire over the Internet, informed Kerim Emre that the funds would be delivered that day.  At 11:43 AM, Kerim Emre acknowledges the message and that information would be forwarded; and at 10:15 PM, Kerim Emre wrote: "... Here is the copy of the wire confirmation message" confirming the receipt of the funds with bank confirmation attached (Exhibit 8).

4.7.5   On 12/21/2009 4:48 PM, Kerim Emre, by wire over the Internet, informs Flores that he updated Flores' banking coordinates with Global Paymaster, LLC, the PSP's paymaster (for PSP escrow account).

**4.8  FALLACY & DECEPTIVE TRADE PRACTICE – 1ST Fraud Scheme –  The Alicorn/Idlyc/BMW Syndicate[23]**

4.8.1   Modus Operandi.  The underlying conspiracy to commit fraud.  It is necessary at this point in the enumeration of the Statement of Facts, to set forth the context of the allegations and the facts because of the complexity and deception that is intrinsic in fraud claims of this nature, international breadth[24] and scope. Essentially there are two parts to the Syndicate fraud formula. The first part is the conspiracy. Its construct is formulated acts, expressions, omissions, and concealment, that are calculated to deceive the Plaintiffs to their disadvantage, after the inducement or the fraud calculated by inducement is effected. These contrivances lie dormant until a catalyst is introduced that destabilizes the Syndicate's commercial operation scheme through a challenge to the legitimacy of the Defendants' activities and commercial endeavor. The second part of the fraud scheme is initiated after they have failed to perform through their initial breach of fiduciary duty resulting in the unleashing of their arsenal of fraud constructs.

---

[23]  The Alicorn/Idlyc/BMW Syndicate is a group of persons *associated-in-fact* for the common purposes of investment contracts and of conducting the fraudulent scheme described in this Complaint, namely, fraudulently inducing investments that were supposed to be, and were represented to be, safeguarded and prudently managed.  As a result, Syndicate defendants constitute an *association-in-fact enterprise* within the meaning of Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961(4) and 1962(c).  During all relevant times, the Syndicate was engaged in activities affecting interstate and foreign commerce, and conducting the fraudulent scheme described herein.

[24]  Scott A. Koster on Thursday February,4, 2010 at 11:20 : "... As I have outlined to your brokers, there are over 20 principals totalling [*sic*] greater than 25 Billion USD in transactional funding that is taking place." (Exhibit 23) (Later exposition will disclose an international network clients as well as corporations, agents related to , *inter alia*, Alicorn, IDLYC, BMW Majestic LLC, incorporating the services of the largest international banks across the globe)

4.8.1.1  Fraudulent Inducement. The inducement is constructed by 1) locating legitimate or seemingly legitimate financial products, 2) identifying prospective clients and propose the financial product by presenting credible entities, 3) offering transaction security through written bank guarantees from credible sources, 4) requiring legitimate financial industry and government disclosure conformance of the client through Client Information Summary ("CIS") containing confidential information and 5) requiring execution of a stringent Non-Disclosure so that Defendants can effectuate their standard procedures and policies[25] with full disclosure and transparency of the PSP business' affairs. The foundation of the Defendants' solution begins with the solicitation of clients through personal business networking connections and relationships,[26] thus, substantiating their assertions using associations with large institutions and their diverse network of Internet presence demonstrating Defendants' numerous relationships with legitimate resources.[27]

Lastly, the financial offering in the PSP Agreement sets forth guarantees and security of the transaction (*see*, Agreement Overview ¶ 4.5.1, pg. 40). This is the "Inducement" part of Defendants' fraud by inducement. At this point of the process, the proposition and offerings appear relatively legitimate and gives no rise for suspicion of criminal intent.

---

[25]  (FN 3, pg. 7)

[26]  ... ; such as Emre's then ongoing due diligence and offerings by Flores' business colleagues and associates involved and working on unrelated projects.

