disjunctive syllogisms to develop his maze of misleading information and deceptive

business practices.


**4.14   2/4/2010 - DEFENDANTS' FALSE PROOF OF PERFORMANCE.**

4.14.1  Notice of Delivery of Promised Proof of Performance[12]  On 2/4/2010

6:43 PM, Kerim Emre wrote:

"… Just wanted to keep you in the loop.  Scott has received all of the NDAs back from all of the principals involved.  It should be fairly quick that you receive the proof of performance information that was promised.  We are also going to be getting a full update outside of this soon." (*emphasis added*) (*see*, Exhibit 22)

4.14.2  Flores responded to Koster's request for a second non-disclosure

agreement and received acknowledgment from Koster by his transmittal, an attached

copy in his 2/4/2010 11:20 PM message, below, and his attachment of the signed NDA.

(Exhibit 24)


**4.15  2/4/2010 - KOSTER DELIVERS THE THIRD STRAW MAN.[12]**

On 2/4/2010 11:20 PM, Scott Koster wrote by wire over the Internet:

"… you are not being provided this document for any reason, other than to provide the much needed proof of performance …  Our BG has been delivered to the funder [*sic*] via swift, as well as the hard copy, but no release has been given as of Wed FEB 3 rd … As I have outlined to your brokers, there are over 20 principals totalling [*sic*] greater than 25 Billion USD in transactional funding that is taking place. …  I am also attaching a copy of the signed and received NDA as conformation of your signature. " (*emphasis added*) (Exhibit 23)

Flores did not have access to his regular e-mail client but was able to access the

2/4/2010 11:20 PM Koster message, but unable to open the attachment. Several days

later he opened the message's attachment to examine the document which Koster had

sent for the purpose of providing "the much needed proof of performance." The

document was another man of straw. It appeared to be a copy of a SWIFT™ [37]

acknowledgment received by HSBC Hong Kong, but because the document was so

defaced, it could have been one of any number of messages sent out on the proprietary

bank network. Koster's transmitted copy of the document identified nothing that

would suggest a scintilla of Koster's promised proof of performance.[12] The document

did not even identify the sender who presumably controlled the purported Twenty-five

Billion Dollar fund[38] of the PSP and its senior-partners.

Plaintiff Flores once again called Emre complaining about the Defendants' bogus

document without receiving any concession in the form of verifiable evidence related

to the document's purported proof of performance, to no avail. Flores continued his

inquiry and demands for proof, but Defendants remained silent and never responded

on the matter.[14]

---

[37] SWIFTs are used for the secure electronic messing and transmittal of banking transactions. SWIFT™ is the trade name of S.W.I.F.T. SCRL.  Source for process and technology: SWIFT User Handbook Online at http://www.swift.com > Support > Documentation.
[38] See FN 24, pg. 44.

**4.16  3/5/2010 - DEFENDANTS ARE INFORMED OF THE MOUNTING**

**DAMAGES.**[3]

> On Mar 5, 2010, at 10:13 AM, Lance Flores wrote:
>
> "John - will there be a status report today? I don't care if it is good or bad
> news, but today I have to make some draconian decisions to cut my losses
> and initiate damage control.
>  lance"


**4.17  DEFENDANTS' BEGIN LONG CAMPAIGN OF DELAY AND DECEIT**

The Plaintiff's persistent challenges for proof and refusal to accept Defendants' bogus

representations of verifiable documentation caused the Defendants to withdraw into

silence and reluctance to return calls or respond to Flores' messages. As well, the

Defendants ended their straw man campaign and did not produce another document to

the Plaintiffs, bogus or otherwise for another nine months. It would not be until

11/16/2010 4:26 PM,  after informed of Plaintiffs' intent to file this Original Complaint and

production request by Flores and Gary Grab, attorney for Vicki Clarkson; even then, the

production did not comply with the production request. During the following nine months

Defendants continued their fraud and deceptive trade practices with delays, diversions,

and more misrepresentations and omissions.

4.17.1  Plaintiff Flores' telephone inquiries continued without any substantive

results concerning the status and proof of performance. On 2/19/2010 4:48 PM CST,

Kerim Emre responded to Flores' Friday, February 19, 2010 22:44:41 GMT message

asking for news from Koster with little more to say than "... we'll be hearing

something on Monday rather than today ..."

4.17.2  DEFENDANTS CONTINUALLY ARE INFORMED OF

DETERIORATING CONDITIONS.   Throughout the course of events since early

December of 2009 Flores had been diligent in informing the Defendants of the state of

reliance upon the Defendants' candor and fiduciary duty through news and reports of

liabilities and damages they had caused. For example, the candid and timely dialog

relating to the Defendants fraud, and the goodwill losses and economic jeopardy

Defendants had placed upon the Plaintiffs, in the activities with the City of San

Antonio concerning the production facility.[39] Defendants were well aware that the

Plaintiffs would endure continued economic burdens and damages resulting from the

intended detrimental reliance they had calculated and induced. This intended reliance

was willful and wholly predicated on their wire frauds. It will be from this vantage that

Defendants fraud formulations would further evolve their complex fraud scheme:

4.17.3  From mid-February, 2010 until about mid-March, consisted of inquiry of

the status and complaints from Flores about the accumulating harm the Defendants'

delay and deceptions were causing the Plaintiffs. Emre insisted he was not assuming

any responsibility as a fiduciary and dismissed the Defendants' inducements of

written guarantee from the financial resources and Defendants' promises, inferring

the Defendants shouldn't have been trusted.[†, ‡2, ‡3]

---

[39] *See* Exhibit 26

**4.18  3/15/2010 — 3/16/2010 - KOSTER & ATTORNEY CLAIM WITNESS TO PERFORMANCE.**[12, 16]  There hadn't been any progress in meaningful information until after John Childs response to Flores (Exhibit 27) when Koster, whose legal counsel was Thomas P. Harlan, a lawyer representing himself to be of high qualified and substantial experience,[40] followed on 3/15/2010 12:13 PM and on 3/16/2010 10:24 AM, the next day stating that he and his attorney had first-hand proof, having visually confirmed performance and no intentional delays of the Alicorn PSP/IDLYC transaction. Koster suggested a short-term alternative was possible, but made assurances of his trust and the viability of the Syndicate's transaction. (Exhibit 28 at ①)

> Koster:
> "… I will call you directly as soon as I talk with the trader. <u>Myself and my attorney have seen proof with our own eyes</u> of this working, and where the holdup is, so its [*sic*] not an issue of nonperformance, or deliberate delays. As I stated very early on, this is one of the only trade groups that I trust, as I have seen performance by them in the past." (*emphasis added*)

**4.18.1  The April 2nd Scheduled Payout & Default.**  On Thursday, March 18, 2010 1:59 PM, Scott Koster in a message Stated he had received an update from one of his partners on another instrument who spoke to "the trader", and it appeared that the first payout was on track "for the April 2nd [2010]" (Exhibit 29 at ①) and would be out of the country and providing current updates by e-mail. Koster noted he had spoken to the trader that Monday, who stated that "if there were any delays, they would be

---

[40]  "I have been involved in hundreds if not thousands of lawsuits, including a number in Texas." (Exhibits Vol. 5 - Exhibit "123" at ¶ 1)

SWIFT related delays, and would only hold things up for a few days." (*see*, Exhibit 29) Koster's assurances fail, no payout ever occurred.

4.18.2  Defendants Exhibit Conscious Indifference to Silence, Concealment & Non-disclosure.  Koster and Harlan had knowledge of the true facts and circumstances, stated above, and had fiduciary duty including the duty to speak, inform and provide documentary verification to the Plaintiffs, as that duty of care had arisen in this instance. However, they did not, and by fraudulent inducement, coerced reliance and fraudulent intent, instead maintained and continued the various frauds, fully aware of the consequences of their tortuous acts which they knew would injure the Plaintiffs. Defendants, but particularly Koster and Harlan, also knew that by concealing information of grave consequential import, it would likely cause great harm to the Plaintiffs.

Defendants, specifically Koster, counseled by Thomas Harlan,[41] continued their conscious indifference, concealment and willful silence and deprivation of information legally due the Plaintiffs. They knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming of certain related rights later through their silence and non-disclosure.[42, 44]

---

[41]  Clearly Harlan has substantial legal experience and is aware that a lawyer who commits fraud, advises his client to do so, or has knowledge that his client has committed fraud or about to commit an act of fraud, and  fails to advise him of the law and consequences, or aids and abets his client in fraud in the conduct of a business, is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. (MRPC Rule 8.4., Minnesota Rules of Professional Conduct)

**4.19  EXTRINSIC FRAUD ATOP DETRIMENTAL RELIANCE.**

4.19.1  Defendants used and continued to use that same detrimental reliance as a weapon to threaten Plaintiffs with contract non-performance should Flores continue his pressure on Defendants to seek proof of performance or criminal complaint, or civil litigation. Defendants' threats were clearly intended to shift responsibility of any financial transaction failure to the Plaintiffs continued due diligence efforts or legal action.

4.19.2  Of far greater import, is the malice aforethought and criminal intent in the Defendants' fraud scheme. In addition to the continual fraud perpetrated over the wires on the Internet to this point in time, Koster decisively decided to risk criminal liability by instituting coercion, duress and intimidation and threatening Plaintiffs and any who attempted to verify his or the Syndicate's or the traders' veracity or validity by terminating their contracts and throwing them out of the PSP. Koster stated that he had done so to another partner, he labeled a troublemaker. Additionally, he threatened the same for anyone making an insinuation about seeking legal criminal or civil action.

4.19.3  Undoubtedly, Koster felt he was above the law and could unilaterally terminate all contractual rights or claims of a partner in these circumstances. The Defendants' clear intent was to instill the fear of losing everything, in the minds of the Plaintiffs and others, to assure Defendants control and continued detrimental reliance

of the Plaintiffs on Koster. The Defendants executed these actions through the use of

the public communications wires over the Internet in the furtherance of their fraud.

**4.20  3/26/2010 - KOSTER DECLARES 100% CONFIRMATION ARRIVAL OF**

**FUNDS IN U.S.**

   4.20.1  On  Friday, March 26, 2010 at 12:43 PM, Scott Koster, representing the

Syndicate, sent a message to the Plaintiffs stating:

> "Funds have been received here in the US for the purpose of our
> program through IDLYC, as well as several others. This has been
> 100% confirmed to be true directly by the head trader at HSBC HK,
> as well as by the CEO's of IDLYC, the two bodies transacting this
> program for all of the principals."  (Exhibit 30 at ①)

Koster asserts that the funds arrived in the United States in the

ALICORN/IDLYC/BMW transaction, based on first and second hand information

from the HSBC Hong Kong "head trader," but does not specify what bank or to whom

the funds were delivered; neither does Koster identify the head trader at HSBC Hong

Kong who made the "100%" confirmation.[12]

**4.21  3/26/2010 - DEATH KNELL TOLLS FOR PSP PARTNER.**  Koster next writes

alleging:

> "There have been numerous hangups along the way, to include one
> principal making direct death threats to the program managers, then
> going to the FBI to try to ruin the whole program after he was
> kicked out."  (*id.* at ②)

The Syndicate speaking through Koster claims that a principal in the transaction was kicked out based on allegations of making death threats and going to the FBI. Through this communication the Syndicate expresses the gravity it places on clients contacting the U.S. Justice Department (FBI) giving it equal measure with making a death threat. Whether or not their allegations are true was never verified by the Plaintiffs. But, by Koster's example, he makes the point by dragging the ousted principal's corpse down the street, to deter the Plaintiffs from making contact, reporting, or complaining to investigating officials about the actions of the Syndicate. Here again, the Defendants stretch their extrinsic fraud to nearing the point of obstruction of justice, but in either case, extrinsic fraud or obstruction of justice it is fraud perpetrated over the wire, *i.e.*, wire fraud.[13, 12, 17, 18]

**4.22 SYNDICATE/KOSTER BLAME HSBC FOR DELAYS.** Koster speaking for the Syndicate then blames HSBC Hong Kong for the delay by inferring fraud on the part of the bank through their intentional delay to unjustly make a profit, yet provide no proof. Thus, if untrue they have purposely made written defamatory representation that conveys an unjustly unfavorable impression about HSBC Hong Kong.

