IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| R. LANCE FLORES, | § | |
| VICKI CLARKSON, | § | |
| Plaintiffs, | § | |
| vs. | § | Civil No. 3:11-CV-0726-M-BH |
| | § | |
| SCOTT ANTHONY KOSTER, et. al, | § | |
| Defendants. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the *Special Order 3-251*, this case has been automatically referred for pretrial management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. Before the Court are *Defendant Jon Divens' Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c)*, filed August 2, 2013 (doc. 368); *Defendant Francis E. Wilde's Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c)*, filed August 2, 2013 (doc. 369); *Defendant Maureen Wilde's Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c)*, filed August 2, 2013 (doc. 371); and *Defendant Steven E. Woods' Motion to Dismiss Pursuant to FED.R.CIV.P. 12(b)(2) and/or Motion for Summary Judgment Pursuant to FED.R.CIV.P. 56 and/or Motion for Judgment on the Pleadings Pursuant to FED.R.CIV.P. 12(c)*, filed October 10, 2013 (doc. 383). Based on the relevant filings and applicable law, all motions for judgment on the pleadings should be **GRANTED**, and the claims against the moving defendants should be dismissed. The claims against the remaining defendants should also be dismissed *sua sponte*. Steven E. Woods's motion to dismiss and motion for summary judgment should be denied as **MOOT**, and the case should be **DISMISSED**.

## I. BACKGROUND

On April 8, 2011, R. Lance Flores (Flores) and Vicki Clarkson (Clarkson) (collectively

Plaintiffs) filed this *pro se* action against twenty defendants, alleging a fraudulent investment scheme.  (*See* doc. 1.)  On March 19, 2012, they filed an amended complaint adding numerous defendants and asserting claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., as well as state law claims of fraud in the inducement, common law fraud, negligent misrepresentation and deceit, fraud by nondisclosure, aiding and abetting fraud, breach of confidential or special relationship, promissory estoppel, intentional infliction of emotional distress, and civil conspiracy.[1]  (*See* doc. 36.)  They seek $220,000,000 in actual damages,[2] and ask that the amount be trebled under RICO for a total award of $660,000,000.  (*Id*. at 187, 190-191, 217, 219.)[3]  The amended complaint further alleges that the defendants are jointly and severally liable.  (*Id*. at 12, 219, 221.)

Relying on various court documents filed in other district courts, Plaintiffs allege that the defendants participated in four fraudulent schemes:  (1) the "Newport Titan Fraud" that began in April 2008 and ended around February 2009 (doc. 36 at 48-51); (2) the "Cobalt CMO Fraud & Theft" that began around February 2009 and ended around October 2009 (*id.* at 51-54); (3) the "Amedraa FNMA Series CMO Swindle" that began around December 2008 and ended around October 2009 (*id.* at 55-58); and (4) the "Bank Guarantee Scheme" that began around October 2009, and for which one defendant allegedly recruited a group of defendants called the "Milaca Gang",

---

[1]  Plaintiffs' amended complaint makes numerous references to a case now pending in the Central District of California, *SEC v. Wilde*, 8:11-CV-315-DOC-AWJ, involving several of the named defendants in this case.  (Doc. 36 at 8 n. 2, 11 & n. 11, 48 n. 22, 60.)  Whether the two suits are related, and to what extent, is unclear from the record.

[2]  The source of Plaintiffs' alleged damages is not readily apparent from the amended complaint; the damages sought are not necessarily limited to the sum of Plaintiffs' investment.  (*See* doc. 36.)

[3]  Citations refer to the cm/ecf system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*id.* at 59-61). Plaintiffs assert that Francis E. Wilde (Wilde) participated in all four schemes, acting as the "Godfather" of the alleged RICO enterprise and making every important decision behind the scene. (*Id.* at 48-61, 75, 171.) Plaintiffs further allege that he used the bank account of his wife, Maureen O'Flanagan Wilde (M. Wilde), while misappropriating the "Bank Guarantee Scheme" funds. (*Id.* at 79.) Steven E. Woods (Woods) allegedly participated in three of the four schemes, and Jon Divens (Divens) allegedly participated in two. (*Id.* at 48-61.)