[27]  *e.g.* Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20, Exhibit 21

4.8.1.2  A Catalyst for the Fraud.  It is the next part of the Syndicate's formula that contains extensive fraud. The Plaintiffs' challenges to the Defendants' conduct that is well outside ordinary business and financial industry's standards and practices. This would include the demand for proof by bona fide verifiable documentation of the PSP-IDLYC performance was the catalyst that initiated the Defendants' reaction. This was the condition where each time a challenge or demand for proof was made, the Defendants initiated an extensive plan of deceit through their actions that follow:

## 4.9  12/14/2009 — 12/30/2009 KOSTER INITIATES A PATTERN OF CAMOUFLAGED ARTIFICES

4.9.1  The First Straw Man.  Following Flores' demands for authentication from the period of 12/14/2009 through 12/30/2009,[28] Emre responded by wire over the Internet on 1/4/2010 1:17 PM, writing:  "… Here are the redacted contracts of the trade that Scott is using for the buy/sell trade we got you in. [sic]…" (*emphasis added*).

4.9.1.1  The document proffered as authentic documentation of the PSP and verification of the IDLYC PPP execution of the Deutsche Bank Hong Kong SBLC instrument, the HSBC Hong Kong or Standard Chartered Hong Kong monetization of the SBLC, and the documentation to verify the performance of the Platform and related transactions was completely defaced by redaction. This

---

[28]  ¶ 4.5.2, pg. 41

rendered the document unreliable, devoid of authenticity and without any verifiable substance that the IDLYC PPP was executed or that the PPP was genuine. (Exhibit 9) Clearly, the document was unaccommodating to the accepted disclosure understanding and obligations of the Defendants. In an overtly fraudulent method of responsibility and compliance to producing material documents of critical and substantive import to Flores, the Defendants produced with incontrovertible scienter, an unverifiable completely discreditable copy of the alleged "contracts of the trade" that was intended to mislead with a reckless disregard for the truth.

4.9.1.2  Plaintiff, in turn, responded by calling Emre demanding disclosure of the information so that the transaction could be verified by the Plaintiff. No response to Plaintiff's demand for verification or correction of Defendants' of non-disclosure defects have been forthcoming to date.[42]

4.9.2   Second Straw Man.  On 1/5/2010 8:08 PM, the next day, Kerim Emre wrote by wire over the Internet:

> "Bond/BG ISIN number XS0205433377 that the instrument is going to be issued on."[29]

Emre's response provided an ISIN number which Flores could only verify that a financial instrument was issued by Deutsche Bank AG London (Exhibit 11) as were thousands of others issued by the bank. The value of the information was useless as there was no proof that this financial instrument secured the PPP nor did it offer to

---

[29]  Exhibit "J"

whom the instrument had been issued or if it collateralized or attached to the PPP in any capacity whatsoever.

### 4.10  1/7/2010 - PAYOUT AND DEPOSIT SCHEDULE.

On 1/7/2010 12:52 PM, Kerim Emre wrote by wire over the Internet:

"  1. Settlement is Friday. [Friday, January 8, 2010]
   2. This Friday will be the first settlement. So there will be 39 more.
   3. Money will be wired on Monday. [Monday, January 11, 2010]
   4. This wire will hit scotts [*sic*] paymaster then be distributed from there.
   5.  Future wires will go direct to JV principals not through Scott.
   6. Scott should have a hard copy of the actual BG early to mid week next week that will be provided to the JV partners." [*notation added*] (Exhibit 12)

### 4.11  1/13/2010 - EMRE TAKES A 16.7% CUT OF FLORES' PSP EARNINGS.

On 1/13/2010  2:17 PM, Kerim Emre wrote by wire over the Internet:

"... subfee agreement for Global Paymasters.  I filled out my information, but I'll need you to fill out the header, as well as yours so we can be setup for disbursement.  Please sign/date/etc and then send back to me.  I will then sign my portion and and [*sic*] send it back to you as a PDF. ..." (Exhibit 13)

### 4.12  1/13/2010 - FRAUD BEGINS WITH DELAYS, DECEIT, AND MORE ARTIFICES

4.12.1  1/13/2010 - DEFENDANT'S LONG SILENCE.  On or about 1/13/2010 Flores began numerous inquiries about why there had been no deposit to his bank account. Koster had reaffirmed (*ibid.* ¶ 4.9.2, *supra*) his previous schedule (¶ 4.3.2.2, *supra*) for the deposit, however provided no prior notice or explanation when the deposits for the PSP partners did not arrive. Flores received no verifiable answer nor

credible explanation other that there had been some delay in the transaction due to the holiday of a banker (the "HSBC HK Banker" also "John Doe 3") in Hong Kong. After telephone calls placed to Emre, Flores insisted on a direct follow-up with Mark Gelazela at IDLYC and identification of the HSBC HK Banker with no response. Defendants were unresponsive until 1/26/2010 when Flores received a forwarded message from Koster through Emre.