> "HSBC is has been more than difficult in moving the funding along, as they continue to collect interest on the funds the longer they hold them in their hands." (*id.* at ③)

> "Our bankers have expressed that funds are eminent nearly every day for at least a week and a half. We did have an issue after the Chinese new year, but that was handled and we were not expecting further delays. We do feel that things are going to finalize shortly, but certainly understand that your patience is wearing thin. Ours is as well. Banks historically have a habit of delaying funds as long as

possible to keep their balance sheet as high as possible to get as
much interest as possible before relinquishing control." (*id.* at ⑤)

## 4.23  3/26/2010 - KOSTER MAKES 2ND CONFIRMATION AND ADDS ANOTHER

HEDGE.  Koster confirms once more "directly" with his first hand information with

another scheduled date for funding. He now adds new conditions to the delivery noting

that the "principals" will receive back their initial investments. None of the proceeds will

be issued to the PSP partners, however. They will receive funds on the next week's

delivery. [16]

Koster:

"Currently, we are looking at approximately 2-4 weeks for full funding to
take place. There may be one small funding, which will be the principals
initial investments, and the following week a payout. This is information
that has been confirmed directly, and is not second hand information, or
rumor." (*id.* at ④)

## 4.24  3/26/2010 - CANCELLATION EDICT FOR VOICING LEGAL ACTION

Koster unveils a direct threat to terminate PSP financial transaction if he finds out

about any utterances of legal (criminal), or civil action; apparently singling out the

Plaintiffs.

Koster:

"Your rights apropos of continuance, are very simple, and clearly stated
within the contract.  We do expect everyone to remain professional despite
the hiccups.  And for those it applies to, in the event we hear profane
threats of any kind (legal, civil, or physical) we will immediately cancel your
transaction." (*id.* at⑥)

Clearly Koster was exerting a threat in the form of extrinsic fraud, that is, fraud that infects the actual judicial process, by which he intended to inhibit the Plaintiffs from filing complaints through legal challenges or referral to a governmental investigative agency. Further, it is also evident that it is Koster's intent to conceal other frauds, thus, Defendants' actions of deceit are consequently broadened by Koster attempted <u>fraudulent concealment by extortion</u>. Koster threatened the Plaintiffs with the intent to obstruct an investigation or judicial proceeding and violated the prohibitions or requirements applicable by law.  Because Koster conducted the extortion of the Plaintiffs' property, their money from the transaction, over the wires, is another instance of wire fraud.[†4, †2,†7,†8]

4.24.1  Friday, March 26, 2010 20:52:11 GMT – Later that day at 2:52 PM, Flores frustrated by another unjustified delay, and incensed by more lies, and Koster's threat to thieve Plaintiffs' earnings, asked for a justifiable "answer" (Exhibit 31).

4.24.2  Monday, March 29, 2010 16:07:36 GMT – Three days later on Monday, at 4:07 PM, after receiving no credible response from the Defendants, Flores sent a message to Koster: "Scott, I'd like to get through the riddles and vagueness; perhaps get some clarification (about Koster's previous message)." (Exhibit 32)

4.24.3  The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to Defendants' fiduciary duty through Silence, Concealment, Beach of Contract for Nonperformance, Breach of Common Law Duty of Good Faith, Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due

Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel particularlyPromissory Estoppel, Estoppel by Non-disclosure, Estoppel by Silence, Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned facts, Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[*5,*6*7,*9,*13,*19,‡1,‡2,‡4,] (see also, ¶ 4.18.2, 62)

4.24.4  The Elements Of Equitable Estoppel were satisfied and are asserted against the Defendants in that (1) The Defendants were advised of the facts; (2) The Defendants intend that their conduct be acted upon by the Plaintiffs, or the Defendants acted in such a way that the Plaintiffs had a right to believe it was so intended; (3) The Plaintiffs were ignorant or were previously misinformed of the true facts by the Defendants; and (4)  The Defendants had by their frauds and coercions forced or induced the Plaintiffs into a detrimental reliance.


4.25  3/30/2010 — 4/14/2010 - 91ST DAY IN DEFAULT - 116TH TRANSACTION DAY – DISCLOSURE REQUEST – TERMINATED PARTNER SPEAKS OUT ABOUT IDLYC

In the period from March 30, 2010 to Plaintiff's April 14th message, Plaintiffs' continued requests for information in order to plan recovery from damages. They also sought to reaffirm Koster's confirmation of the funds and the clarification of his

evasive discussion of additional distribution delays suggested during phone conversations. Flores urged Koster to initiate legal action seeking an injunction, since the initial funds had arrived in the United States, against Mark Gelazela and William Chandler Reynolds to insure the collection of the funds. Koster immediately dismissed the suggestion stating again that "Mark" was his friend. Koster wanted to give Gelazela more time to distribute the funds, and would prefer to find another opportunity later down the road.

4.25.1  On Tuesday, April 13, 2010 7:55 PM (Wed, 14 Apr 2010 01:55:42 GMT) Flores sent a message notifying Koster that the ALICORN/IDLYC/BMW transaction was about 40% in arrearage (no revenue paid out) and Flores wanted a documented answer from Gelazela. Flores also noted again to Koster, the damages to him from the transaction nonperformance."[3] Included in the message was a fraud story, a few days old, posted on the Internet concerning Koster's friend Gelazela and his partner Reynolds that occurred in exactly the same time frame as the PSP's transaction. (Exhibit 32)

4.25.2  "On 4/13/2010 9:55 PM, Scott Koster wrote:

"... this funding has been delayed, ...

Also, regarding the post on ripoff report, there are always two sides to every story. One client who I brokered in requested a refund, and it was granted to him pending he signed a release of liability. The poster on ripoff report screwed himself, in that all of us signed a ncnd, as well as an agreement to not purposely attempt to disrupt the funding process by going to external sources prior to exhausting all provisions in the contract."

Koster responded two hours later that evening, announcing that the PSP was delayed and not going to be paid from the funds that he and his attorney, Thomas P.

Harlan, had verified the funds had arrived in the United States. In the same message

Koster acknowledged the partner that had written the complaint on the Internet, was

indeed the individual he had removed and terminated from the PSP. Koster remarked

upon the requirement for that individual to execute a release of liability. <u>This</u>

<u>requirement was not in the agreement</u>. Only a demand was required.

Moreover, it was an unlawful coercion to require the partner to execute the release

of liability in order to have his money returned; particularly after Koster had

defaulted on the contract by nonperformance and fraud. In fact, Koster's act of

holding the partner's money hostage and extorting a release from liability, was clearly

coercion, or worse, extortion, if the partner was terminated for suggesting legal

action, or reporting Koster's actions to the U.S.  Justice Department.

4.25.3  Koster's Reinforce Previous Threat of Retaliation.  There is little doubt that

Koster's message was a veiled threat intended to reinforce his previous threat of

retaliation[42] for hearing any kind of legal [criminal] or civil action, which he deemed as

profane.

4.25.4  On Wednesday, April 14, 2010 11:42 AM (17:42:59 GMT) Flores sent a

message to Koster to get a "yes or no" answer whether or not the revenue funds were

going to be sent; resolving the next action by Flores to resolve the financial and

damages issues. (Exhibit 35)

4.25.5  188TH DAY NOTICE.  Friday, April 16, 2010 5:00 AM, Flores sent a

message to Koster noting that it was over 118 days into the financial transaction, the

---

[42]  See ¶ <u>4.23</u>, *supra.* at <u>66</u>  (also, Exhibit 30 at ⑤)

last day in the 2 to 4 week period following the payout of the principals and looking to

confirm that the PSP would be paid this day. As in many other messages previously,

Flores again, reinformed Koster of the status of the accumulating damages and harm

Koster and his friend Gelazela were inflicting upon Flores and a host of others.[*3]

> Flores: "… I depended on the agreement and anticipation that the trade
> transaction principals would meet contract performance, and shall
> experience substantial damages and losses as a result of their lack of
> performance. These guys owe us an explanation and should apologize,
> moreover, reconcile and perform.
>
> "Notwithstanding the loss of credibility, perceived veracity and reputation
> in the industry, I[t] appears I will loose the studio property will cost an
> additional $30M-$40M, have lost a couple film projects, and most likely
> several more film projects. Having only needed the first couple of the
> weekly profit payouts to lever my entire film slate funding via a loan, now
> most if not all of this financial venture may just pay for the monetary losses.
> My reputation is not likely reparable. I have place a couple of examples in
> the post script below.
>
> "Please inform me this morning of the scheduled deposit to the paymaster
> so that I may contact my crews, casts, and producers, and attempt to
> salvage some of our projects."

4.25.6  Koster acknowledges film project damages – suggests move to commodities

trade.  On 4/16/2010 10:15 AM, Scott Koster wrote acknowledging film project losses

resulting from his failure to perform, aware that Flores is not anticipating litigation

and agency complaints, next suggests moving funds into a Gold Buy/Sell as a direct

principal. Though it seems to just work into Koster's delay scheme, this message will

play a significant role in clarifying the fraudulent intent and act in an entirely new

program substituted for the IDLYC transaction later on. Koster:

> "Lance,
> I understand where you are coming from with all of this.

"... 100% see where your coming from, but am also aware of your situation and past issues prior to coming into this program. With all that being said, please get in touch with John or Kerim to learn more about the commodities buy/sell, how that all works, and we can look into timelines and possibilities to move you away from IDLYC, and into that program, not as a 4th party to the transaction, but as a direct principal."

4.25.7  The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to Defendants' fiduciary duty through Silence, Concealment, Beach of Contract for Nonperformance, Breach of Common Law Duty of Good Faith, Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel particularlyPromissory Estoppel, Estoppel by Non-disclosure, Estoppel by Silence, Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later.

4.25.8  The Elements Of Equitable Estoppel were satisfied and are asserted against the Defendants in that (1)  The Defendants were advised of the facts; (2)  The Defendants intend that their conduct be acted upon by the Plaintiffs, or the Defendants acted in such a way that the Plaintiffs had a right to believe it was so intended; (3)  The Plaintiffs were ignorant or were previously misinformed of the true facts by the Defendants; and (4)  The Defendants had by their frauds and coercions forced or induced the Plaintiffs into a detrimental reliance.[*3,*5,*6,*7,*9,*11, *12,*13,*19,‡1,‡2,‡4,]

**4.26  4/22/2010 - KOSTER REPORTS SEC INVESTIGATOR SAYS IDLYC CHECKS OUT – FUNDING IS IMMINENT .** On 4/22/2010 1:10 PM CST, Kerim Emre wrote restating Koster's telephone conversation that Koster was told by an SEC investigator[43] that the IDLYC transaction was legitimate, and that he was advised that the PSP funding was imminent. Neither Emre nor Koster provided any verifiable documentation of the SEC report, the name of the investigator, or SEC district investigating IDLYC to Flores.

4.26.1  Following, in later telephone conversations with Koster, Flores maintained that IDLYC was engaging in fraudulent actions and that Koster had to be aware of those frauds. Flores continued informing Koster that he had first hand information and both he and Harlan had an obligation and were required by law to report the frauds, and that the only reason that Koster and Harlan could possibly have to gain, not to produce that evidence to the SEC investigator, would be to conceal his, Harlan's and Emre's involvement in the unlawful and/or illegal activities with IDLYC and BMW Majestic. Koster would not respond, and remained silent on this challenge, knowing full well they were obstructing justice by interfering with a government investigation and not being forthcoming with evidence of criminal or regulatory violations.

---

[43] Koster had mentioned in several telephone conversations with Flores that he was contacted on a number of occasions by an investigator from the Securities and Exchange Commission looking into the IDLYC, each time reporting that there appeared no wrongdoing by Mark Gelazela and William Chandler Reynolds.

4.26.2  Non-disclosure & Silence.[12]   The Defendants refused to produce any

verifiable documentation or information. Defendants, particularly Koster counseled by

Harlan, continued their conscious indifference to their fiduciary duty through silence,

concealment and non-disclosure of information legally due Plaintiffs. Koster and

Harlan knew they would be prohibited or otherwise be estopped from later making

certain related arguments, defenses or claiming certain related rights later. It is

evident, given the aforementioned fact , Koster and Harlan took into account their

tortious and/or illegal acts, their reckless and wanton disregard of the law, and the

harm they had, or would continue to inflict upon others, and with scienter, weighed the

risks of their deeds.

4.26.3  Koster would not provide any documentation his advisory of the "imminent"

funding though urged in subsequent telephone conversations with Emre and Koster.

Flores also responds shortly thereafter concerning IDLYC's non-performance.

(Exhibit 38)

Flores: "… It is well past the moment that they [IDLYC, G ] be given a
dictate the time and date given delivery, since after three months they have
failed and have not produce[d] the contracted deliverable.  No more
imminent anything … a few more imminent 2-4 week promises by IDLYC
and it will be Christmas."