Plaintiffs' actual contact with some of the RICO defendants began when Mockingbird Films International, LLC (Mockingbird) entered into a profit sharing agreement with Alicorn Capital Management, LLC (Alicorn), a nominal defendant and alleged RICO enterprise in this suit.[4] (Docs. 1-3 at 7-11; 36 at 66-68; 287 at 3.[5]) Mockingbird is a New Mexico limited liability company in which Flores, a Texas resident, has an ownership interest. (Docs. 36 at 8; 287 at 2.)

Through the profit sharing agreement executed on December 11, 2009, Mockingbird purchased a 12 percent interest in the anticipated profit stream from Alicorn's investment with IDLYC Holdings Trust (DILYC), a New Zealand foreign trust also named as a defendant. (Doc. 287 at 3.) Mockingbird and Alicorn agreed that Mockingbird would pay Alicorn $80,000, $30,000 of which was to be transmitted to two defendants as a brokers' fee. (*Id.*) On December 18, 2009, Clarkson transferred $90,000 from her bank in Calgary, Canada, to Alicorn and one defendant's bank account in Minnesota. (*Id.*) Alicorn then transferred $40,000 to another defendant in California; this sum represented the $30,000 brokers' fee and an additional $10,000 that was to be

---

[4]Alicorn is dismissed due to lack of personal jurisdiction. (Doc. 287.)

[5]This Court "may rely on its previous findings of fact in connection with these issues." *City Bank v. Compass Bank*, No. EP-10-CV-62-KC, 2010 WL 2680585, at *9 n.5 (July 2, 2010) (citing *Mowbray v. Cameron County*, 274 F.3d 269, 281 (5th Cir. 2001)).

transferred to Flores.  (*Id.*)

Alicorn earned no profits on the IDLYC investment.  (*Id.*)  It offered to return Mockingbird's $50,000 investment, though not required to do so under the profit sharing agreement.  (*Id.*)  In the alternative, Alicorn offered to invest Mockingbird's funds in a gold operation in Ghana, Africa, through Berea, Inc. (another defendant).  (*Id.*)  Mockingbird elected to proceed with the gold investment. (*Id.*)  Before the new investment, Mockingbird signed a partnership termination and mutual release agreement that terminated the earlier profit sharing agreement related to the IDLYC investment.[6]  (Docs 1-7 at 8-10; 1-9 at 15-19, 20-25.)  The gold investment deal later foundered when Berea, Inc.'s principals refused to consummate the investment transaction.  (Doc. 287 at 3.)

On August 2, 2013, defendants Wilde, M. Wilde and Divens moved for judgment on the pleadings.  (Doc. 368, 369, 371.)  On October 10, 2013, Woods moved for judgment on the pleadings, to dismiss action based on lack of personal jurisdiction, and for summary judgment. (Doc. 383.)[7]  The motions of Divens, Wilde, M. Wilde, and Woods (collectively Moving Defendants) are ripe for consideration.

## II.  RULE 12(C) STANDARD

Moving Defendants move for judgment on the pleadings under Rule 12(c).  (Docs. 368 at 11-12; 369 at 10; 371 at 10; 383 at 32-33.)

Parties may move for judgment on the pleadings "[a]fter the pleadings are closed–but early

---

[6]The Partnership Termination and Wind-up Agreement and Mutual Release notes parties of interest as Lance Flores MFI (MFI) and Alicorn, using MFI as a short-form for Mockingbird throughout the agreement.  (Docs 1-7 at 8-10; 1-9 at 15-19, 20-25) (noting "[o]n December 11, 2009, MFI and Alicorn entered into a Profit Sharing Agreement . . .).

[7]Various defendants have already been dismissed from this action, either voluntarily by Plaintiffs, for insufficient service of process, or for lack of personal jurisdiction.  (*See* docs. 271, 287, 331, 353, 376.)

enough not to delay trial." Fed. R. Civ. P. 12(c).  Rule 12(c) motions are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation omitted).  The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

Under the 12(b)(6) standard, a court cannot look beyond the pleadings. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  Pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).  The court must accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).  Although "detailed factual allegations" are not necessary, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the

> misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (citations omitted). When Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 129 S. Ct. at 1950-51.

## III. RICO

Moving Defendants move for judgment on the pleadings, asserting that Plaintiffs lack standing to sue under RICO. (Docs. 368 at 11-12; 369 at 10; 371 at 10; 383 at 32-33.