4.12.2  1/13/2010 — 1/25 2010 - LEGAL NOTICE: LEGAL RIGHT TO RELY ON INTEGRITY AND HONESTY.[13, 14, 15, *2]  During that period of twelve days that began about 1/13/2010, Plaintiff restated to Emre that he and Koster had a fiduciary duty that vests in Plaintiffs (the "Entrustors"), the legal right to rely on the integrity and honesty of Koster, Emre and their partners as well as the quality of the services Fiduciaries are required to provide.

4.12.3  Further, Flores reiterated to Emre the jeopardy their performance failure has placed on his "slate funding"[30] and the mounting damages along with the increasing cost of delaying crews, talent, and affecting location availability. Plaintiff also informed the Defendants he had suffered irreversible damage to his reputation, and loss of credibility and trust with the "A" List crews and talent, and that would extend into the industry including unions, and local government officials who were working to create incentives for employment and education for their constituents and the economic welfare of their communities anticipating the arrival of the slate productions."[3]

---

[30]  Motion picture production funding from Prosperity International for a slate of productions scheduled for YR 2010 (this is a temporal bound reference relative to the period in which the terms and availability of the funding were limited).

4.12.4  With the scheduled funds delivery date nearing two weeks in the arrear and inquiries seeking explanation, Koster began a credibility damage control campaign by creating a ruse. Koster embarked on a plan to first create a false trust and a sense of legitimacy using decoys by where he presents faithless corroboration for his claims.

4.12.5  Defendants' first device was the use of disguised or altered replicas of documents. The device's form may or may not have been initially authentic, but its intended purpose was to solicit Plaintiffs' trust and quell Flores' due diligence inquiries while intentionally misrepresenting and omitting the true condition and status of the IDLYC/PSP transactions. As well, the deceit was intended to hide any information that Flores could use to explore the state of those transactions.

4.12.6  The Defendants second device was staged to fill in the evidentiary voids in Defendants physical artifices, *i.e.* Defendants altered or defaced documents. Koster would next convey unverifiable accounts to the Plaintiffs of his meetings between himself and inferred administrators of the high-level international banking transaction events. Koster related to Plaintiff that he had this access by virtue of his unique liaison with official financial industry operatives. Defendants intended the use of these reports along with the "sanitized documents" to established a collective inferential credibility of Defendants' claims, and to sustain genuineness of the documents Koster had in his possession and was about to produce to the Plaintiffs.

**4.13  1/26/2010 - THE THIRD MAN OF STRAW**

4.13.1  1/26/2010 - FIRST SELF-JUSTIFICATION FOR THE DELAY. On

1/26/2010 6:32 PM, Kerim Emre forwarded an e-mail message sent to him that

afternoon from Scott Koster by wire over the Internet to explain the state of the PSP

and IDLYC financial transactions. Koster cites a message allegedly sent to him by

Mark Gelazela "with the trade platform" at IDLYC setting up the first excuse for the

delay of the funds delivery due fifteen days prior to this point.[46] Gelazela:

> "Please express our thanks to all the clients for their continued patience.
> As mentioned, all is going well and we presently have received 4
> preadvices for 4.6b. of those 4, we have verified and authenticated 2 of
> them.  We are having some of the hard copies picked up on Monday.  It
> was supposed to be delivered by the sending bank earlier, but we are
> now picking them up ourselves (via qualified couriers).  This, and the
> banks moving slowly (some of the bank officers at HSBC didn't arrive
> back from vacation till the 16th of Jan), have been the source of the
> delay.  All of this translates to being able to make small payments next
> week with bigger ones to follow the week after that and full payments
> two weeks after that, then each week thereafter.  Thanks again."