4.26.4  The Defendants refused to produce any verifiable documentation or

information. Defendants, particularly Koster counseled by Harlan, continued their

conscious indifference to Defendants' fiduciary duty through Silence, Concealment,

Beach of Contract for Nonperformance, Breach of Common Law Duty of Good Faith,

Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due

Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel particularlyPromissory Estoppel, Estoppel by Non-disclosure, Estoppel by Silence, Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later.

4.26.5  Defendants, specifically Koster and Harlan, continued their acquiescence to Flores' legal notifications arising after Flores gave legal warning to Defendants based on clearly asserted facts and specification of related legal principle, where after Koster and Harlan, did not respond within a reasonable period of time. By acquiescing, the Defendants lost the legal right to assert the contrary and would be prohibited or otherwise estopped from later making certain related arguments, defenses or claiming certain related rights. It is evident, given the aforementioned facts, Defendants, particularly Koster and Harlan, took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[3,5,6,7,9,11,12,13,19,11,12,13,14,]

4.26.6  The Elements Of Equitable Estoppel were satisfied and are asserted against the Defendants in that (1) The Defendants were advised of the facts; (2)  The Defendants intend that their conduct be acted upon by the Plaintiffs, or the Defendants acted in such a way that the Plaintiffs had a right to believe it was so intended; (3) The Plaintiffs were ignorant or were previously misinformed of the true facts by the Defendants; and (4) The Defendants had by their frauds and coercions forced or induced the Plaintiffs into a detrimental reliance.

4.27  4/24/2010 - FLORES INFORMS IDLYC PRINCIPALS & KOSTER OF
THEIR INTRINSIC FIDUCIARY DUTY. From April 22nd through April 24, 2010,
Flores informed Koster and IDLYC principals through Koster, of their fiduciary duties
and that their clients have a right to information given the real and potential damages to
everyone involved in the transaction.[*5,*7,*11,*13,*19,12,13,14] (Exhibit 39)


4.28  6/24/2010 - LEGAL NOTICE GIVEN - LEGAL DEFINITION - DEFINING
AND GOVERNING FIDUCIARY DUTY ARISE OUT OF THE LAW OF EQUITY.[13]
On Thursday, June 24, 2010 6:46 AM, having just been surprised by news of a
fiduciary/principal in the IDLYC/ALICORN transaction which had never been revealed
to the Plaintiffs in telephone conversation with Koster, Flores insisted on a conference to
discuss the  matters concerning 1) the Gold Transaction, 2) IDLYC/BMW Majestic trade
matters, 3) investment fund issues dates including demand letters and responses, and
4) SBLC resources. (Vol. 2 Exhibit 44 at ①)

ADDITIONALLY, Flores Gave Legal Notice Based on Clearly Asserted Facts
and Specification of Related Legal Principle. (See, Vol. 2 Exhibit 44 at ②, ③)

4.28.1  On 4/26/2010 11:25 AM, Scott Koster replied (Exhibit NN) to Flores
response to Emre's "Imminent payout schedule" message of April 22nd.  Koster
responded in an interleaved form:

[Flores E-mail Msg. of Mon, Apr 26, 2010 at 9:45 AM]
I can find no reason not to fully document the circumstances, conditions,
and history of this transaction and formally memorialize all this information.

[Koster's response]
I agree.

However, like all of the Defendants' promises for full disclosure and transparency, their commitments remained unrealized assurances to fulfill their legal duties to the Plaintiffs.

4.28.2  Koster and Harlin had knowledge of the true facts and circumstances, states above, and had fiduciary duty including the duty speak, inform and provide documentary verification to the Plaintiffs, as that duty of care had arisen in this instance. However, they did not, and maintained and continued the various frauds, fully aware of the consequences of their tortuous acts which they knew would injure the Plaintiffs. Defendants, but particularly Koster and Harlin, also knew that they were concealing information of grave consequential import to the Plaintiffs, and as well maintained the fraudulent concealment of their fraudulent acts.[5]

4.28.3  Estoppel by Acquiescence.  Defendants, specifically Koster, counseled by Harlin, continued their acquiescence to Plaintiffs' legal notifications arising after Flores gave legal warning to Defendants based on clearly asserted facts and specification of related legal principle, where after Koster, counseled by Harlin, did not respond within a reasonable period of time. By acquiescing, the Defendants lost the legal right to assert the contrary and would be prohibited or otherwise estopped from later making certain related arguments, defenses or claiming certain related rights. It is evident, given the aforementioned facts, Defendants, particularly Koster and Harlin, took into account their tortious and/or illegal acts, their reckless and

wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[13]


**4.29  EMRE'S REQUEST FOR IRS W9 FORM. PAYMENT SCHEDULE UPDATE.**  From 4/27/2010 11:08 PM though 4/29/2010 Kerim Emre sent request for Flores W9 IRS form, and exchanged information and acknowledged procedures for his submission to escrow attorney (paymaster)  David B. Kaplan Attorney-at-Law JOLTA Trust Account, Chase Bank, 270 Park Avenue, New York, NY 10017, Bank Officer: Fery Sabouri. (Exhibit 41)


**4.30**  May 5TH - *COME TO JESUS TIME FOR MARK & CHANDLER* .  (Exhibit 43)
On Wednesday, May 5, 2010, Flores sent his Come to Jesus Time message to Koster exhibiting the frustrations of the Plaintiffs. Clarkson and Flores had discussed the drafting of a complaint and assembling evidence for submission to the grand jury foreman under various jurisdictions and to U.S. and Canadian investigative agencies, which Plaintiffs have done in part thus far, continuing to collect additional evidence. In previous months, Koster and Emre were made aware, in both telephone conversations and e-mail communications, that the Plaintiffs were pursuing such actions. Koster was asked to inform his partners, Gelazela and Reynolds, of their fiduciary duty, as Koster refused to allow direct access to them.

Nonetheless, the Defendants continued their concealment, deceit, and unresponsiveness to lawful demands of the Plaintiffs. Clearly Koster and his legal

counsel Harlan, were fully aware of the circumstances, that the Plaintiffs must plead with particularity.[44] As well, Harlan was well aware that the Plaintiffs' must establish the necessary "quantum of proof" of the crime/fraud exception in order to penetrate his attorney-client privilege; a privilege he and his client anticipated would protect the evidence disclosure of their fraud and conspiracy to commit fraud. Faced with choosing disclosure over continued fraud and fraudulent concealment, Koster, and Harlan choose the later. Flores' call, expressed the Plaintiffs' intentions to proceed toward litigation, which they did with care, such, apparently mistaken as a bluff.

4.30.1  Non-disclosure.  The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to their fiduciary duty through silence, concealment and non-disclosure of information legally due Plaintiffs. Koster and Harlan knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned fact , Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[32] (see also, ¶ 4.18.2, 62)

4.30.2  Acquiescence.  Further, Defendants, specifically Koster, counseled by Harlan, continued their acquiescence to Flores' legal notifications arising after Flores

---

[44] There are few attorneys that are unaware of *Wilson, Wilson,* 525 F.3d at 379, and know the higher pleading requirements for fraud claims. {United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4TH Cir. 2008) (quoting Harrison, 176 F.3d at 784). This set of information is often called the "who, what, when, where, and how" of the alleged fraud.}

<u>gave legal warning</u> to Defendants based on clearly asserted facts and specification of related legal principle, where after <u>Koster, counseled by Harlan, did not respond within a reasonable period of time</u>. By acquiescing,[13] the Defendants <u>lost the legal right to assert the contrary</u> and would be thereafter prohibited or otherwise estopped from later making certain related arguments, defenses or claiming certain related rights. It is evident, given the aforementioned facts, Defendants, particularly Koster and Harlan, took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[12] (see also, ¶ <u>4.18.2</u>, <u>62</u>).

## 4.31  KOSTER OFFERS GOLD BUY/SELL VALUE EQUIVALENCY SUBSTITUTION FOR IDLYC PERFORMANCE IN DEFAULT

4.31.1  On Friday, April 16, 2010, Scott Koster, sent a message to Flores, copying John Childs and Kerim Emre stating:

> "... With all that being said, please get in touch with John or Kerim to learn more about the commodities buy/sell, how that all works, and we can look into timelines and possibilities to move you away from IDLYC, and into that program, not as a 4th party to the transaction, but as a direct principal.

> I will follow this up with a phone call later today. *&c.*" (Exhibit 36)

4.31.2  In the period following Koster's Friday, April 16, 2010 10:15 PM message, Flores and Koster engage in telephone conversations in which Koster further explained the process and procedure of Richard Hall's (and partners') Gold Transaction as a settlement for the performance failure of the Plaintiffs' interest in

the non-performing Alicorn PSP.  In those phone conversations Koster reiterated, proposed, assuring the reliability of the program, and offered the commodity buy/sell to Flores.  Koster made additional promises and reassurances to that which he stated in his April 16TH message that Flores would be taken out of IDLYC transaction, and placed into the buy/sell program, not as a 4th party to the transaction, but as a direct principal.

4.31.3  Promissory Estoppel.  Defendant, the promisor, made a a promise, in fact a gratuitous promise that he should reasonably have expected to induce action or forbearance of the Plaintiffs by a definite and substantial character on the part of the Defendant, whom a promise has been made. The Plaintiffs, promisees, justifiably relied on the Defendants' promise for which Plaintiffs suffered harm and substantial detriment, that was an economic loss and other damages that ensued to the Plaintiffs from action or forbearance.  Thus, injustice can be avoided only by enforcing the promise.[41]

4.32  4/29/2010 - PLAINTIFFS' APRIL 29TH DEMAND FOR PERFORMANCE & PRODUCTION OF DOCUMENTS.

4.32.1  FLORES APRIL 29TH DEMAND FOR PAYOUT PERFORMANCE.  On Thursday, April 29,  2010 15:03:53 GMT Flores wrote to Koster,

> Flores: "Don't need any more updates from Mark. His updates are just manufactured excuses to deceive and delay; Mark has provided no definitive or substantiated reasons for his delays. He needs to transfer the funds today. (Exhibit 45 at ①)

4.32.2  None of the Defendants affirmatively responded by performing on the

delivery of funds.*6

4.33  6/13/2010 - FLORES' JUNE 13TH DEMAND FOR PERFORMANCE &

PRODUCTION OF DOCUMENTS.  (Exhibit 46)

4.33.1  On Sunday, June 13, 2010, Flores gives Koster notice that the PSP has

entered into its 177TH day of the transaction (152ND day in default) specifies that,

> Flores:  " * There never has been a definitive explanation of the schedule of
> transactions, other than verbal and email promises.
>      * We've never had any verifiable documentation on any legitimate
> [transactions] having taken place -
>           o except for the initial bank transaction of initial transfer
>             of funds into the investment,
>           o telephone inquiries into the status of investment
>             transactions, and
>           o email inquiries into the status of investment transactions,
>             these we can verify;
>      * this accounts for over 150 inquiries of the status for which there
>        is no means to verify any legitimate transaction outside the
>        initial investment, and none by the parties having a fiduciary
>        responsibility,"

4.33.2  Flores clearly sets forth the deficiencies in the Defendants' actions, and

breach of their fiduciary duties where Defendants have, after, minimally, one-hundred

fifty (150) inquires from the Plaintiffs, never provided any affirmative responses that

would verify the legitimacy or the Defendants' transaction as they apply to the PSP.

4.33.3  Defendants, having the opportunity, never respond, to or resolve any of the

points made as of the date of June 13, 2010.

4.33.4  Non-disclosure & Silence.  The Defendants refused to produce any

verifiable documentation or information. Defendants, particularly Koster counseled by

Harlan, continued their conscious indifference to their fiduciary duty through silence, concealment and non-disclosure of information legally due Plaintiffs. Koster and Harlan knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned fact , Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.

    4.33.5  The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to Defendants' fiduciary duty through Silence, Concealment, Breach of Fiduciary Duty, Fraud in the Factum, Fraud in the Inducement, Constructive Fraud, Fraud in Law, Actual Fraud, Fraud by Concealment, Beach of Contract for Nonperformance, Breach of Common Law Duty of Good Faith, Intentional Misrepresentation, Negligent Misrepresentation, Bad Faith, Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel particularly, Estoppel by Non-disclosure, Estoppel by Silence, Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later.[5,6,7,9,10,11,12,13,14,15,16,17, 18,19,12,14,16]

**4.34   6/29/2010 - CLARKSON'S CALL FOR VERIFICATION OF KOSTER'S**

**PURPORTED DEMAND LETTER TO IDLYC.**

**4.34.1   CLARKSON'S 1ST REQUEST FOR A COPY OF KOSTER'S**

**PURPORTED IDLYC DEMAND LETTER.**  On June 29, 2010 4:44 PM MST,

Plaintiff Vicki Clarkson wrote following her telephone call voice message.