Plaintiffs allege RICO claims under § 1962(a), (c), and (d). (Doc. 36 at 183-191.) In their simplest terms, the four subsections of § 1962 provide that:

> (a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;
>
> (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering;
>
> (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and
>
> (d) a person cannot conspire to violate subsections (a), (b), or (c).

*See Abraham v. Singh*, 480 F.3d 351, 354-55 (5th Cir. 2007); *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995). All four subsections have three common elements: "1) a *person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an *enterprise*." *Crowe*, 43 F.3d at 204 (alteration in original).

"As a preliminary matter . . . [Plaintiffs] must establish that [they have] standing to sue[]" under RICO. *Dunn v. Board of Incorporators of African Methodist Episcopal Church*, No. 3:00-

6

CV-2547, 2002 WL 1000920, at *2 (N.D. Tex. May 14, 2002); *see Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 742 (5th Cir. 1989) ("[A] RICO plaintiff must have standing to sue pursuant to 18 U.S.C. § 1964(c)."). "[W]hether standing exists to assert a RICO claim entails a two-part inquiry." *Ocean Energy II, Inc.*, 868 F.2d at 746; *see Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992). The first step requires determining whether any non-RICO standing requirements apply and are satisfied. *Id.* If non-RICO standing requirements are satisfied, then Plaintiffs must show that they "suffered injuries 'by reason of' the commission of a predicate act." *Ocean Energy II, Inc.*, 868 F.2d at 746.

## A.    Non-RICO Standing

Plaintiffs' claims stem from Mockingbird's investment with Alicorn. (Docs. 1-3 at 7-11; 1-7 at 8-10; 1-9 at 15-19, 20-25; 36 at 62-66, 68-70, 73, 75; 287 at 2-4.) "Where . . . RICO plaintiffs bring claims analogous to shareholder derivative claims, [such as in this case, courts] apply a three-part test to determine whether the plaintiffs satisfy general standing requirements." *Joffroin v. Tufaro*, 606 F.3d 235, 238 (5th Cir. 2010). The three-part test asks "(1) whether the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation." *Whalen*, 954 F.2d at 1091. "If each of these questions can be answered 'yes' then [Plaintiffs] do not have the requisite standing." *Id.*

### 1.    *Object of Activities*

The first part of the non-RICO standing requires identification of the object of the alleged racketeering activities. The amended complaint alleges Wilde was involved in all four fraudulent

schemes: (1) the "Newport Titan Fraud"; (2) the "Cobalt CMO Fraud & Theft"; (3) the "Amedraa FNMA Series CMO Swindle"; and (4) "Bank Guarantee Scheme." (Doc. 36 at 38, 48-61.) Divens was involved in two of the four schemes: the "Cobalt CMO Fraud & Theft" and the "Amedraa FNMA Series CMO Swindle." (Doc. 36 at 51-58.) Woods was involved in two of the four schemes: the "Amedraa FNMA series CMO swindle" and the "Bank Guarantee Scheme." (Doc. 36 at 55-58, 59-61.) Plaintiffs allege M. Wilde was involved in the "Bank Guarantee Scheme" because her bank account was used to misappropriate part of the funds. (Doc. 36 at 79.)

Plaintiffs' relationship with the alleged RICO defendants began in late 2009 when Mockingbird sought an investment opportunity. (Docs. 36 at 83; 287 at 3.) On December 11, 2009, Mockingbird entered into a profit sharing agreement with Alicorn, but no income derived from the agreement. (Docs. 1-3 at 7-11; 1-4 at 5-7; 287 at 3.) The investment was allegedly related to the "Bank Guarantee Scheme." (Doc. 36 at 62-64, 68-69.) Plaintiffs allege that Moving Defendants (sans Divens)[8] committed the following racketeering activities related to the "Bank Guarantee Scheme," as defined by 18 U.S.C. § 1961(1)(B): (1) money laundering under 18 U.S.C. § 1956 by Wilde, M. Wilde, and Woods, (doc. 36 at 79, 175-76, 179-80); (2) transactions conducted with criminally derived property under 18 U.S.C. § 1957 by Wilde, M. Wilde, and Woods, (*id.*); (3) transportation of stolen goods under 18 § 2314 by Wilde, M. Wilde, and Woods, (*id.*); (4) sale or receipt of stolen goods under 18 U.S.C. § 2315 by Wilde, M. Wilde, and Woods, (*id.*); and (5) wire fraud under 18 U.S.C. § 1343 by Woods, (doc 36 at 78-79,178, 180). *See* 18 U.S.C. § 1961(1)(B). Each of the racketeering activities relates to the misappropriation of the alleged "Bank Guarantee Scheme" investment funds. (Doc. 36 at 78-80.)