4.13.2  2/3/2010 - NOTICE TO DEFENDANTS OF ACCUMULATING

DAMAGES.[*3]

On 2/3/2010 at 11:33 PM CST Plaintiff Flores wrote to Emre requesting a report

from Koster on status information which was vital to Flores in handling damages and

liabilities being incurred through Defendants' failure to perform:

> From: "Lance @ MFI" <lance@mockingbirdfilms.com>
> To: Kerim Emre <kerim.emre@gmail.com>
> CC:
> Subject: Status Report?
> Date: Wed, 03 Feb 2010 05:33:30 GMT
> Content-Type: text/plain; charset=utf-8

Does Scott have a report for us. I've got to do some maneuvering in order to begin damage control. I need some kind of reliable information to assess losses, liabilities, etc. and work on some kind of recovery.

Lance

4.13.3  On 2/3/2010 2:04 PM, one week after Kerim Emre's 1/26/2010 6:32 PM

message, Emre forwarded an update via e-mail from Scott Koster concerning Bank

Guarantee[31] Preadvice[32]. (Exhibit 14)

Koster: 'I am putting together a more solid update as we speak. I am in receipt of the pre-advice for the BG that our group, and several others that I am a direct party to, are transacting off of [*sic*]. Please convey to your investor/client my gratitude and appreciation for being patient through all of this. As you can imagine, we are all very anxious to be in receipt of conformation [*sic*] of the first payout.

I appologize [*sic*] for just now getting back to you. I will be forwarding this update to John, which will include a Non-disimination [*sic*] disclosure, so that I can then forward on the Pre-advice in a sanitized format for everyone to see that there is true performance happening here :)'

It is clear that Koster has made a claim that he has some benefit of privileged

information that which he is about to furnish as legitimate and expects "everyone" to

believe so. Koster also extends the emblazonment of a "Non-disimination [*sic*]

disclosure [document]" which he knows is clearly unnecessary given the

---

[31] A guarantee from a lending institution ensuring that the liabilities of a debtor will be met. In other words, if the debtor fails to settle a debt, the bank will cover it.

[32] Preadvice. Preliminary information about a letter of credit (L/C) sent by the issuing bank to the advising bank where time is short. It notifies the recipient that the named buyer has opened an L/C of a specified amount for a named seller (beneficiary), and usually includes the statement "the credit will follow" or words to the effect. Depending on the jurisdiction, a preadvice may or may not irrevocably commit the issuing bank to actually issue the said L/C. Therefore, the advising bank generally does not issue an advice of credit but only notifies the beneficiary of the receipt of preadvice so that he or she (if willing) may proceed with the processing of the buyer's order. Also called preliminary advice. (source: BusinessDictionary.com)

comprehensive NCND already executed[33] by Flores and the purported partners. Koster states he will provide "a sanitized" copy of the "Preadvice" bank communication "for everyone to see that there is true performance happening here" apparently anticipating that notifying "everyone" will prepare Flores and others that he intends to present <u>another unverifiable document as proof of the legitimacy</u> of the financial transaction he is managing for the PSP.[42]

4.13.4  On 2/3/2010 2:49 PM, John Childs wrote (Exhibit 15) that he was "expecting another update tonight or tomorrow morning" and presented an e-mail message from Scott Koster stating he was going to provide "more recent information" and that he had attached" a non-disclosure agreement, "so that [Koster] may without worry, forward on the items that I am in receipt of, to provide to our PSA clients proof of performance."[42] Koster then attempts to misrepresent and memorialize the state-of-mind in an expression of common knowledge to "our clients" by declaring "[a]s all of our clients are aware, there have been numerous setbacks and holdups," when actually, the only awareness was that from personal knowledge, that Koster's delivery of the funds were in arrearage, and nothing more. Koster attempts to place his words into "[his] clients" mouths.

Koster declares he then had a "more solid picture of what has been transpiring;" that picture being an expected first payout "within a loosly [*sic*] spelled out timeline" thus setting up for another delay opportunity.