> Clarkson: "Below is an outline of what I'm looking for.
>
> "Please provide the tracking numbers for the letters that were sent to
> IDLYC.  We would all like to understand the exact date that IDYLC has to
> refund the money.  As per our conversation, 2 weeks ago, IDYLC has 30
> days to return the funds to you, what we don't know is what is the final date
> they have to return the funds.
>
> ( For example, if the letter was received by IDYLC on June 16, then based
> on a 30 day refund time frame, we can expect the funds returned to you by
> July 16, 2010.)
>
> Please provide the last date IDYLC has to return the funds.
>
> Help me understand why two weeks has gone by and it doesn't sound like
> we are any further ahead today than we were in the middle of June.  If I'm
> missing something, please advise. (Exhibit 45 at ②)

**4.34.2   6/30/2010 - CLARKSON'S 2ND CALL FOR A COPY OF KOSTER'S**

**PURPORTED IDLYC DEMAND LETTER.**  On Wednesday, June 30, 2010 2:23 PM,

Vicki Clarkson reminded Koster of her request for a copy of his purported demand

letters he claimed to have sent to Mark Gelazela at IDLYC.  (Exhibit 45 at ③)

**4.34.3  6/30/2010 - CLARKSON'S 3[ND] REQUEST FOR A COPY OF KOSTER'S PURPORTED IDLYC DEMAND LETTER.**  On Wednesday, June 30, 2010 2:23 PM, Vicki Clarkson reminded Koster of her request for a copy of his purported demand letters he claimed to have sent to Mark Gelazela at IDLYC.  (Exhibit 45 at ③)

**4.34.4  KOSTER FAILS TO PRODUCE DOCUMENTS CONCEALING THE INTERNAL ACTIVITIES OF THE SYNDICATE.**  Koster never responded to the Clarkson request for Koster's purported demand letters to IDLYC; neither to Clarkson nor Flores. This information was critical to their financial interests and was information lawfully due the Plaintiffs; as of the date of the filing of this instant action, no document of any sort, verifiable or not, related in this section (¶ 4.33.5), has been produced to either of the Plaintiffs.

**4.34.5  Knowledge of Fiduciary Duty.\*[2]**  Koster and Harlan had knowledge of the true facts and circumstances, and had fiduciary duty including the duty to speak, inform and provide documentary verification to the Plaintiffs, as that duty of care had arisen in this instance. However, they did not, and instead coerced reliance with fraudulent intent, and maintained and continued the various frauds, fully aware of  the consequences of their tortuous acts which they knew would injure the Plaintiffs. Defendants, but particularly Koster and Harlan, also knew that they were concealing information of grave consequential import to the Plaintiffs, and as well maintained the fraudulent concealment of their fraudulent acts.[\*5,\*7,\*10,\*11,\*13,\*19,‡4]

4.34.6  Estoppel by Silence. An estoppel arose when Defendants, specifically Koster, counseled by Harlin, had an obligation and a duty to speak, and they intentionally failed, or should have acted, and did not, or otherwise withheld information for which they had the duty to provide the Plaintiffs. By Defendants' silence that arises from their obligation their silence was maintained to intentionally mislead that the Plaintiff would be deceived.

4.34.7  Defendants Fully Informed of Governing Laws. It cannot be claimed that Defendants, particularly Scott A. Koster and Thomas Harlan were uninformed or were ignorant of the law of torts, legal and equitable doctrines, the common law, federal and state statutory law, nor the Defendants lawful duties therein prescribed as Harlan had himself proclaimed his vast legal experience.[45]

4.34.8  Non-disclosure & Silence. The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlin, continued their conscious indifference to their fiduciary duty through silence, concealment and non-disclosure of information legally due Plaintiffs. Koster and Harlan knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned fact, Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.[32]

---

[45] FN 40, at 61.

**4.35  6/30/2010 - KOSTER BMW MAJESTIC PLAUSIBLE DENIABILITY -**

**USING THEIR OWN STRAW MAN. (Vol. 2 Exhibit 47)**

On June 30, 2010 at 11:13:31 AM CST, Koster sent Flores a message (Vol. 2 Exhibit)

"Subject: Update with info on IDLYC/BMW Majestic" explaining the BMW Majestic

role:

4.35.1  [Ex. at ①→] On June 14, 2010, Koster received a document

[bmwmajesticUpdateletterJune142010.pdf] from BMW Majestic, presumably from

Woods, the same being received by IDLYC, presumably from Gelazela, and stated by

Koster to be confirmed by "the tracking number" as well as a phone call and e-mail

from Mark Gelazela.

4.35.2  [Ex. at ②→] Koster stated, "I had my contract with his [Gelazela's] bank.

He [Koster's contact at bank] felt very strongly that they [Gelazela/IDLYC] had both

the ability, and the commitment to all parites [*sic*] to issue the refunds within the

timeline stated in the document that was sent." Thus, Koster committed that it was

highly probable that he would receive a refund for the Alicorn PSP.

4.35.3  [Ex. at ③→] I feel, as does my attorney [Harlan], that we are at the point of

escelation [*sic*]. Koster infers that he and Harlan intended to escalate the recovery of

funds by stronger measures, presumably litigation.[15]

4.35.4  [Ex. at ④→] Koster commits funding to restoring the

ALICORN/IDLYC/BMW MAJESTIC transaction performance failure with a (Gold)

Buy/Sell transaction.

4.35.5  [Ex. at ⑤→] Koster introduces the purported evidence of BMW Majestic's confirmation to refund investment including a 10% fee and return all moneys by June 30, 2010 or sooner . The document appears to be completely fraudulent, showing issuance without a signatory appearing on no letterhead.

4.35.6  [Ex. at ⑥→] Koster, after stating that he and Harlan were going to escalate the recovery of funds now make a conflicting statement at ⑥ in which they change position concerning escalation of the funds recovery, stating "… it is not time to escelate [*sic*].

4.35.7  Estoppel by Conflict. An estoppel arose when Defendants, specifically Koster, counseled by Harlan, by changing positions that were conflicting with their decision to seek, then not seeking recovery of funds through escalation . Thus Koster's statements and acts, concerning the decisions of he and Harlan, were in an inconsistent position, attitude and course of conduct, that contributed to loss or injury to the Plaintiffs and the proximate cause of the harm to the Plaintiffs.[15]

## 4.36  7/5/2010 – KOSTER WITHHOLDS EVIDENCE FROM FEDERAL SEC INVESTIGATOR.

4.36.1   On Tuesday, July 5, 2010 at 19:12:09 GMT -0500 (7:12: 09 PM CST) Koster sent a message to Flores concerning, *inter alia,* his interview by a United States Security and Exchange Commission investigator. (Exhibit 53 at ①):

> Koster:
> "I was also contacted again by the SEC investigator, asking if there was anything new to report, and asked if I had received my refund from the investment with IDLYC. He did state that there is an active investigation

regarding this whole investment, and that it is larger than just IDLYC.
There were 5+ other firms like IDLYC that were transacting with BMW
Majestic."

4.36.2  Koster came into conflict with Flores after Koster stated he was questioned

by SEC authorities and later withheld information concerning wire and telephone

communications with Woods and Gelazela. Flores, again admonished, Koster on

several occasions about Koster's and Harlan's intentional obstruction of justice and

pressed Koster to cease aiding and abetting the other members of the Syndicate

operation and their commission of crimes. Flores, stated to Koster, that Koster had

first hand information and other evidence, which he withheld from the Plaintiffs.

Koster was well aware of the demands for production of documents, and had failed to

produce that would evidence the activities of the Syndicate, and he was also aware of

the numerous legal notices he had received from Flores and had failed to act upon.

Given this, Koster failed to inform and provide the SEC investigator with that

information and from whom it had been demanded.  Flores expressed that he would

inform the SEC if Koster would provide to him the evidence, but he couldn't approach

the SEC or Justice Department with only heresy. By all accounts, Koster, Harlan and

Emre were aware of the criminal objectives of the Syndicate.

4.36.3  Koster corruptly influenced, obstructed, and impeded, or endeavored to

influence, obstruct, or impede, the due administration of justice, thereby may have

violated the crime of obstruction of justice, and the due administration of justice. His

conduct interfered with the judicial process by concealment. The defendant's endeavor

to obstruct justice is sufficient to prove obstruction. Koster's endeavor may constitute a lesser threshold of purposeful activity than a criminal attempt.

4.36.4 Acquiescence.[43] Further, Defendants, specifically Koster and Harlan, continued their acquiescence to Flores' legal notifications arising after Flores gave legal warning to Defendants based on clearly asserted facts and specification of related legal principle, where after Koster and Harlan, did not respond within a reasonable period of time.

By acquiescing, the Defendants lost the legal right to assert the contrary and would be prohibited or otherwise estopped from later making certain related arguments, defenses or claiming certain related rights. It is evident, given the aforementioned facts, Defendants, particularly Koster and Harlan, took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.

4.36.5 Non-disclosure.[42] The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to their fiduciary duty through silence, concealment and non-disclosure of information legally due Plaintiffs. Koster and Harlan knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned fact , Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the

harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.

4.36.6  Estoppel by Silence.[34]  An estoppel arose when Defendants, specifically Koster and Harlan, had an obligation and a duty to speak, and they intentionally failed, or should have acted, and did not, or otherwise withheld information for which they had the duty to provide the Plaintiffs. By Defendants' silence that arises from their obligation their silence was maintained to intentionally mislead that the Plaintiff would be deceived.


**4.37  7/8/2010 - LEGAL NOTICE TO KOSTER & HARLAN - FLORES URGES KOSTER NOT TO WITHHOLD EVIDENCE FROM SEC. (Exhibit 54)**

4.37.1  [Ex. 54 at ①→] On Thursday, July 8, 2010 at 15:42:39 GMT (10:42 AM CST) Flores sent a message to Koster inquiring, inter alia, urging Koster not to continue concealing the mail fraud and potential RICO violation of the Syndicate.

Flores:

"Did you give the SEC a copy of that BMW Majestic phony-baloney refund response letter from their Board of Directors?  This has got to be fraudulent as hell; thus, a act of mail fraud (probably just one among many wire/mail frauds that have gone on) which could held as one of the minimum two predicate acts for the feds to move on RICO (racketeering) charges against BMW."

**4.38  7/8/2010 - RESPONSE TO OBSTRUCTION OF JUSTICE - ADMITS TO WITHHOLDING EVIDENCE FROM FEDERAL INVESTIGATION.[13]**

4.38.1  On Thursday, July 8, 2010 1:40 PM, Scott Koster wrote within hours of Flores' inquiry of Koster's disclosure of evidence of the fraud and criminal activities related to the Syndicate.

Flores:

"Did you give the SEC a copy of that BMW Majestic phony-baloney refund response letter from their Board of Directors?  This has got to be fraudulent as hell; thus, a act of mail fraud (probably just one among many wire/mail frauds that have gone on) which could [be] held as one of the minimum two predicate acts for the feds to move on RICO (racketeering) charges against BMW." [*emphasis added*]

Koster:

"I did not. I am meeting with my attorney next week to go over the course of action from here. I do not want to spend too much money on it, as Im already out 150k if they lost/spent the money, and are selling their stake house. I want to see what my attorney can accomplish, prior to going too much farther into my pocket to deal with it." [*emphasis added*]

**4.39  7/9/2010 – 2ND LEGAL NOTICE TO KOSTER OF FEDERAL CRIMES & OBSTRUCTION OF JUSTICE.**

4.39.1  Fri, 09 Jul 2010 09:27:38 AM CST Flores again sends legal notice to Koster concerning the apparent civil fraud, felonies including wire fraud, obstruction of justice[13] and other racketeering related activities which he and the Syndicate may be engaged.

Flores:

"Just a note about BMW BoD refund response letter.  Since it is related to
what may be a felony of felonies involving federal crimes, fraud, mail fraud,
and/or racketeering, inter alia, you may want to rethink the value of
withholding evidence.  Having direct knowledge of a federal investigation
and withholding evidence may be construed as obstruction of justice and is a
federal crime.  Just a thought .."