---

[8]Divens was not involved in the "Bank Guarantee Scheme", according to the amended complaint. (*See* doc. 36 at 59-61, 176-78.)

Here, the only alleged investment into the alleged "Bank Guarantee Scheme" is Mockingbird's $50,000 through its profit sharing agreement with Alicorn. (Docs. 36 at 62-64, 68-69; 289 at 2-3.) Plaintiffs do not allege any facts that show Moving Defendants' acts against the individual Plaintiffs, let alone any "direct intent to injure" them. *See Joffroin*, 606 F.3d at 238 ("Appellants do not allege that Appellees 'committed any fraudulent acts with the *direct* intent to injure' Appellants." (alteration in original)). At most, Moving Defendants' alleged racketeering activities were directed against Mockingbird.

### 2.    *Scope of Injury*

The second part of the non-RICO standing inquiry relates to the scope of the injury. For all three of their RICO claims, Plaintiffs assert that they were injured in their operating and personal assets and their business or property, but they provide no factual support for their claims that they were personally injured apart from the alleged injury to Mockingbird. (Doc. 36 at 187, 189, 191.) Plaintiffs failed to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" as they relate to the individual Plaintiffs. *Bell Atl. Corp.*, 550 U.S. at 555. The sole "injury" discernable with facts in support is the loss of Mockingbird's investment. (*See* docs. 1-3 at 7-11; 1-6 at 43-45; 1-7 at 5-6, 8-10, 1214, 16-18, 1-9 at 1525; 289 at 2-3.) Thus, the asserted injury "merely derive[] from, and [is] not distinct from, the injury to" Mockingbird. *Whalen*, 954 F.2d at 1091.

### 3.    *Relevant State Law*

The last non-RICO standing requirement applies the relevant state law.

"Federal courts sitting in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated." *Askanase v. Fatjo*, 130 F.3d 657, 670 (5th Cir. 1997);

*see also* *Am. Realty Trust Inc. v. Matisse Capital Partners, LLC*, 91 F. App'x 904, 910-11 (5th Cir. 2003) (noting that a corporation's internal affairs, "including the rights and duties of its officers and directors" are governed by the law of the state of incorporation).  Mockingbird is a New Mexico limited liability company, so New Mexico law applies.  *Id.*  New Mexico law provides that Mockingbird alone holds its cause of action; its member[9] has no primary right to sue.  *See* N.M. STAT. ANN. § 53-19-14 (1978) ("A member of a limited liability company is not a proper party to a proceeding by or against the limited liability company solely by reason of being a member of the limited liability company[ ]"); *Marchman v. NCNB Texas Nat. Bank*, 120 N.M. 74, 81(N.M. 1995) ("[A] shareholder of a corporation does not have an individual right of action against a third party for damages that result because of an injury to the corporation.").  Further, "[p]roperty transferred to or otherwise acquired by a limited liability company is property of the limited liability and not of the members.  A member has no interest in an item of limited liability company property."  N.M. STAT. ANN. § 53-19-29A (1978).

Here, when plaintiff Clarkson provided the investment funding on behalf of Mockingbird for the profit sharing agreement, she transferred the funds to Mockingbird.  (Docs. 1-3 at 7-11; 1-4 at 3-4; 287 at 2-3.)  Thus, any injury derived from the investment is Mockingbird's property.  *See* N.M. STAT. ANN. § 53-19-29A.  Plaintiffs as individuals do not have a right to Mockingbird's property and no right sue on Mockingbird's injury.  *See Alto Eldorado Partners v. City of Santa Fe*, No. CIV. 08-0175 JB/ACT, 2009 WL 1312856, at *18 (D.N.M. March 11, 2009) (ruling that the limited liability company, not its member, "should be the party asserting any claims involving its