---

[33]  *See* ¶ <u>4.5.2</u>, pg. <u>41</u>

The next claim by Koster disregards the previous reference in an earlier message which inferred that a group of HSBC HK bankers on very extended holiday (at least a 24 day holiday) caused the delay. Now Koster directs blame upon one banker, the HSBC HK Banker, whom IDLYC had been working with throughout the process as causing the delay in the delivery of financial returns. Koster's inference is that this single banker out of the hundreds of bankers employed at HSBC Hong Kong was the sole banker responsible for a financial transaction estimated to exceed a half billion dollars, went on "vacation from shortly before the [Christmas] holidays, to the 16th of January." Further, Koster's asserted, in common purpose with IDLYC, that this lone banker from this Two-and-a-Half-Trillion dollar financial institution,[34] responsible for this rather large financial transaction, that had originated before the holiday, and continued transacting between the 27th of December, 2009 and the 4th of January, 2010, made no provisions for attendance of this transaction by any other banker, cut off all communications, and left on a twenty-five day vacation.  All this considering the Instance Type Transmission[35] informing HSBC Hongkong and Shanghai Banking Corporation Limited on December 24, 2009 at 10:08 AM of the sender "redacted", acting on behalf of Trask and Affiliates, BMW Majestic, and redacted beneficiary, of the deliver of the financial instrument via MT 760 issued by redacted issuer.[36]

---

[34] As of 2010, HSBC is the world's sixth-largest banking and financial services group and the world's eighth-largest company according to a composite measure by Forbes magazine.[*] It has around 8,000 offices in 91 countries and territories across Africa, Asia, Europe, North America and South America and around 100 million customers. As of 30 June 2010 it had total assets of $2.418 trillion, of which roughly half were in Europe, a quarter in the Americas and a quarter in Asia. { [*] "Special Report - The Global 2000," Forbes, April 2, 2008. "HSBC tops Forbes 2000 list of world's largest companies," HSBC website, 4 April 2008 }

[35] Exhibit 25

Koster would have the Plaintiffs believe this "resulted in a number of delays and a lack of communication flow coming our way, through IDLYC. He then claimed "[t]he funding has been schedualed [sic] to follow approximately one week after the receipt of the hard copies of the instruments, at which time, myself [Koster], as well as all of the other principals, will be in receipt of their hard copy as well.[42]

4.13.5  DEFENDANTS CREATE A FACADE TO ELUDE PROOF.  Koster states[36] that "[a] direct request by a partner of mine, as well as myself [sic] for proof of this was directed towards IDLYC, as well as their attorneys." And now the hedge,

> Koster: "To comply with this request, we were required to sign a Non-dicimination [*sic*] agreement, outlining that we would not, under any circumstances, provide this to any parties, outside of those listed on the agreement. After receiving this agreement, we went back to the group, and requested the authorization to forward a sanitized version of this document, to 3rd party individuals who have a direct relationship to our personal transactions. We provided a list of names, as outlined in the PSA that each of you have signed with ACM, and have been given permission to forward these documents on, after receipt of the NDA's back signed by each PSA contributing member ..." (Exhibit 15)

4.13.6  ESTABLISHING PSEUDO-LEGITIMATE RESOURCES. The term for this deceptive practice is referred to as *authentication by association* and used by Koster continually to construct each man of straw. In retrospect, the *modus operandi* of the Defendants' Syndicate, was obviously formulated at the onset or prior to the instant event as a standing procedure and business formula.  It was implemented for the Alicorn/IDLYC transaction by advancing the established investment and trade experience as well as Koster's and Emre's networked connections to legitimate or

---

[36]  Exhibit 15

pseudo-legitimate financial resources. Some of the resources would have known of and participated in the activities of the Syndicate having full or partial knowledge, or a variance thereof, in the Defendants' commercial operations; while others would be unaware and connected by legitimate means or be legitimately engaged through misrepresentation of the Defendants.

    4.13.6.1  Koster, the *authority apparent*, of the Syndicate, responded to challenges to his arrogating and unequivocal authority and the operations of the PSP, constructed a crudely developed squad of *straw men* to support his plan to unleash a contrived deception fallacies plan. Each Straw Man was fashioned to distract, dissuade, confute or avert challenges to the legitimacy of Koster's claims of the PSP financial performances, credibility of his status reports, and demands for proof for the delays. Koster would use a facsimile of an official document or form and deface any information that would allow independent verification or establish any genuineness to the article, continuing to create of one-man-of-straw after another.  Their purpose was simply to frustrate, exasperate, and cause delay. When Koster's straw man collapsed after forensic examination by the Plaintiff, he resorted back to his fallacy messaging, by distracting from the truth, using vague and inexact wording in his rebuttal. Koster's argument would always be extremely deceptive because he carefully crafted his responses, disregarding the possibility that there was any alternative explanation except his. Reexamination of the foregoing facts and those that next follow, will reveal Koster's pattern and use of