4.39.2  Incorporating by reference the above ¶ 4.36.6, 4.37.1, pg. 91, 92, ¶ 4.36.6,

4.37.1, pg. 91, 92, and ¶ 4.38.1, pg. 92, as if fully set forth hereto, the Plaintiffs aver that

the Defendants and particularly Koster, Harlan, and Emre never responded to the

Plaintiff Flores' legal notices.  The only response from Koster is his admission that he

did withhold evidence from the United States Securities and Exchange investigating

officer, and otherwise did not produce the evidence or information thereto related in

Flores' notices, and has continued to withhold critical information legally due the

Plaintiffs, as well as the United States government.  Plaintiffs aver equitable estoppel,

attaching to the immediate aforesaid incorporated references, the following

thereupon:

4.39.3  Defendants, specifically Koster and Harlan, continued their acquiescence to

Flores' legal notifications arising after Flores gave legal warning to Defendants based

on clearly asserted facts and specification of related legal principle, where after

Koster and Harlan, did not respond within a reasonable period of time.  By

acquiescing,[13] the Defendants lost the legal right to assert the contrary and would be

prohibited or otherwise estopped from later making certain related arguments,

defenses or claiming certain related rights.  It is evident, given the aforementioned

facts, Defendants, particularly Koster and Harlan, took into account their tortious

and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.

4.39.4  An estoppel arose when Defendants, specifically Koster and Harlan, had an obligation and a duty to speak, and they intentionally failed, or should have acted, and did not, or otherwise withheld information for which they had the duty to provide the Plaintiffs. Defendants' silence[14] was maintained to intentionally  mislead, so that the Plaintiffs would continued to be deceived.

4.39.5  The Defendants refused to produce any verifiable documentation or information. Defendants, particularly Koster counseled by Harlan, continued their conscious indifference to their fiduciary duty through silence, concealment and non-disclosure [12] of information legally due Plaintiffs. Koster and Harlan knew they would be prohibited or otherwise be estopped from later making certain related arguments, defenses or claiming certain related rights later. It is evident, given the aforementioned fact, Koster and Harlan took into account their tortious and/or illegal acts, their reckless and wanton disregard of the law, and the harm they had, or would continue to inflict upon others, and with scienter, weighed the risks of their deeds.

4.39.6  Defendants, particularly Koster and Harlan, had knowledge of the true facts and circumstances, and had fiduciary duty[*2] including the duty to speak, inform and provide documentary verification to the Plaintiffs, as that duty of care had arisen in this instance. However, they did not, and instead coerced reliance with fraudulent intent, and maintained and continued the various frauds, fully aware of  the

consequences of their tortuous acts which they knew would injure the Plaintiffs.

Defendants, but particularly Koster and Harlan, also knew that they were concealing

information of grave consequential import to the Plaintiffs, and as well maintained the

fraudulent concealment of their fraudulent acts.

4.39.7  Defendants Fully Informed of Governing Laws.[13] It cannot be claimed that

Defendants, particularly Scott A. Koster and Thomas P. Harlan were uninformed or

were ignorant of the law of torts, legal and equitable doctrines, the common law,

federal and state statutory and criminal law, nor the Defendants lawful duties therein

prescribed.


**4.40  7/29/ 2010 - ACKNOWLEDGMENT OF DAMAGES AND HARM BY**

**SILENCE.**

4.40.1  The allegations and facts informing Defendants of damages and harm to the

Plaintiffs incurred by and through Defendants' non-performance, fraud, maleficence

and/or crimes contained in Vol. 2 Exhibit 52 (incorporated by reference)  and on pages

49, 51, 59, 60, 69, 71, 169 of this Complaint are hereby re-averred and re-alleged, for all

purposes, and incorporated herein with the same force and effect as if set forth

verbatim herein.

4.40.2  Flores July 29TH Msg., 222ND Day of Transaction - Notice of Damages &

Non-Performance.

On Thursday, July 29, 2010 8:17 AM Flores reminds Koster and Childs of damages

the Defendants are inflicting upon the Plaintiffs. (Exhibit 59)

4.40.3  The Defendants by the two-hundred and twenty-second day of the ALICORN/IDLYC/BMW investment transaction had been fully informed and aware of the amount of damages and the harm they had inflicted upon the Plaintiffs. They cannot argue that they did not have knowledge or were not informed.

4.40.4  By their non-disclosure they had deprived the Plaintiffs of critical information in which they could have understood the degree of fraud being perpetrated. Further, the Defendants made misrepresentations of the facts of all the transactions and processes in the PSP, and investment. The facts provided the Plaintiffs by the Defendants were misrepresented information that was intentionally ambiguous. And by Defendants' silence they maliciously allowed the Plaintiffs' damages to accumulate thorough that silence when they had a fiduciary duty to speak with candor and honesty. The Defendants did not. Defendants' silence and all the foregoing prevented the Plaintiffs engagement of federal and state law enforcement, and other agencies which may have been able to cause the cessation of fraud and criminal activity of the Syndicate. As a result Plaintiffs may have had an opportunity to recover a portion of the damages.[3,*5,†2,,‡4,§6]

4.40.5  Defendants, cannot be claim, particularly Scott A. Koster and Thomas P. Harlan, that they were uninformed or were ignorant of the United States and Texas statutory and common law, nor their lawful or professional duties.

**4.41  7/29-8/16/2010 – 2ND FRAUD SCHEME – GENESIS (Berea/Hall Gold Buy/Sell)**

**4.41.1  Conditions & Agreement.**  Flores Sets Conditions for Richard Hall Gold
Buy/sell Substitution. In the period between July 29, 2010 to August 16, 2010 Flores,
in telephone conversations with Koster, expressed that he wanted assurances that
Richard Hall and his company including Vladimir Pierre-Louise and Christine
Wong-Sang would provide complete transparency to the Richard Hall Gold
Transaction, accessability to Richard Hall and a committed understanding to maintain
regular communications with verifiable frequent status reports, copies of the assay
information, and that the documents moving the Plaintiffs over to the Gold
Transaction be  simultaneously executed by all parties on the same day. Koster stated
that could be done as soon as "Richard had the exit plan in place."

**4.41.2  Plaintiffs Plan for Use of Gold Buy/Sell Funds for Critical Short-Term**
Damage Recovery from the ALICORN/IDLYC/BMW Non-performance. Plaintiffs'
plan was to initiate the purchase of a Hong Kong bank instrument to secure a loan to
recover what was left of the severely damaged film slate, and financial damages to film
production crews and talent commitments. It was critical that Flores move quickly
with no delays to use the Gold Buy/Sell revenues to recover, and it was essential for
funds to move directly to a Hong Kong bank to secure the collateral for a loan. The
Plaintiff could then bring the balance of the revenue to help Clarkson recover from the
losses in her real-estate business and damages from lost investment opportunities.

### 4.41.3  Koster Delivers Partnership Termination and Wind-up Agreement and Mutual Release &c. (Exhibit 63)

On 8/16/2010 3:11 AM, Scott Koster wrote:
"Attached is the document [Partnership Termination and Wind-up Agreement and Mutual Release &c.] for the movement of you and the other two parties forward into the instrument as discussed. This will be the first step. Upon executing this document, we will get the buy/sell group to explain their process to you, and have you get an understanding/comfort level in moving forward."

### 4.41.4  Contract Executed under Coercion and Duress.

Because of the delayed funding from the Alicorn PSP failure to perform, and because Plaintiffs had incurred substantial liabilities and damages in reliance on Emre's and Koster's representations, the Plaintiffs were forced to endure significant financial distress and emotional anguish as a result. Koster, Harlan, Childs and Emre were fully aware of those damages and the harm they had dispensed[46] and intended to exploit the Plaintiffs' anguish as a tool of malice they had forged through detrimental reliance of the Plaintiffs to Defendants' extortive ends.  Koster and Harlan exploited Plaintiffs' condition to coerce their submission to an onerous and punitive agreement,[47] (the "First Settlement Agreement").[†4]

---

[46] See ¶ 4.40, pg. 95
[47] "Partnership Termination Agreement and Wind-up Agreement and Mutual Release"

**4.42  8/18/2010 - FLORES' SIGNATURE WITHDRAWAL**

4.42.1  On August 18, 2010 2:44:30 PM CST, Flores sent a message informing

Koster of his signature withdrawal from the PARTNERSHIP TERMINATION

AND WIND-UP AGREEMENT AND MUTUAL RELEASE (the "First Wind-up

Agreement") resulting from Koster's failure to respond by counter signing the

agreement on the same day, failing to send an electronic copy by e-mail, returning a

duplicate original of the countersigned document by mail and immediately executing

the gold buy/sell contract between Richard Hall and Flores. The conditions of the

execution had been previously arranged so that the documents moving the Plaintiffs

over to the Gold Transaction be simultaneously executed by all parties on the same

day", which, Koster stated could be done as soon as Richard had the "exit plan in

place".[48] Flores waited throughout the day of the 16TH and 17TH with no response from

Koster. On August 18, 2010 at 2:44:30 PM CST, Flores notified Koster that he had

withdrawn his signature and for Koster to update Flores with the schedule, so they

could complete the execution of the agreement at that time. (Exhibit 64)

---

[48]  *See,* ¶ 4.41.1, pg. 97 – Conditions & Agreement

**4.43  8/24/2010 - KOSTER ESTABLISHES EARLIEST OPPORTUNITY TO SIGN THE 1ST WIND-UP AGREEMENT - EVIDENCE OF AUGUST 16TH DOCUMENT FORGERY**

4.43.1  On August 24, 2010 11:18:36 AM, Koster explains the document he sent should have had his signature, which, in fact, it did not.[49] Koster indicates that he will sign the document when he returns and is at his desk.

4.43.2  Koster never delivered the counter-signed document until after he responded to Flores and Clarkson's attorney Gary Grab's demand for production of Documents letter. The counter-signed document arrived November 17, 2010 at 1:13 AM CST to Flores. It was then discovered by Vicki Clarkson that Flores' signature had been forged onto a non-original signature page which didn't bear the embedded watermark seal[50] of the original document[51] whereupon Flores had signed. Not only had Koster forged Flores' signature on a fraudulent signature page, but had backdated the signature date of his signature to reflect that he executed the agreement on August 17, 2010.

4.43.3  Koster penned the fraudulent signature date to have it appear as though he had inscribed his signature on August 17TH.  In fact, Koster hadn't signed the document or given any notion to sign it.  It wasn't until one week after Flores informed Koster of his signature withdrawal of August 18TH that Koster had even

---

[49] *See,* Exhibit 63 *at* ③ and ④.
[50] Exhibit 108
[51] Exhibit 107

given thought to signing the document, as Koster said he would <u>sign the agreement when he returned "back to [his] desk"</u> on August 24TH .[52]

Koster had forged Flores' signature on the fraudulent signature page with a falsified signature date for Koster's own signature. There could only be one objective for Koster to risk the penalty for the criminal act of forgery by wire fraud; his purpose was to falsely establish Koster's execution of the document prior to Flores' signature withdrawal date. This act establishes more than the tort of civil fraud.

4.43.4  Koster sent documents, falsified by forgery, affecting a monetary transaction value exceeding millions of dollars, directly in the offer and sale of securities.  He did so through the use of interstate commerce and by use of the public wire over the Internet.  This action is a violation of State and federal crimes including: felony Forgery,[53][15] and felony federal Wire Fraud,[54][12,17,18] that are both elements of Racketeering[19] (RICO)[55].

### 4.44  8/25/2019 - NINE MONTH DEFAULT/FAILURE TO PERFORM NOTICE

On Wednesday, August 25, 2010 8:07, Flores wrote:

"Scott -
It's now Wednesday, August 25, 2010 , more than nine months after you received funds.
Are we going to wrap this up today? Please advise immediately as I have a scheduled appointment.

---

[52] Exhibit 66
[53] Texas P. C. § 32.21 Forgery - felony
[54] 18 U.S.C. § 1343 Wire Fraud
[55] 18 U.S.C. §§ 1961-1968 Civil RICO (Racketeer Influenced and Corrupt Organizations Act)

I will be unavailable from 2:30 PM CST until 4:00 PM CST for an
electrocardiogram and cardiology clinic appointment.
Lance" (Exhibit 67)

The Defendants refused to produce any verifiable documentation or information.

Defendants, particularly Koster counseled by Harlan, continued their conscious

indifference to Defendants' fiduciary duty through Silence, Concealment, Beach of

Contract for Nonperformance, Breach of Common Law Duty of Good Faith,

Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due

Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel

particularly Promissory Estoppel, Estoppel by Non-disclosure, Estoppel by Silence,

Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later

making certain related arguments, defenses or claiming certain related rights

later.[*6,*7,*10,*11,*13,*19,‡1,‡2,‡4]


**4.45  9/1/2010 10:43 AM - SCHEDULE FOR TELEPHONE CONFERENCE CALL**

**W/GOLD TRADE COMPANY PRINCIPAL RICHARD HALL.**  On September 1, 2010

10:43:18 AM CST Scott Koster sends an e-mail message to inform Flores of the

conference call with Richard Hall.