---

[9]In New Mexico, "[a limited liability company] is analogous to a corporation but is owned by 'members' rather than shareholders, and is run by 'managers' rather than officers and directors."  *In re Kalinowski*, 482 B.R. 334, 340 (B.A.P. 10th Cir. 2012) (referring to New Mexico law).

property").      All of Moving Defendants' alleged actions were directed at Mockingbird. Plaintiffs'

only asserted injuries were derived merely from Mockingbird's injuries, and New Mexico law

provides that Mockingbird alone holds any cause of action resulting therefrom.  As all of the non-

RICO standing three-part test questions are answered in favor of Mockingbird, Plaintiffs failed to

satisfy the non-RICO standing requirements, and they "do not have the requisite standing[ ]"to bring

a RICO action.  *Whalen*, 954 F.2d at 1091.

**B.      Injury and Causation**

In addition to the non-RICO standing requirements, Plaintiffs must also show injury and

causation under 18 U.S.C. § 1964(c) to establish RICO standing.  *Dunn*, 2002 WL 1000920, at *2.

The injury must be concrete and "an actual loss of their own money."  *Id.*  (internal marks omitted).

As discussed, members of a New Mexico limited liability company have no right to the company's

property, including a right of action.  *See Alto Eldorado Partners*, 2009 WL 1312856, at *18.  Thus,

Plaintiffs have failed to sufficiently allege that they suffered injury.

Similarly, they also cannot show, based on their allegations, that the injury asserted was

suffered "by reason of" the predicate act under 18 U.S.C. § 1964(c).  "[T]o state a claim under civil

RICO, [Plaintiffs are] required to show that a RICO predicate offense 'not only was a "but for"

cause of [their] injury, but was the proximate cause as well.'"  *Hemi Group, LLC v. City of New

York*, 559 U.S. 1, 9 (2010).  Showing "[a] link that is 'too remote,' 'purely contingent,' or

'indirec[t]'" would be insufficient to establish proximate cause.  *Id.*

Here, Alicorn invested $150,000 of its money in IDLYC, and it subsequently entered into

a profit sharing agreement with Mockingbird.  (Docs. 1-3 at 7-11; 289 at 3.)  When IDLYC (i.e.,

Bank Guarantee Scheme) failed to pay, Alicorn was directly injured by the alleged "Bank Guarantee

Scheme," which in turn resulted in Mockingbird's injury. (Doc. 287 at 3.) Alicorn offered to refund $50,000 to Mockingbird, but Mockingbird declined and chose another investment opportunity through Alicorn, which ultimately also failed. (*Id.*) By declining the refund, Mockingbird took on the risk of loss through the second investment; Plaintiffs' own pleadings show that the "Bank Guarantee Scheme" was not the reason for Mockingbird's ultimate loss of its investment. Further, in *Holmes v. Securities Investor Protection Corp.*, 50 U.S. 258 (1992), the Supreme Court ruled that SIPC, which insured certain broker-dealers, did not have RICO standing against those who manipulated stock prices that ultimately resulted in SPIC paying $13 million to investors because its loss was not "by reason of" the fraud, but "purely contingent" on the broker-dealers' direct injuries. *Id.* at 271; *see Hemi*, 559 U.S. at 8-9 (interpreting *Holmes*). Likewise, in this case, Mockingbird's agreement was with Alicorn, and any arguable injury was borne out of Alicorn's injury from the alleged "Bank Guarantee Scheme." Mockingbird's injury was "purely contingent" on Alicorn's direct injuries. *See id.*

Even assuming that Mockingbird's injury was directly related, Plaintiffs' relationship with the IDLYC investment is too remote to satisfy "RICO's direct relationship requirement." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (stating that "the central question [a court] must ask is whether the alleged violation led directly to the [plaintiffs'] injuries."); *see Price v. Pinnacle Brands, Inc.*, No. 3:96-CV-2150-T, 1997 WL 820964, at *2 (N.D. Tex. April 2, 1997) ("To have standing under RICO, Plaintiffs must suffer an economic injury which is concrete and particular and not speculative."). Any injury suffered by Plaintiffs were purely contingent on Mockingbird's injuries. *See Holmes*, 50 U.S. at 271. Thus, they fail to establish RICO standing.