Koster:
    "Your call is scheduled for 1pm EST today. That is 12pm CST. After these calls are
done, you will have direct access to Richard, to ask any questions you need to. I do not
get involved in that side of the transaction, only the instrument side."
(Exhibit 73)

**4.46   9/1/2010 12:01 AM - 2ND FRAUD SCHEME - DURING CONFERENCE**

**KOSTER INITIATES AN EXTORTION KICKBACK PLOT**

4.46.1   9/1/2010 12:01 AM - Richard Hall/Gold Buy/Sell Telephone Conference. On

September 1, 2010 21:01 CST, Flores joined a conference call on conference line

number 218-844-8230 access code 380262# already in progress.

Toward the end of the teleconference call, Richard Hall inquired about the method

Plaintiffs would prefer their funds were to be transferred:

September 1, 2010, Dallas, Texas, Central Standard Time.

| | | |
|---|---|---|
| 12:45:23 PM | Hall: | "If you want us to, you know, to Panama it might be easier, ahh, and faster to receive your funds for each disbursement if were to transact in Dubia, umm, that way we avoid the U S altogether … |
| 12:45:33 PM | Flores: | Okay |
| 12:45:44 PM | Hall: | But until, it's up to you guys |
| 12:45:47 PM | Flores: | Well, if you want to do, ahh (pause) Dubia, (Koster interruption) Dubia is fine , |
| 12:45:51 PM | Koster: | Let me give you an answer to that |
| 12:45:51 PM | Flores: | Dubia is fine with us (Koster interruption unintelligible) either way |
| 12:45:51 PM | Koster: | Regarding the other two partners Lance, ahh |
| 12:45:52 PM | Flores: | Yeah |
| 12:45:52 PM | Koster: | You should probably find out where they're sitting 'cause I know beyond a shadow a doubt that ah Doctor Fletcher has put that very clearly he wants to keep the funds here in the U S" |

Koster, interrupts the dialogue between Hall and Flores and interposes himself

into the conversation becoming adamant about how the other two partners wanted

their funds transferred.  Koster became even more emphatic in his interjection stating

that Eugene Fletcher was "beyond a shadow of a doubt" insistent that the funds be

kept in the U.S. to the point that it appeared that Fletcher had taken over the control

and management of the Plaintiffs' "one-third" interest of the Gold Transaction; *i.e.* the

Plaintiffs assets, or rights to Plaintiffs share from the Gold Transaction generated

revenues.

In retrospection, Koster, if his statement was truthful, directly implicates Eugene

Fletcher as a co-conspirator in a felony conspiracy of the extortion scheme Koster was

plotting. If Koster had lied in his statement about Fletcher's involvement and

interference on September 1, 2010 at 12:45:52 PM CST in the teleconference, then he

made a tortious fraudulent statement for his own purpose in an act of wire fraud.[12,17,18]

4.46.2  9/4/2010 8:24 AM Flores Raises Issues with Koster Concerning the Eugene

Fletcher's Control of the Payout Stream Raised During the Teleconference.  In a

message on September 4, 2010 8:24:17, Flores queries Koster about the due diligence

on Richard Hall's group and Fletcher's involvement in taking unlawful and illegal

control of Plaintiffs' assets.

Flores:

"1. Can we get the Richard's Company information and contracts so we can
complete due diligence and wrap up this transaction, or at least find out
what the timeline is going to be.

2. Why do all the payment transactions have to come through the U.S. when
Dubai is faster?

3. If Eugene insists his funds be issued from the U.S. why is it necessary for everyone else's funds xfer's be the same?

4. Is Eugene controlling the funds?

5. If Eugene's selection is a requirement, I presume he will be liable for damages incurred by delays, Homeland confiscations, etc."

(Exhibit 74 at ①)


**4.47   9/6/2010 11:10 AM – 2ND FRAUD SCHEME - THE SHAKEDOWN.[14]**

**4.47.1   Koster Reveals the Shakedown and the Eventual Take it or Loose Everything Deal.** On Saturday, September 4, 2010 7:11:33 PM, Koster laid out the extortion kickback for his front man Kerim S. Emre, relating the payoff he wanted as Kerim's "initial agreement." What Koster was referring to as the initial agreement, was the 16.7% piece of the action, the investment returns, required by the Syndicate, out of the Plaintiffs' earnings from the Alicorn PSP investment with IDLYC and BMW.   (Exhibit 74)

The Richard Hall Gold By/Sell transaction was the sentiment for payment of partial damages and all of the ALICORN/IDLYC/BMW investment non-performance that would be recovered by "levering up" the gold returns until complete payment was made. Emre had not negotiated a settlement with the Plaintiffs for the damages nor non-performance and just wanted to stiff the Plaintiffs out of their money and damages at the time. However, Emre was still liable for those damages, and Koster was aware of this.

Now, Koster unveils the shakedown for the kickback to Emre. This was the ulterior motive[56] for not transacting out of Dubia.  Koster's purpose in requiring the money to come stateside prior to Plaintiffs receipt of their funds, was to afford Koster the opportunity to take control of Plaintiffs' revenue stream from the settlement before Flores could refuse to pay the extortion and instead pay for the collateral for a loan out of Hong Kong. Moreover, another one-third-interest-partner, Arcadia Ivan A. Santos III ("Ivan Santos"), lives in Manila and is a citizen of the Republic of the Philippines, and had no interest nor any reason to have his settlement funds going to the Unites States. There is no other reason for Koster's control of Plaintiffs' revenues from the Gold Transaction.  Eventually Plaintiffs discovered Koster's intent to have the funds processed stateside, and the conspiracy to extort money from the Plaintiffs. With control of the revenue stream, Koster would coerce the Plaintiffs and deceive Ivan Santos into signing "legal looking" documents. The document, that was to be executed, was little more than a facade for the theft of money by extortion in a 16.7% kickback scheme to Emre. Koster made little effort to cloak the extortion paid to his front man.  Emre had no contract for any services to the Plaintiffs and was liable for damages and non-performance from the ALICORN/IDLYC/BMW transaction.

However, Koster does make an attempt to cloud his statement implicating Eugene Fletcher in the scheme but does not fully withdraw his insinuation. Koster claims that each of the partners has a separate contract for his one-third ($\frac{1}{3}$) interest[57] in the use of the SBLC, for the Gold Transaction.

---

[56] *See*, Vol. 3 Exhibit 74 at ②

[57] (*id.* at ③)

4.47.2  9/9/2010 - Childs Defines Procedures for the Richard Hall Gold Buy/sell

Instrument Transactions – Koster to Fund Escrow Account.  (Exhibit 76)

On Thursday 9/9/2010 11:04 AM, John Childs contacted Flores and former PSP

partners to describe the procedure and specification of the Richard Hall Gold

Transaction requesting a second Client Information Sheet (CIS):

"Gentleman,
To date I have only received the Completed CIS for Ivan.  Thanks you Ivan.
In order for me to proceed to the next step with the paperwork, I need the
remaining two CIS packages.  Thanks in advance.  Upon receipt and
succesful review of all three packages I intend to do the following and in this
order:

     * Prepare an FPA (this will insure that the proceeds are distributed
properly to the three of you) and Sub Fee Agreemet (this will ensure that
all brokers are paid properly) for Dr. Fletcher and his team.
     * Prepare a Sub Fee Agreement for Ivan. [Arcadia Ivan A. Santos III]
     * Prepare a Sub Fee Agreement for Lance.

Once they have been executed and returned to me, I will lodge them with
my paymaster  He will distribute the funds accordingly and to their proper
destinations as they come in.  Once this is done I will:

     * Prepare the contracts for delivery of the SBLC for review and
subsequent execution.
     * Scott will request the Asset Management Agreement from Richard Hall
and his group for your review and subsequent execution.
     * Scott will fund escrow.
     * I will complete the transaction detail report for the SBLC provider.
     * The SBLC will be delivered electronicly.
     * The Escrow will be released and my lender paid.
     * The SWIFT will be requested and delivered Standard Bank of South
Africa (MT798 Envelope / MT760).
     * The ISN number will be generated upon successful receipt of the
SWIFT.
     * My roll and Alicorn's roll as SBLC provider will be concluded at this
point and you will be in the very capable hands of Richard and his team.
[*emphasis and notation added*]

4.47.3  The Defendants particularly Koster, counseled by Harlan, Emre and Childs, continued their conscious indifference to Defendants' fiduciary duty through , Breach of Common Law Duty of Good Faith legally due Plaintiffs.  Childs and Koster counseled by Harlan, knew the consequences of their action to extort the Emre Kickback from the Plaintiffs and wilfully with malice aforethought, conspired in an act of Coercion and Tortious Interference with Prospective Contracts over the wires, elements of Racketeering.[*7,*9,*11,*21,†2,†7,†8,†8,†9]

## 4.48  9/6/2010 - 2ND FRAUD SCHEME - JOHN CHILDS EMERGES AN ACTOR IN THE SHAKEDOWN.[†4] (Exhibit 74 at ④)

4.48.1  John Childs Acknowledges Emre Had No Entitlement to Fee -- But Would Aid in the Kickback for Emre. Childs acknowledges that Emre had an agreement FPA (Fee Payment Agreement), only for the PSP ALICORN/IDLYC/BMW deal, not the substituted Richard Hall Gold Transaction intended as a settlement for the Plaintiffs' damages and the lost revenues resulting from the transaction's non-performance. However, Childs stated he intended to get the payoff for Emre anyway, and threaten to make the PSP partners pay Emre for his part in resolving the Plaintiffs' restitution.  Childs affirms his threat by raising the stakes threatening further to increase the cost to the PSP partners to One-Million Dollars ($ 1,000,000).

4.48.2  9/7/2010 2:05 PM - Flores Demand for Agreement Verification. (Exhibit 74 annot ⑤) On Tuesday, September 7, 2010 2:05 PM, Flores demanded the agreement information which affected the cost to the Plaintiffs' settlement transaction:

"John - Please send a copy of the verbal agreement you had with Scott. This is always why I'm asking for written agreements and verifiable instruments of transactions ...  I was told that after the IDLYC/BMW Majestic boondoggle there would be communications and transparency. I want everything on the table, clarified, and documented tomorrow; no more surprises."

**4.48.3  9/7/2010  6:20 AM - John Childs Continues Extortion Sham Asserting Claim to a Nonexistent Emre Agreement He Had Already Acknowledge Didn't Exist.**

(Exhibit 74 at ⑥)

On Tuesday, September 07, 2010 6:20 AM, John Childs sent a message to Flores, copied to Scott Koster and Vicki Clarkson concerning the "Wrap up" of the gold commodity buy/sell transaction:

John Childs:

"On the other hand my agreements with Scott, written or otherwise, are between scott and myself. You have no need and no right to the information as it/they do not involve yourself, vicki or anyone else.

Your concern is your ability to enter into this transaction. In order to do that the three of you will need to execute contracts for the delivery of an SBLC. the LC costs money. I have agreed to do so at no initial markup. I did so out of respect for scott yourself and others. However, I am in no way required to arrange the delivery of any debt instrument for free.

If you choose not to honor your agreements or commitments with Kerim and the other intermediaries then I will have to increase the cost of the instrument back to its normal price to include commissions for all involved rather then deferring until a little later down the road."

**4.48.4  9/7/2010 10:17 AM -  Koster Continues Extortion Sham[14] Referring to a Nonexistent Agreement or commitment to take a kickback on the settlement of the ALICORN/IDLYC/BMW tranaction nonperformance and damages.**

On Tuesday, September 7, 2010 at 10:17:32 AM, Koster sends an e-mail message asking Flores to "stop with the legal talk" and insists on continuing the extortion using his "Doublespeak" referring to the Plaintiffs' refusal to pay the extortion kickback as dodging some kind of legitimate financial obligation:

Koster:

"Lance, please stop with all the legal talk. I'm saying this just to you. Its not making the situation any easier. The deal I have with john is for he and I to waive any front load commissions for the instrument...nothing more, nothing less. He is upset about you dodging the fpa you have with kerim. (Exhibit 74 at ●)

"John is an adversary, and not an opponent. However, he does have the legit ability to kill this, as it was his relationship to the lender that made all this possible in the first place. (*id.* at ●)"

John Childs had already acknowledged[58] that Emre had a fee payment agreement for the ALICORN/IDLYC/BMW transacton and nothing more. There was no reasonable explanation why Emre should be receiving part of the damages settlement. Koster, Emre and Childs were all fully aware that there was no fee payment agreement for Emre to receive a kickback from the settlement damages for which, *inter alios*, Koster, Emre, and Childs were liable for the non-performance, damages and they knew they had incurred liability for each of their participation in the commission of their tortious conduct. Yet, here, once more, they continue their shakedown for a kickback.