# IV.  STATE LAW CLAIMS

In addition to the RICO claims, Plaintiffs assert state law claims of fraud in the inducement, common law fraud, negligent misrepresentation and deceit, fraud by nondisclosure, aiding and abetting fraud, breach of confidential or special relationship, promissory estoppel, intentional inflection of emotional distress, and civil conspiracy against Defendant.  (Doc. 36 at 192-207.)

## A.  <u>Supplemental Jurisdiction</u>

Pursuant to § 1367(a), federal courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a). In essence, § 1367(a) grants courts the "power to hear a state law claim under pendent or supplemental jurisdiction if (1) the federal issues are substantial, even if subsequently decided adverse to the party claiming it; and (2) the state and federal claims derive from a common nucleus of operative fact."  *McKee v. Texas Star Salon, LLC*, No. CIV.A.3:06-CV-879BH, 2007 WL 2381246, at *4 (N.D. Tex. Aug. 21, 2007) (citations omitted); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

When all federal claims are dismissed prior to trial, the general rule in this Circuit is for the district court to decline exercising jurisdiction over the remaining state law claims.  *Nagy v. George*, No. 3:07-CV-368-K, 2007 WL 2122175, at *10 (N.D. Tex. July 23, 2007), *aff'd*, 286 F. App'x 135 (5th Cir. 2008); *LaPorte Constr. Co. v. Bayshore Nat'l Bank*, 805 F.2d 1254, 1257 (5th Cir. 1986); *see also* 28 U.S.C. § 1367(c)(3).[10]  Nonetheless, this rule is "neither mandatory nor absolute."  *Smith*

---

[10] Under § 1367(c), a court may decline to exercise supplemental jurisdiction over a state claim if:
 (1) the claim raises a novel or complex issue of state law,
 (2) the claim substantially predominates over the claim or claims over which the district court has
   original jurisdiction,

*v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002) (citation omitted). Rather, district courts are given wide discretion in deciding whether to exercise jurisdiction under such circumstances. *See Heaton v. Monogram Credit Card Bank*, 231 F.3d 994, 997 (5th Cir. 2000); *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993); *see also United Mine Workers*, 383 U.S. at 726 ("[P]endent jurisdiction is a doctrine of discretion, not of [a] plaintiff's right."). In determining whether to exercise supplemental jurisdiction, courts should consider issues of judicial economy, convenience, and fairness to the litigants. *LaPorte Constr. Co.*, 805 F.2d at 1257; *Nagy*, 2007 WL 2122175, at *10.

Here, all three factors weigh in favor of retaining jurisdiction over Plaintiffs' state law claims. First, Plaintiffs' state claims arise from the same "common nucleus of operative facts" as their federal claims, namely, Defendants' alleged "Bank Guarantee Scheme" and its relationship to Alicorn. Requiring Plaintiffs to litigate these claims in state court would "necessarily require consideration by two distinct courts of the same operative facts" and the "same legal issues." *See McKee*, 2007 WL 2381246, at *4. Moreover, because the action has been pending in this Court for nearly three years and the Court has spent a substantial amount of time and resources reviewing the pleadings and researching the legal issues involved, and has become familiar with the merits of their claims. *See McCall v. Peters*, No. CIV.A. 3:00-CV-2247-D, 2003 WL 21488211, at *12 (N.D. Tex. May 12, 2003), *aff'd*, 108 F. App'x 862 (5th Cir. 2004) (in determining whether to exercise pendent or supplemental jurisdiction, the court may consider factors such as the amount of time and resources that it has spent adjudicating the case). The Court should therefore exercise supplemental

---

(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
28 U.S.C. § 1367(c).

jurisdiction over Plaintiffs' state law claims.

**B.      Standing**

When deciding state law claims, "applicable state law governs." *See PEMEX Exploracion y Produccion v. Murphy Energy Corp.*, 923 F.Supp.2d 961, 965 (S.D. Tex. 2013) (citing *Crocker v. Federal Deposit Ins. Corp.*, 826 F.2d 347, 349 (5th Cir. 1987)); *see also Aarti Hospitality, LLC v. City of Grove City, OH.*, 350 F. App'x 1 at 6 (6th Cir. 2009) ("The law is well-settled that a federal court exercising supplemental or diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims . . . Whether plaintiffs have standing to seek a [state claim under state law] is a question of [the state's substantive law], not federal procedural, law."). Texas law applies here because Plaintiffs assert that Texas is where the "vast majority of the events giving rise to the claims" occurred.[11]  (Doc. 36 at 32.)