    4.48.4.1 *Arsonist Analogy: It is well established by Childs that Emre was not entitled to compensation from the Alicorn settlement for the damages and harm to*

---

[58] *Supra,* at <u>4.48.1</u>

*the Plaintiffs, which Emre had a hand in. Yet, both were determined to get a*

*kickback out of the settlement for Emre. Such would be akin to the arsonist who*

*burned one's house down to cover up a robbery then returning to the resident's*

*home after the insurance check arrives to demand a piece of the insurance claim.*

4.48.5  9/7/2010 11:05 AM, John Childs Advances a New Extortion and Strikes out

to Kill the Richard Hall/berea Gold Transaction.[14]  Fifty-two minutes following

Koster's 10:17 AM message, Childs sends a message to Flores exhorting his own

kickback extortion of Three-hundred Fifty-thousand Dollars U.S. ($350,000 USD).

(Vol. 3 Exhibit 74 at ●)

4.48.6  9/22/2010  9:54 PM CST - Flores Gives Notice to Koster and Emre That

Emre Has No Wavier.

On Thursday, September 9, 2010  9:54 PM CST, Flores informs Koster:

> "I do not have any waiver agreement with Kerim for damages liability for
> IDLYC/BMW Majestic so I do not want to complicate matters; better stay
> away from Mark [Wolanin] getting involved in this transaction. I have another
> gold buy/sell I can get Mark into in the morning." (*id.*)

4.48.7  The Defendants particularly Koster, counseled by Harlan, Emre and

Childs, continued their conscious indifference to Defendants' fiduciary duty through ,

Breach of Common Law Duty of Good Faith legally due Plaintiffs.  Childs and Koster

counseled by Harlan, knew the consequences of their action to extort the Emre

Kickback from the Plaintiffs and wilfully with malice aforethought, conspired in an act

of Coercion and Tortious Interference with Prospective Contracts over the wires,

elements of Racketeering.[*7,*9,*11,*21,12,17,18,18,19]

**4.49  10/11/2010 - KOSTER ANNOUNCES READY TO EXECUTE GOLD TRANSACTION - IDENTIFIES THE THREE PARTNERS**

4.49.1  On Monday, October 11, 2010  2:06 PM, Scott Koster announced "ready to execute … live by end of the week." (Vol. 4 Exhibit 79 at ①).

The next day on October 12TH at 6:04 PM Flores inquires about the issue of a transaction code. (Vol. 4 Exhibit 79 at ②)

Koster immediately answers at 6:05 PM, stating, "Yes sir, we are getting all docs put together." (Vol. 4 Exhibit 79 at ③)

4.49.2  Flores responds to Koster's agreement being full of holes and weak, noting it would be unlikely to be upheld in a court of law.[59]

4.49.3  On Monday, October 18, 2010, at 11:37:36 Koster sends a message to Flores, copying Childs and Emre. At this time, there had been no verification of the execution of the Gold Transaction having been executed as had been stated by Koster earlier (¶ 4.49.1) on October 11TH. In the message Koster states that the <u>three partners (MFI a.k.a. R. Lance Flores, Winston J. Cook, and Ivan Arcadio Santos identified in the attachment</u> have equal ownership thus rights, in the interests of the financial instrument which Winston J. Cook would execute.[60]

---

[59]  Vol. 4 Exhibit 81

[60]  *See,* e-mail and attachment Exhibit 80

4.49.4  On Monday, October 18, 2010 12:03:06 PM CST, Flores responds to Koster's 11:37 AM message and amends, signs and sends the Partnership Termination and Wind-Up &c. document to Scott Koster.[61]

4.49.5  Just over three hours later at 3:26 PM, Koster sends a message with an attached document appearing similar to the one he had sent earlier at 11:37 AM that morning.  The 3:26 PM document had, what appeared to be, the signature of Ivan Santos, however, it had been altered from the original 11:37 AM document at the signature page, previously showing "Arcadio Ivan Santos III" under the signature, whereas, the 3:36 PM document sent to Flores, originally was typewritten with "Ivan Arcadia Santos" at the signature location for Mr. Santos.

## 4.50  10/19/2010 5:45 PM,  - 2ND FRAUD SCHEME - THE RANSOM NOTE.[14, 12,17,18]

4.50.1  On Tuesday, October 19, 2010  5:45:07 PM, Subject:  Your final Piece,  John Childs wrote:

> "Lance,
>
> "I have attached a Sub Fee Agreement to this email.  This is the final piece of paperwork that requires your attention as it address' your obligations. The other partners have their own obligations.  That said this does not affect them nor will theirs you.  Please sign it, add your letterhead to the Header and return it to me.  Once I have the entire file completed, I will disseminate it to all three parties.  Thanks in advance for both your time and consideration in this matter.  &c."  (Exhibit 83)

Relentless in the group's extortion pursuits, Childs delivers the last extortion demand by sending an attached Sub Fee Agreement, disregarding his acknowledgment and

---

[61]  Exhibit 81

knowledge of he, Koster, and Emre, had that there was no agreement for Emre to receive

any payoff, kickback or part of the Plaintiffs' settlement funds. Childs uses his own

*Doublespeak*, writing:

> "I have attached a Sub Fee Agreement to this email. This is the final piece
> of paperwork that requires your attention as it address' your obligations.
> The other partners have their own obligations. That said this does not
> affect them nor will theirs you. Please sign it, add your letterhead to the
> Header and return it to me. Once I have the entire file completed, I will
> disseminate it to all three parties. Thanks in advance for both your time
> and consideration in this matter." (Exhibit 74 *at* ⓪) (Sub Fee Agreement,
> *see* Exhibit 75)

Upon examination of the extortion demand delivered by Childs, the extortion kickback

for Emre was sixteen and seven-tenths percent (16.7%) to be taken from every payment

for the performance default and damages reconciliation made to the Plaintiffs' in the

settlement payment stream. In addition to the kickback, the Sub Fee Agreement

contained a separate agreement written in behalf of Plaintiff Vicki Clarkson who was

neither made aware of what Childs had sent, nor had she given her consent to anyone to

represent her financial interests, nor had she given her power of attorney to anyone to

represent her in any legal capacity, nor had she appointed an agent to act in her behalf to

enter her into any agreement. Not only was the document an extortion instrument, but

also a fraudulent instrument sent by wire, over the Internet.

   4.50.2  10/19/2010  6:11 PM CST - Flores Responds to the Extortion Demand.

   On Tuesday, October 19, 2010  6:11 PM, Twenty-one minutes following Childs'

delivery of the extortion demand, Flores demands proof of an executed agreement or

contact information of Childs attorney:

"Provide all background information and the signed agreement between Kerim & Mockingbird Films. Provide all notification information of this subject matter that was delivered to Mockingbird Films prior to 10/19/2010 5:45 PM message sent to mockingbirdfilms.com mail from John Childs. Please provide a contact phone number which you can be contacted by my legal team and I; or provide your legal counsel's name and contact information." (Exhibit 74 *at* 11)

It was on this day that the Plaintiffs after substantial discussion and due consideration, that Clarkson and Flores decided they would pursue litigation which Flores had previously outlined in telephone conversations with Koster.

4.50.3  The Defendants particularly Koster, counseled by Harlan, Emre and Childs, breached their Defendants' fiduciary duty through , Breach of Common Law Duty of Good Faith legally due Plaintiffs.  Childs and Koster counseled by Harlan, knew the consequences of their action and attempt to extort the Emre Kickback from the Plaintiffs and wilfully with malice aforethought, conspired in an act of Coercion and Tortious Interference with Prospective Contracts over the wires, elements of Racketeering.[7,9,11,21,12,17,18,18,19]

4.51  10/20/2010  6:49 PM CST - FLORES GIVES NOTICE OF BREACH OF FIDUCIARY RESPONSIBILITY, INTERSTATE FRAUD, AND EXTORTION.

On Wednesday, October 20, 2010, Flores responds to Koster concerning Childs' extortion demand and fraudulent exaction document. Flores again noted that Emre, Alicorn and Koster had not executed a settlement and release from liabilities related to the Syndicate's and their failure to perform and the related damages.  Likewise, Flores gave notice to Koster concerning the recent activities of he, and Childs, that

they had breached their fiduciary responsibility, and engaged in interstate fraud, and

extortion.[43] (Exhibit 74 *at* 12)


### 4.52  10/21/2010 3:00 PM – CHILDS IDENTIFIES EMRE AS AUTHOR OF EXTORTION DOCUMENT AND IN THE FRAUDULENT REPRESENTATION OF CLARKSON AND IMPLICATES EMRE IN THE EXTORTION[12,17,18]

On Thursday, October 21, 2010, Childs sent a message to insure the Plaintiffs that

Emre was the author of the sub fee agreement, that Childs was using to extort the

kickback for Emre, and thus implicating Emre in the extortion conspiracy along with

himself and Koster.  This also implicates Emre in the unlawful and illegal

misrepresentation of Vicki Clarkson and fraudulent representation of her in the

extortion document, falsely representing her by failing to inform her and obtaining

her consent.


4.52.1  On 10/21/2010 11:08 PM, Scott Koster wrote:

"Rather than point out where you see the liability is with Kerim, lets [*sic*] focus on one thing, which is what is holding us back from moving this forward [*i.e.*, Emre's kickback on the non-performance and damages settlement]" (Vol. 4 Exhibit 84 at ②)

"Lance, do you agree that because you came into this transaction through your relationship with Kerim, that Kerim deserves some level of compensation [*payoff*] for helping us get all the pieces together for this instrument [settlement for Defendants' non-performance, damages and harm]?" (at ③)

"… please respond with what you feel is a fair % for Kerim to receive, and lets start there. I am just doing this as a friend to both of you, but more so because I want this to move forward." (at ④)

4.52.2  Beyond question, Koster was extorting a kickback that would be funneled to Emre taking some of the action from the settlement. Koster then advanced to Flores in the message a reasoned solicitation for Flores to make a negotiable offer for Emre's payoff.

Koster, Emre and Childs had a meeting of the minds to use the Plaintiffs' duress as an advantage in an *eleventh hour* extortion kickback and payoff scheme to Emre.

4.52.3  The Defendants particularly Koster, counseled by Harlan, Emre and Childs, continued their conscious indifference to Defendants' fiduciary duty through , Breach of Common Law Duty of Good Faith legally due Plaintiffs.  Childs and Koster counseled by Harlan, knew the consequences of their action to extort the Emre Kickback from the Plaintiffs and wilfully with malice aforethought, conspired in an act of Coercion and Tortious Interference with Prospective Contracts over the wires, elements of Racketeering.[*7,*9,*11,*21,12,17,18,18,19]

## 4.53  10/21/2919 - KOSTER WANTS A STOP OF LEGAL NOTICES "FOR EVERYONE TO SEE"

4.53.1  On 10/21/2010 11:08 PM, Scott Koster wrote "… as I have told you in the past, while I appreciate and understand your legal background, putting all that out there for everyone to see does nothing but put people on the defensive." (Vol. 4 Exhibit 84 at ①)

4.53.2  Harlan and Koster were uncomfortably aware that Flores had been providing legal notice and warning throughout the course of their fraud actions and

posed potential criminal activity of the Defendants. Given Harlan's legal training, long experience, [FN 40] and understanding of his professional duties [FN 41] it is evident Defendants Harlan and Koster needed Flores to cease and desist from his lawful warnings, in order that they might attempt a defense of their tortious actions. Harlan and Koster with full cognisance and understanding of related and prevailing law and doctrine, and knowing the risks of Defendants' acquiesce, thus far, and with expectation of their need to continue, the anticipated continuance of Flores' legal notices and warnings, attempted with scienter, to coerce Flores into ceasing his disciplined procedure.

### 4.54  10/25/2010 - PLAINTIFFS DEMAND STATUS TERMS AND TIME-LINE OF GOLD TRANSACTION

4.54.1  On Monday, October 25, 2010 at 2:30 PM, Flores demanded from Koster and Childs the status of the Gold Transaction by 5:00 PM that day. (Exhibit 85 at ①)

4.54.2  In the period between October 25TH and November 1ST Flores called Koster to have him respond to the Plaintiffs numerous demand for the status and time-line of the Gold Transaction.