In Texas, standing is a non-waivable component of subject matter jurisdiction that can be raised *sua sponte* by the court. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445-46 (Tex 1993).  The "[Texas] test for standing parallels the federal test for Article III standing[.]" *PEMEX Exploraciony Produccion*, 923 F.Supp.2d at 965.  Standing, as an essential part of the Article III case-or-controversy requirement, requires showing of three elements: "injury in fact, a 'fairly traceable' causal link between that injury and the defendant's conduct, and the likelihood that the injury will be 'redressed by a favorable decision.'" *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992)).  Plaintiffs must

---

[11]This is separate from applying the state law of incorporation related to the internal affairs of a corporation because Plaintiffs are individuals asserting claims against Moving Defendants on events Plaintiffs assert were occurred in Texas.  *See De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.") (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)).

first show that they were "*personally* injured[.]"  *Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012) (alternation in original).  This requires Plaintiffs to demonstrate that they, rather than a third party, were injured.  *Id.*

Here, all of Plaintiffs' state law claims relate to Mockingbird's investment with Alicorn. Any alleged misrepresentations, fraud, or conspiracy was intended to induce Mockingbird's investment in the defendants' alleged scheme, and any duty owed, if any, was to Mockingbird based on its investment.  (*See* doc. 36 at 192-207.)  Plaintiffs cannot show that they were personally injured.  *See* N.M. STAT. ANN. § 53-19-29A ("Property transferred to or otherwise acquired by a limited liability company is property of the limited liability and not of the members.  A member has no interest in an item of limited liability company property.").  Rather, the injury belongs to Mockingbird.  (*See* doc. 287 at 2-3); N.M. STAT. ANN. § 53-19-29A; *Alto Eldorado Partners*, 2009 WL 1312856, at *18.  None of Moving Defendants' acts described in the amended complaint were directed at Plaintiffs as individuals.  (*see generally* doc. 36).  Plaintiffs failed to show that they suffered an injury-in-fact.

Having suffered no personal injury, Plaintiffs also cannot meet the third element of standing; any damages awarded to Plaintiffs will not redress the alleged injury to Mockingbird.  *See Sprint Comm. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 268, 287 (2008) (noting that the redressability "inquiry focuses . . . on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation–not on what the plaintiff ultimately intends to do with the money he recovers." (alteration in original)).  Their state law claims are also subject to dismissal for lack of standing.

## III.  REMAINING DEFENDANTS

Because Plaintiffs lack standing to sue Moving Defendants both under RICO and Texas state

law, they also lack standing to sue the remaining defendants who did not move for judgment on the pleadings. Accordingly, the court should *sua sponte* dismiss this action against them. *See Turner v. AmericaHomeKey, Inc.*, 2011 WL 3606688, at *6 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.), *aff'd*, 2013 WL 657772 (5th Cir. Feb. 22, 2013) (dismissing action against a defendant who had not joined the motion to dismiss that was before the court; explaining that a "court has the authority to consider the sufficiency of a complaint and 'dismiss an action on its own motion as long as the procedure employed is fair') (citing *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006)) (internal quotation marks omitted)). The fourteen-day time frame for filing objections to the recommended dismissal ensures the procedure is fair by providing the requisite notice and opportunity to be heard. *See Shaunfield v. Experian Information Solutions, Inc.*, __ F. Supp. 2d __, 2014 WL 103703, at *15 (N.D. Tex. Jan. 09, 2014).

## IV.  RECOMMENDATION

Because Plaintiffs lack standing for their RICO claims and their state law claims, the motions for judgment on the pleadings of the Moving Defendants should be **GRANTED**, and all claims against them should be **DISMISSED**. For the same reasons, the claims against the remaining defendants should also be **DISMISSED** *sua sponte*. Steven E. Woods's motion to dismiss and motion for summary judgment should be **DENIED as moot**, and the case should be **DISMISSED**.

**SO RECOMMENDED**, this 28th day of February, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

18