4.54.3  On November 1, 2010 12:54 PM, Koster responded to the Plaintiffs' messages stating " I will call you later on today. In and out of meetings for most of the day regarding local business." (*id.* at ②)

Nevertheless, Koster did not call back nor did he send a message regarding his failure to call Flores.

**4.55  PLAINTIFFS MAKE IMPASSIONED DEMAND FOR PERFORMANCE ON THE GOLD BUY/SELL SETTLEMENT.**  The following morning, Tuesday, November 2ND at 3:38 AM, Flores in an e-mail message responded:

"And you never called. So .. the last few words ...

[http://www.youtube.com/watch?v=mBS0OWGUidc&feature=related ]" (*ibid.* at ③)


   4.55.1  Following Flores' effusive demand for performance on the settlement Koster responds later that day with several messages establishing excuses for more delays to come because of gold seller's increased requirements for a larger purchase. (*id.* at④)

   4.55.2  Koster provided the assay results of the barreled gold stating the results as 93.44% pure. However, he did not provide any verifiable proof. (*id.* at ⑤)


**4.56  11/2/2010 - CLARKSON'S NOVEMBER 2ND MSG. – DEMAND FOR VERIFIABLE DOCUMENTATION OF GOLD TRANSACTION**

   4.56.1  On Tuesday, November 2, 2010, Clarkson sent a message to Koster complaining about Koster's promises about greater transparency and improved communications from him. Clarkson quarried about the status of the Gold Transaction, and verifiable evidence:

   Clarkson:

"Scott,

"I was under the impression that the communication was going to improve. Thus far, I haven't seen any changes since the IDYLC deal, none.

"What is the status of the gold buy/sell?

"Kerim advised it would be completed on August 10th, via a telephone conversation I had with him in early August. Here we are today, the second of November and we are still no closer to understanding where this deal is at.

"Do you have any verifiable documents that you can send out? Such as the SBLC document? Verification that there is one in place?

"In my last conversation with Lance, I was told that contracts were supposed to be sent out to finalize the buy/sell of the gold. Where are these contracts, have they been sent?   Please advise, what is the hold up?

"Vicki"   (Exhibit 86)

## 4.57  10/28/2010 - WINSTON J. COOK IS LOCATED AND QUARRIED ABOUT IDLYC AND GOLD TRANSACTION

4.57.1  After numerous inquires to Koster and his refusal to relinquish information requests for the names and contact information of the PSP partners and those involved in the Gold Transaction, Flores locates Winston Jerome Cook. Cook was either a partner or a business associate of Eugene Fletcher.

On October 28, 2010 at 2:10 PM Flores located Cook on the "Facebook" social network site and made contact. (Exhibit 87)

Flores spoke to Cook late Tuesday afternoon on November 2, 2010. Flores asked Cook if he had heard or received any funds from IDLYC or ALICORN or heard from Koster about the investment returns or status of the Gold Transaction; to which Cook

replied, he hadn't. Flores informed Cook that he believed that Koster, IDLYC and

BMW Majestic were hiding funds and were involved in a fraud scheme. Flores stated

if he didn't get some immediate clarification and verifiable information he would be

moving onto litigation of the issues. The two exchanged information and discussion

about their businesses and concluded the conversation.


4.58  11/10/2010 - NOVEMBER 10TH/11TH FLORES/CLARKSON DIALOGUE -

INITIATION OF LITIGATION (copied to Scott A. Koster)

Clarkson and Flores discuss the strategy and details of prospective litigation and

decide to move forward after first generating "Settlement Stipulations." Plaintiffs copy

Koster on one communication to inform him of their intent, that he may plan for settling

on the Plaintiffs' terms and stipulations.

*See* Vol. 4 Exhibit 88 – November 10TH/11TH Flores/Clarkson Dialogue - Initiation of

Litigation *&c.*; Copied to Scott A. Koster by e-mail:

"—— Original Message ——
From: Lance @ MFI
To: VICKI CLARKSON
Cc: Scott Koster
Sent: Thursday, November 11, 2010 12:03 PM
Subject: Re: Gold Buy/Sell"

4.59  11/11/2010 1:23 PM - KOSTER RESPONSE TO NOVEMBER 11TH

CLARKSON/FLORES INITIATION OF LITIGATION

On Thursday, November 11, 2010 at 1:23 PM, Scott Koster responded to the

Flores/Clarkson intonation of legal proceedings to Cook and subsequent Thursday,

November 11, 2010 12:03 PM copy, in part, of Plaintiffs' litigation discussion:

4.59.1  "As john told you on the phone, you more than ruffled feathers with your comments regarding the feds to winston and dr fletcher. This email is icing on the cake." (Exhibit 89 at ①)

4.59.2  "Everything that has been done to this point can be proven and defended in a court of law. Please tread carefully, as we are very aware of the lies you have told about your involvement with myself, as well as how you passed money through your family to get back to you. (*id.* at ②)

4.59.3  "Again, issues between you and vicki are between you and vicki. You did not make anyone aware of her involvement until mid this year. (*id.* at ③)

4.59.4  "If you wish to proceed in either this transaction, or just back out, let me know. After your comments to winston, it was requested by both richard, and the other two partners to find a replacement for your 1/3rd, as richard does not need that kind of drama in his world, and neither do the other two. (id. at ④)"

**4.60  KOSTER IMPLICATES RICHARD HALL, and TWO PARTNERS IN CONVERSION[62], THEFT, AND CONSPIRACY OF PLAINTIFFS' ONE-THIRD (⅓) INTEREST IN THE GOLD TRANSACTION IN RETALIATION FOR INVOLVING THE FEDERAL COURT AND EXPOSURE TO DOJ & SEC**

> Koster:  "As john told you on the phone, you more than ruffled feathers with your comments regarding the feds to winston and dr fletcher. This email is icing on the cake." (*emphasis added*) (Exhibit 89 at ①)

> "If you wish to proceed in either this transaction, or just back out, let me know. After your comments to winston, it was requested by both richard, and the other two partners to find a replacement for your 1/3rd, as richard does not need that kind of drama in his world, and neither do the other two. (*id.* at ④)" (*emphasis added*)

**4.60.1  Koster Threatens and Acts to Attempts and Intentionally Tortuously Interferes with the Gold Transaction Agreement.** Koster's suggests in his message, that following Winston J. Cook and Flores conversation, Cook had apparently informed Eugene Fletcher of the details of that phone call. Plaintiffs had never met or been given Fletcher's contact information and were unable question him about his insistence in taking control of Plaintiffs' funds. In his message, Koster infers that the

---

[62] Conversion is the wrongful exercise of dominion or control over the property of another in denial of, or inconsistent with, the other's right to the property. *AIG Life Ins. Co. v. Federated Mutual Ins. Co.*, 200 S.W.3d 280, 285 (Tex.App.Dallas 2006, pet. denied). A claim lies for conversion of money when identification of the money is possible and there is an obligation to deliver the money in question. *Id.* The factual allegations in Plaintiff's amended complaint are sufficient to state a claim for conversion. Defendants also contend that Plaintiff has failed to allege "demand and refusal." A demand for property and refusal to return the property may be necessary when the possession is initially lawful, because the refusal is what makes the possession unlawful, and a cause of action may then accrue. *Hofland v. Elgin-Butler Brick Co.*, 834 S.W.2d 409, 413 (Tex.App.-Corpus Christi 1992, no writ). A demand and refusal is not necessary for every conversion cause of action to accrue.

Plaintiffs demands and their decision to litigate aggravated Cook, Fletcher, Koster

and others, and angered some so much, that the group deemed Clarkson and Flores

too unsafe to be involved in the transaction.   Further, the group would not tolerate

Plaintiffs constant demands for proof, legal notice, and menace of exposure of the

group's activities to federal authorities. *id. at* ①.

4.60.2  Koster's threat of "[i]f you wish to proceed in either this transaction, or just

back out, let me know", is his ultimatum, to either pay the extortion and stay away

from the "feds" or Plaintiffs would pay dearly and loose everything and intentionally

interfere with an existing contract.

This was the consequence of the Plaintiffs discussion and ultimate decision to

proceed to litigation and involve the SEC and Justice Department.  This was done

only after Plaintiffs had undertaken extensive investigation, research, and analysis

and could present more than hearsay and supposition to the Court and federal official.

Koster had once more voiced his *cooperate and keep away from the "feds" or*

*loose everything threat,*[63] and continued his tactic of *instilling the fear of losing*

*everything.*[64] With his claim of the enlistment of Richard Hall, and two partners,

Winston J. Cook and Eugene Fletcher, "Dr. Fletcher and his team,"[65] Koster

becomes more cavalier about extorting a kickback from the Plaintiffs.

4.60.3  The Defendants refused to produce any verifiable documentation or

information. Defendants, particularly Koster counseled by Harlan, continued their

---

[63] *See* ¶ 4.23, *supra*, at 66
[64] ¶ 4.19.3, *supra*, at 63
[65] ¶ 4.47.2, 4.60.2, *supra*, at 107, 124

conscious indifference to Defendants' fiduciary duty through Silence, Concealment,

Beach of Contract for Nonperformance, Breach of Common Law Duty of Good Faith,

Intentional Misrepresentation, Willful Omissions, Fraud by Concealment legally due

Plaintiffs. Koster and Harlan knew they would be prohibited by equitable estoppel

particularly Promissory Estoppel, Estoppel by Non-disclosure, Estoppel by Silence,

Estoppel by Estoppel by Misrepresentation, or otherwise be estopped from later

making certain related arguments, defenses or claiming certain related rights later.

Further, the Defendant did so with malice and executed their torts and intentionally

interfered with the Gold Transaction agreement. [6,7,10,11,13,19,11,12,14]


### 4.61  11/11/2010  1:23 PM - KOSTER DECLARES HE CAN PROVE AND DEFEND EVERYTHING IN A COURT OF LAW – LITIGATE OR GO AWAY.

November 11, 2010 at 1:23 PM

> Koster:
> "Everything that has been done to this point can be proven and defended
> in a court of law. Please tread carefully, as we are very aware of the lies you
> have told about your involvement with myself, as well as how you passed
> money through your family to get back to you." (emphasis added)
> (Exhibit 89 at ②)

4.61.1   Koster makes a declaration that he can prove and defend  "[e]verything,"

which would include, *inter alia*, his breach of contract, breach of good faith, breach of

fiduciary duty, misrepresentations, bad faith, intentional misstatements, deception,

non-disclosure, willful omissions, tortious interference with prospective contract and

all his duplicitous pursuits; notwithstanding the production of all of the associated

information and documents related to the ALICORN/IDLYC/BMW transaction and the ALICORN/HALL/BEREA/CBS Enterprise Gold Transaction. (Vol. 4 Exhibit 89 at ②)

4.61.2  FEDERAL COURT DARE.  Koster to the date of the filing of this Complaint, has extended a pattern of breaches of fiduciary duty, concealment of activities, including alleged criminal activities, and the withholding of information directly affecting the financial welfare of the Plaintiffs and substantially harming numerous members of the communities involved in the Plaintiffs' business activities. Defendants, but particularly Koster and Harlan are fully aware of the substantial cost, and emotional distress they would inflict, as well as the difficulty of litigating a fraud case such as this.

4.61.3  Defendants, but particularly Koster whose legal counsel is Thomas P. Harlan, had effectively disaffected or conspired with others, or by knowledge of the activities in the Syndicate or the Gold Transaction were aware of other Defendants that have dissuaded victims[66] from pursuing them in the courts.  They have taken their proven ability to deter action taken against the Syndicate and the Collective into account, have weighed the risks of potential civil and criminal prosecution, and have chosen a posture of forcing Plaintiffs into a standoff. Here, Koster, maintains the standoff in his course of holding hostage the critical information due the Plaintiffs, and

---

[66] *e.g.,* "... I considered the FBI but I was embarrassed [*sic*] and I didn't want to tarnish my own name by lodging an investigation with the FBI. I talked with other brokers that brought their clients to Mark and Chandler to see if they had been paid and they were in the same boat ... Finally, I contacted a friend that has conections [*sic*] in the FBI and asked if he could look into these two guys. He simply said RUN! If you can get your money... you'd better grab it and RUN! After another month, I asked for proof of the BG that I had bought and if they couldnt [*sic*] prove it I wanted my money back or I was going to the FBI." Exhibit 133